# UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT
## CIVIL APPEAL PRE-ARGUMENT STATEMENT (FORM C)

**1. SEE NOTICE ON REVERSE**     **2. PLEASE TYPE OR PRINT**     **3. STAPLE ALL ADDITIONAL PAGES**

| Case Caption: Black Love Resists et al. v. City of Buffalo et al. | District Court or Agency: W.D.N.Y. | Judge: Christina Clair Reiss |
|---|---|---|
| | Date the Order or Judgment Appealed from was Entered on the Docket: 5/29/2026 | District Court Docket No.: 18-cv-00719 |
| | Date the Notice of Appeal was Filed: 6/30/2026 | Is this a Cross Appeal? ☐ Yes ✔ No |

| **Attorney(s) for Appellant(s):** ✔ Plaintiff ☐ Defendant | Counsel's Name: See Addendum C    Address:    Telephone No.:    Fax No.:    E-mail: |
|---|---|
| **Attorney(s) for Appellee(s):** ☐ Plaintiff ✔ Defendant | Counsel's Name: See Addendum C    Address:    Telephone No.:    Fax No.:    E-mail: |

| Has Transcript Been Prepared? Yes | Approx. Number of Transcript Pages: | Number of Exhibits Appended to Transcript: | Has this matter been before this Circuit previously? ☐ Yes ✔ No |
|---|---|---|---|
| | | | If Yes, provide the following: Case Name: 2d Cir. Docket No.:    Reporter Citation: (i.e., F.3d or Fed. App.) |

*ADDENDUM "A"*: COUNSEL MUST ATTACH TO THIS FORM: (1) A BRIEF, BUT NOT PERFUNCTORY, DESCRIPTION OF THE NATURE OF THE ACTION; (2) THE RESULT BELOW; (3) A COPY OF THE NOTICE OF APPEAL AND A CURRENT COPY OF THE LOWER COURT DOCKET SHEET; AND (4) A COPY OF ALL RELEVANT OPINIONS/ORDERS FORMING THE BASIS FOR THIS APPEAL, INCLUDING TRANSCRIPTS OF ORDERS ISSUED FROM THE BENCH OR IN CHAMBERS.

*ADDENDUM "B"*: COUNSEL MUST ATTACH TO THIS FORM A LIST OF THE ISSUES PROPOSED TO BE RAISED ON APPEAL, AS WELL AS THE APPLICABLE APPELLATE STANDARD OF REVIEW FOR EACH PROPOSED ISSUE.

### PART A: JURISDICTION

| 1. Federal Jurisdiction | 2. Appellate Jurisdiction |
|---|---|
| ☐ U.S. a party    ☐ Diversity | ☐ Final Decision    ☐ Order Certified by District Judge (i.e., Fed . R. Civ. P. 54(b)) |
| ✔ Federal question (U.S. not a party)    ☐ Other (specify): _____ | ✔ Interlocutory Decision Appealable As of Right    ☐ Other (specify): _____ |

**IMPORTANT. COMPLETE AND SIGN REVERSE SIDE OF THIS FORM.**

FORM C (Rev. October 2025)

**PART B:  DISTRICT  COURT DISPOSITION    (Check as many as apply)**

1. Stage of Proceedings

- [✓] Pre-trial
- [ ] During trial
- [ ] After trial

2. Type of Judgment/Order Appealed

- [ ] Default judgment
- [ ] Dismissal/FRCP 12(b)(1) lack of subject matter juris.
- [ ] Dismissal/FRCP 12(b)(6) failure to state a claim
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) frivolous complaint
- [ ] Dismissal/28 U.S.C. § 1915(e)(2) other dismissal
- [ ] Dismissal/other jurisdiction
- [ ] Dismissal/merit
- [ ] Judgment / Decision of the Court
- [✓] Summary judgment
- [ ] Declaratory judgment
- [ ] Jury verdict
- [ ] Judgment NOV
- [ ] Directed verdict
- [✓] Other (specify): denial of injunction

3.  Relief

- [ ] Damages:
  - [ ] Sought:  $ _____
  - [ ] Granted: $ _____
  - [ ] Denied:  $ _____
- [✓] Injunctions:
  - [ ] Preliminary
  - [ ] Permanent
  - [✓] Denied

---

**PART C:  NATURE OF SUIT   (Check as many as apply)**

1. Federal Statutes

- [ ] Antitrust
- [ ] Bankruptcy
- [ ] Banks/Banking
- [✓] Civil Rights
- [ ] Commerce
- [ ] Energy
- [ ] Commodities
- [ ] Other (specify): _____
- [ ] Communications
- [ ] Consumer Protection
- [ ] Copyright □ Patent
- [ ] Trademark
- [ ] Election
- [ ] Soc. Security
- [ ] Environmental
- [ ] Freedom of Information Act
- [ ] Immigration
- [ ] Labor
- [ ] OSHA
- [ ] Securities
- [ ] Tax

2. Torts

- [ ] Admiralty/ Maritime
- [ ] Assault / Defamation
- [ ] FELA
- [ ] Products Liability
- [ ] Other (Specify):

3. Contracts

- [ ] Admiralty/ Maritime
- [ ] Arbitration
- [ ] Commercial
- [ ] Employment
- [ ] Insurance
- [ ] Negotiable Instruments
- [ ] Other Specify

4. Prisoner Petitions

- [ ] Civil Rights
- [ ] Habeas Corpus
- [ ] Mandamus
- [ ] Parole
- [ ] Vacate Sentence
- [ ] Other

5. Other

- [ ] Hague Int'l Child Custody Conv.
- [ ] Forfeiture/Penalty
- [ ] Real Property
- [ ] Treaty (specify): _____
- [ ] Other (specify): _____

6.  General

- [ ] Arbitration
- [ ] Attorney Disqualification
- [✓] Class Action
- [ ] Counsel Fees
- [ ] Shareholder Derivative
- [ ] Transfer

7.  Will appeal raise constitutional issue(s)?

- [✓] Yes
- [ ] No

Will appeal raise a matter of first impression?

- [✓] Yes
- [ ] No

---

1. Is any matter relative to this appeal still pending below? [✓] Yes, specify: A Rule 54(b) motion for judgment    [ ] No

2. To your knowledge, is there any case presently pending or about to be brought before this Court or another court or administrative agency which:

   (A)   Arises from substantially the same case or controversy as this appeal?    [✓] Yes    [ ] No

   (B)   Involves an issue that is substantially similar or related to an issue in this appeal?    [✓] Yes    [ ] No

If yes, state whether □ "A," or □ "B," or □ both are applicable, and provide in the spaces below the following information on the *other* action(s):

| Case Name: See Addendum D for a list of related appeals | Docket No. | Citation: | Court or Agency: |
|---|---|---|---|

Name of Appellant:  Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds

| Date: 7/2/2026 | Signature of Counsel of Record:  /s/ Claudia Wilner |
|---|---|

# NOTICE TO COUNSEL

**Once you have filed your Notice of Appeal with the District Court or the Tax Court, you have only 14 days in which to complete the following important steps:**

1. Complete this Civil Appeal Pre-Argument Statement (Form C); serve it upon all parties, and file it with the Clerk of the Second Circuit in accordance with LR 25.1.

2. File the Court of Appeals Transcript Information/Civil Appeal Form (Form D) with the Clerk of the Second Circuit in accordance with LR 25.1.

3. Pay the $605 docketing fee to the United States District Court or the $600 docketing fee to the United States Tax Court unless you are authorized to prosecute the appeal without payment.

**PLEASE NOTE: IF YOU DO NOT COMPLY WITH THESE REQUIREMENTS WITHIN 14 DAYS, YOUR APPEAL WILL BE DISMISSED.** *SEE* LOCAL RULE 12.1.

**FORM C**  (Rev. October 2025)

# ADDENDA TO PRE-ARGUMENT STATEMENT (FORM C)

## ADDENDUM A

This class action—originally filed in 2018 and amended in 2020—challenges well-documented and ongoing use of racially discriminatory traffic enforcement practices by the City of Buffalo's police department ("BPD"). These practices—all made pursuant to municipal policy—include crime suppression checkpoints targeted at Black and Latino neighborhoods; multiple tinted-windows ticketing of Black and Latino drivers; and rampant racial profiling during traffic enforcement that continues to this day.

The Amended Complaint alleged violations of the Fourth Amendment, the Equal Protection and Due Process provisions of the Fourteenth Amendment. and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 20000(d). Plaintiffs demanded damages for past harms and specific policy reforms to end the unlawful and discriminatory traffic enforcement harming Black and Latino motorists. This appeal, brought pursuant to 28 U.S.C. § 1292(a)(1), seeks to reverse the district court's dismissal of Plaintiffs' injunctive claims.

In November 2024, Plaintiffs moved to certify two damages classes challenging the checkpoint and multiple tinted-windows ticketing practices along with an injunctive class (the "Traffic Enforcement Class"). On April 22, 2025, the district court entered an order granting certification of the two damages class but denying certification of the Traffic Enforcement Class on the ground that the Named Plaintiffs lacked standing to seek prospective injunctive relief because they had not been harmed within two years prior to filing the motion for class certification. The court also faulted the Class "[t]o the extent" that it sought impermissible "obey the law" relief. *Id.* at 32.

Following the certification order, Plaintiffs moved for reconsideration. Simultaneously, Markel Nance and Thomas Christopher Williams, Jr. ("Intervenors"), each of whom had experienced multiple instances of discriminatory traffic enforcement between 2021 and 2024, moved to intervene in the Action as plaintiffs and class representatives. Plaintiffs also filed a renewed motion for class

certification under Rule 23(c)(1)(C) based on newly developed evidence of BPD's discriminatory traffic enforcement; supplemental declarations from two existing plaintiffs who had each experienced discriminatory traffic enforcement in 2025; and the proposed intervention of the two new plaintiffs.[1]

On March 31, 2026, the district court denied all three motions in a single order. The district court reaffirmed its original decision to deny class certification, holding that Plaintiffs lacked standing and had primarily requested impermissible "obey the law" relief. In so doing, the district court ignored Plaintiffs' allegations and evidence that the discrimination they endured flowed directly from ongoing municipal policies and practices, including deliberate indifference to discriminatory traffic enforcement. However, because a decision on class certification is not a dispositive ruling, Plaintiffs' injunctive claims remained pending.

On April 14, 2026, Plaintiffs timely petitioned for Rule 23(f) review of the denial of their renewed motion for class certification; *See* No. 26-968 (2d Cir.). On April 27, 2026, Intervenors timely filed their Notice of Appeal. *See* No. 26-1157, Dkt. 1 (2d Cir.). This Court has ordered that these two appeals be heard in tandem. *See* No. 26-968, Dkt. 21; No. 26-1157, Dkt. 11. Intervenors' Opening Brief is due on July 31, 2026.

On May 29, 2026, the district court issued its summary judgment decision. The district court granted summary judgment to Defendants on Plaintiffs' Due Process claims but found that genuine disputes of material fact require a trial on Plaintiffs' Fourth Amendment, Equal Protection, and Title VI claims. Most relevant to this appeal, the district court dismissed all of Plaintiffs' injunctive claims, relying on its two previous orders denying class certification.

On June 30, 2026, Plaintiffs moved the district court for entry of judgment on their injunctive claims pursuant to Rule 54(b). That same

---

[1] The Defendants, meanwhile, successfully petitioned this Court for Rule 23(f) review of the portion of the class certification decision that approved two damages class. Briefing of that appeal is complete, but argument has not yet been scheduled. *See* No. 25-1191 (2d Cir.).

day, Plaintiffs timely filed a Notice of Appeal pursuant to § 1292(a)(1), as the district court's summary judgment order has foreclosed their ability to obtain an injunction.

This appeal raises similar issues on the same record as the Intervenor appeal. Specifically, the Intervenor appeal requires this Court to determine whether Intervenors have injunctive standing and adequately framed their requests for injunctive relief. These questions are also of central importance to Plaintiffs' injunctive appeal. Hearing both appeals at the same time will promote judicial efficiency and ensure that Plaintiffs and Intervenors each have a fair opportunity to be heard.

## ADDENDUM B

1. Whether the district court erred in holding that Plaintiffs lack standing to obtain prospective injunctive relief.

2. Whether the district court erred in holding that Plaintiffs cannot obtain injunctive relief because their Amended Complaint "primarily" requested "obey the law" relief and lacked the specificity required for injunctions entered under Rule 65.

The standard of review for all of these questions is *de novo*.

## ADDENDUM C

**Counsel for Plaintiffs-Appellants:**

| Name | Address | Tel. No. | Fax No. | Email |
|---|---|---|---|---|
| Claudia Wilner | National Center for Law and Economic Justice 50 Broadway, Suite 1500 New York, NY 10012 | (212) 633-6967 | N/A | wilner@nclej.org |
| A. Chinyere Ezie | Center for Constitutional Rights 666 Broadway, 7th Floor New York, NY 10012 | (212) 614-6475 | (212) 614-6475 | cezie@ccrjustice.org |
| Baher Azmy | Center for Constitutional Rights 666 Broadway, 7th Floor New York, NY 100012 | (212) 614-6475 | (212) 614-6475 | bazmy@ccrjustice.org |
| Matthew Alan Parham | Western New York Law Center 37 Franklin Street, 2nd Floor Buffalo, NY 14202 | (716) 828-8422 | N/A | mparham@wnylc.com |
| Philip A. Irwin | Covington & Burling LLP 30 Hudson Yards New York, NY 10001 | (212) 841-1000 | (212) 841-1010 | pirwin@cov.com |
| Jordan S. Joachim | Covington & Burling LLP 30 Hudson Yards New York, NY 10001 | (212) 841-1000 | (212) 841-1010 | jjoachim@cov.com |

| Christine A. Nelson | Covington & Burling LLP 30 Hudson Yards New York, NY 10001 | (212) 841-1000 | (212) 841-1010 | cnelson@cov.com |
|---|---|---|---|---|
| Jacob T. Stark | Covington & Burling LLP 30 Hudson Yards New York, NY 10001 | (212) 841-1000 | (212) 841-1010 | jstark@cov.com |

## Counsel for Defendant-Appellee:

| Name | Address | Tel. No. | Fax No. | Email |
|---|---|---|---|---|
| Hugh M. Russ III | Hodgson Russ LLP The Guaranty Building 140 Pearl Street, Suite 100 | (716) 856-4000 | N/A | hruss@hodgsonruss.com |
| Cheyenne N. Freely | Hodgson Russ LLP The Guaranty Building 140 Pearl Street, Suite 100 | (716) 856-4000 | N/A | cfreely@hodgsonruss.com |

## ADDENDUM D

| Case Name | Docket No. | Citation | Court or Agency |
|---|---|---|---|
| De'John Hall, et al. v. City of Buffalo, N.Y., et al. | No. 25-2216 | N/A | United States Court of Appeals, Second Circuit |
| Dorethea Franklin, et al. v. City of Buffalo, N.Y. | No. 26-968 | N/A | United States Court of Appeals, Second Circuit |
| Markel Nance and Thomas Christopher Williams, Jr. v. City of Buffalo, N.Y. | No. 26-1157 | N/A | United States Court of Appeals, Second Circuit |

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

---

DORETHEA FRANKLIN *et al.*, individually and
on behalf of a class of all others
similarly situated,

                Plaintiffs,

    v.

CITY OF BUFFALO, N.Y., *et al.*,

                Defendants.

No. 1:18-cv-00719-CCR

---

## NOTICE OF APPEAL

Notice is hereby given that Plaintiffs hereby appeal to the United States Court of Appeals for the Second Circuit from the part of the Order entered on May 29, 2026 (ECF 364) denying Plaintiffs' claim for injunctive relief.

Dated: June 29, 2026

Respectfully Submitted,

*/s/ A. Chinyere Ezie*
A. Chinyere Ezie
Baher Azmy
CENTER FOR CONSTITUTIONAL
RIGHTS
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464
bazmy@ccrjustice.org
cezie@ccrjustice.org

Claudia Wilner
NATIONAL CENTER FOR LAW AND
ECONOMIC JUSTICE
50 Broadway, Suite 1500
New York, NY 10004
(212) 633-6967
wilner@nclej.org

Matthew A. Parham
WESTERN NEW YORK LAW CENTER
37 Franklin Street, 2nd Floor
Buffalo, NY 14202
(716) 828-8422
mparham@wnylc.net

Philip Irwin (*pro hac vice*)
Jordan S. Joachim (*pro hac vice*)
Christine Nelson (*pro hac vice*)
COVINGTON & BURLING, LLP
30 Hudson Yards
New York, NY 10001
212-841-1000
pirwin@cov.com
jjoachim@cov.com
cnelson@cov.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on June 29, 2026, the foregoing document was filed with the Clerk of the Court and served in accordance with the Federal Rules of Civil Procedure, and/or the Western District's Local Rules, and/or the Western District's Case Filing Rules & Instructions upon all counsel registered through the ECF System.

*/s/ A. Chinyere Ezie*

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DORETHEA FRANKLIN, TANIQUA )
SIMMONS, DE'JON HALL, JANE DOE, )
individually and on behalf of a class of )
others similarly situated, SHIRLEY )
SARMIENTO, EBONY YELDON, )
CHARLES PALMER, SHAKETA )
REDDEN, and JOSEPH BONDS, )
)
Plaintiffs, )
)
v. )
) Case No. 1:18-cv-00719
CITY OF BUFFALO, N.Y., BYRON B. )
BROWN, Mayor of the City of Buffalo, in his )
individual and official capacities, BYRON )
C. LOCKWOOD, Commissioner of the )
Buffalo Police Department, in his individual )
capacity, DANIEL DERENDA, former )
Commissioner of the Buffalo Police )
Department, in his individual capacity, )
)
Defendants. )

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING
PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**
(Docs. 252 & 253)

## I.    Procedural Background.

Plaintiffs Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Shirley Sarmiento,

Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, and Jasmine Evans[1]

bring this action against the City of Buffalo, New York (the "City"); former City of

Buffalo Mayor Byron B. Brown; Buffalo Police Department ("BPD") Commissioner

---

[1] In a declaration filed May 20, 2025, Ms. Evans identified herself as "one of the Plaintiffs in this action (formerly known as 'Jane Doe.')." (Doc. 298 at 1, ¶ 1.)

Byron C. Lockwood; and former BPD Commissioner Daniel Derenda (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs allege violations under the Fourth Amendment, Fourteenth Amendment Equal Protection Clause, Fourteenth Amendment Due Process Clause, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

Plaintiffs filed an amended class action complaint ("Amended Complaint"), (Doc. 63), on May 21, 2020, and a motion for class certification on May 29, 2024. (Doc. 202.) On April 22, 2025, the court certified two distinct classes: (1) a "Checkpoint Class"[2] and (2) a "Tinted Windows Class."[3] (Doc. 261.) The court denied certification for a third class, the "Traffic Enforcement Class," finding the class lacked standing, was unascertainable, and the injunctive relief primarily requested an "obey the law" injunction. *Id.* at 8.

On July 11, 2025, Plaintiffs filed a motion to reconsider the denial of the motion to certify the Traffic Enforcement Class or, in the alternative, to renew the motion to certify. (Doc. 327.) Simultaneously, Plaintiffs filed a motion to intervene on behalf of two proposed intervenors as plaintiffs and representatives of the Traffic Enforcement Class. (Doc. 326.) On March 27, 2026, the court denied the motions for reconsideration and to intervene. (Doc. 357.) Plaintiffs have sought an interlocutory appeal of those decisions. Accordingly, the court does not consider summary judgment insofar as it pertains to the Traffic Enforcement Class.

---

[2] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[3] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.*

2

The Checkpoint Class, represented by Plaintiffs Bonds, Evans, and Redden, claims: (1) a violation of the Fourth Amendment; (2) a violation of the Fourteenth Amendment Equal Protection Clause; (3) a violation of the Fourteenth Amendment Due Process Clause; and (4) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

The Tinted Windows Class, represented by Plaintiffs Franklin, Palmer, and Yeldon, claims: (1) a violation of the Fourteenth Amendment Equal Protection Clause; (2) a violation of the Fourteenth Amendment Due Process Clause; and (3) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d.

On February 7, 2025, Defendants filed a motion for summary judgment, (Doc. 252), and Plaintiffs cross-moved for partial summary judgment on their Fourth Amendment claims for the Checkpoint Class. (Doc. 253.) The parties filed their respective oppositions on May 30, 2025, (Docs. 266 & 321), and their replies on August 1, 2025. (Doc. 331 & 332.) The court held a hearing on October 17, 2025, at which time it took the pending motions under advisement.

On October 3, 2025, the court granted Plaintiffs' consent motion to dismiss Black Love Resists in the Rust as a plaintiff and to dismiss claims against Defendants Young, Brinkworth, Serafini, Thomas, and the Unknown Officers and Supervisors. (Doc. 349.)

Plaintiffs are represented by Andrea Chinyere Ezie, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Claudia Wilner, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., and Jordan Scott Joachim, Esq. Defendants are represented by Ava J. Horgan, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

## II.   Whether to Consider Plaintiffs' Additional Evidence.

Pursuant to Western District of New York Local Rule 56, a party opposing summary judgment

> shall include a response to each numbered paragraph in the moving party's statement, in correspondingly numbered paragraphs. Each numbered paragraph in the moving party's statement of material facts may be deemed admitted for purposes of the motion unless it is specifically controverted by

3

correspondingly numbered paragraphs in such opposing statement with citation to admissible evidence or to evidence that can be presented in admissible form at trial as required by Fed. R. Civ. P. 56(c)(1)(A). In addition, when appropriate, the opposing party's statement may also contain a short and concise statement, in numbered paragraphs, of additional material facts (i) as to which the opposing party contends there is no genuine issue to be tried; and/or (ii) that the opposing party contends are in dispute.

W.D.N.Y. Loc. R. Civ. P. 56(a)(2).

In response to Defendants' Statement of Undisputed Material Facts ("SUMF"), Plaintiffs submitted a Counterstatement including 667 additional material facts ("CSMF"). (Doc. 345.) Plaintiffs' CSMF is supported by a declaration of a former BPD Internal Affairs Division ("IAD") employee (the "IAD Declaration"). Defendants object to consideration of this declaration because Plaintiffs initially filed it under seal without making a motion to seal as required by Western District of New York Local Rule 5.3. *See* W.D.N.Y. Loc. R. Civ. P. 5.3(c) ("A party seeking to have a document or portion of a document filed under seal on notice must . . . file . . . a notice of motion to seal[.]"). On September 26, 2025, however, Plaintiffs submitted a consent motion to partially unseal the IAD Declaration, (Doc. 340), which the court granted on September 29, 2025. (Doc. 342.) A redacted version of the IAD Declaration was filed on October 3, 2025. (Doc. 346.) The court will therefore consider the IAD Declaration to the extent it contains material facts.

Defendants assert that Plaintiffs' CSMF relies on individualized anecdotal evidence, which they argue is irrelevant and contradicts Plaintiffs' class action claims. Anecdotal evidence, however, can supplement statistical evidence of racial disparity, helping to bring "the cold numbers convincingly to life." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 339 (1977). It is "relevant at both the class certification and merits stages." *Chen-Oster v. Goldman, Sachs & Co.*, 293 F.R.D. 557, 565 (S.D.N.Y. 2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 358 (2011)); *see also Chalmers v. City of New York*, 2022 WL 4330119, at *13 (S.D.N.Y. Sept. 19, 2022) ("At the class certification stage, [p]laintiffs may provide 'significant proof' supporting their disparate

4

treatment claims via statistical and anecdotal evidence.") (quoting *Chen-Oster*, 325 F.R.D. at 76).

Defendants further challenge Plaintiffs' inclusion of facts concerning "the history of Buffalo's development and growth as a city[,]" particularly its "history of segregation and the resulting establishment of the virtually all-Black neighborhoods on the East Side[]" as irrelevant. (Doc. 331-13 at 15.) This challenge pertains to an expert witness report authored by Robert Silverman, PhD, a professor in the Department of Urban and Regional Planning at the University of Buffalo, wherein he describes the history of segregation in the City, including housing and public education policies from the 1930s through the 1980s, and opines that these policies contributed to the City's present de facto segregation. His report includes court cases from the 1970s against the BPD and the City's Board of Education for discriminatory practices, as well as research from the early 2000s regarding BPD stereotyping of Black residents. This history is relevant to Plaintiffs' claims because "'the historical background of the decision is one evidentiary source' for proof of intentional discrimination." *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987) (quoting *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977)). However, "unless historical evidence is reasonably contemporaneous with the challenged decision, it has little probative value . . . [and a court] cannot accept official actions taken long ago as evidence of current intent." *Id.* (citation omitted). Because the proffered historical evidence concerns actions taken decades before the challenged conduct, it would ordinarily be inadmissible, but, for purposes of summary judgment, the court will consider it only to the extent that it is reasonably contemporaneous and there is evidence that racial discrimination and de facto segregation persist.[4]

---

[4] At trial, the court is likely to require a more robust foundation for admissibility. *See* Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice . . . [or] misleading the jury[.]"). "[W]hile it is not unheard of to exclude evidence under Rule 403 at the summary judgment stage, the balancing process contemplated by that rule is best undertaken at the trial itself." *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 374 (S.D.N.Y. 2024) (alteration adopted) (internal quotation

5

Defendants object to the opinions of Plaintiffs' expert witnesses Michael Gennaco and David Bjerk as irrelevant because the experts lack "personal knowledge of any interaction that [has] taken place between a potential class member and a BPD officer." (Doc. 331-13 at 16.) Expert witnesses are not required to have personal knowledge to testify. *See, e.g., United States v. Johnson*, 2017 WL 11490479, at *2 (E.D.N.Y. Aug. 4, 2017) ("Th[e] restriction that testimony must be based on personal perception does not, however, apply to 'a witness who is qualified as an expert by knowledge, skill, experience, training, or education,' i.e. an expert witness.") (alteration adopted) (emphasis omitted) (citing Fed. R. Evid. 602, 702).

Finally, Defendants challenge Plaintiffs' reliance on news articles as evidence. "[N]ewspaper articles offered for the truth of the matters asserted therein are inadmissible hearsay that may not be considered by the [c]ourt in deciding a motion for summary judgment." *Outerbridge v. City of New York*, 2015 WL 5813387, at *4 (S.D.N.Y. Sept. 30, 2015) (internal quotation marks and citation omitted). Accordingly, the court will not consider any factual assertions supported solely by newspaper articles as such evidence is inadmissible.

## III. Factual Background.

### A. The Undisputed Facts.

Plaintiffs are Black individuals who drive in the City and intend to do so in the future and who seek to serve as class representatives for Black and Latino motorists.

From 2012 to 2017, Daniel Derenda served as BPD Commissioner, the BPD's highest-ranking member, and Byron B. Brown served as the Mayor of the City. Bryon C. Lockwood served as BPD Commissioner after Defendant Derenda.

The BPD has received federal funds from the Department of Justice since at least 2015. The City has received Justice Assistance Award Grants from the Department of

---

marks and citation omitted); *cf. SEC v. McGinnis*, 2015 WL 5643186, at *15 n.12 (D. Vt. Sept. 23, 2015) ("[T]he reason for excluding evidence that is unfairly prejudicial (because it may inflame the jury) is simply not present at the summary judgment phase."); *Murray v. Miron*, 2015 WL 4041340, at *9 (D. Conn. July 1, 2015) (noting that the "fact-intensive, context-specific inquiry" required by Rule 403 "must be made at trial[]").

Justice, including in 2013, which it disbursed in part to the BPD to "reduce crime and promote public safety[.]" (Doc. 279-17 at 8.)

The New York State Vehicle and Traffic Law ("NYSVTL") contains more than nine hundred provisions. Depending on the gravity of the offense, an offense may be charged as a violation, misdemeanor, or felony and may include as criminal penalties incarceration as well as civil fines. BPD officers' general law enforcement duties include enforcement of the NYSVTL.

### 1.      The Strike Force and Housing Unit.

In 2012, the BPD created the Strike Force with the stated mission to: (1) "[t]arget and eliminate crime hotspots throughout the [C]ity[]"; (2) "[r]emove illegal [g]uns from [the City's streets]"; (3) administer "[s]trict [e]nforcement of the Mayor[']s Zero Tolerance Crime Policy"; and (4) "[m]ake [the City] a better place to live, work[,] and raise a family." (Doc. 254-21 at 2). According to Defendant Brown, the Strike Force "was designed to address crime overall and in general[,]" (Doc. 268-6 at 27:18-19), although he "wasn't involved in [its] creation. It was a recommendation of the" BPD. *Id.* at 24:7-8. "The purpose of the Strike Force Task Force [was] to target and eliminate high crime areas throughout the [C]ity . . . as well as other crime hotspots throughout the City." (Doc. 254-17 at 7, § 8.6.) In 2018, the Strike Force was disbanded during Defendant Lockwood's tenure as BPD Commissioner.

In 2010, the Housing Unit was created pursuant to a contract between the City and the Buffalo Municipal Housing Authority ("BMHA"). According to the BPD Manual of Procedures ("MOP"), as revised in August 2013, the Housing Unit was "responsible for all policing and security issues in the BMHA Housing Complexes located throughout the City" and was instructed to "work closely with the BMHA Staff, Council, outside agencies, as well as other units in the BPD to maintain strict enforcement of the Mayor's [Z]ero [T]olerance [C]rime [P]olicy." *Id.* at 7, § 8.5. Housing Unit officers were intended to be highly visible to deter crime and proactively enforce the NYSVTL in and around BMHA properties. The Housing Unit's contract to patrol BMHA properties expired in 2020.

Both the Strike Force and the Housing Unit "were proactive in that they were not 'tied to the radio.'" (Doc. 345 at 6, ¶ 8.) At the direction of Defendant Derenda, officers in each unit were required to submit daily reports reflecting certain statistics including the number of arrests made, traffic summonses issued, impounds performed, and guns and cash seized, which was a reflection of Defendant Derenda's "philosophy [that] what gets measured gets done." (Doc. 254-5 at 8:10-11.)

### 2.      The Checkpoint Program.

Between June 2012 and November 2017, the City, through the BPD, operated the Checkpoints, which subjected every vehicle that passed through them to an initial stop regardless of whether there was individualized suspicion of wrongdoing (the "Checkpoint Program"). Under the Checkpoint Program, more than 1,600 Checkpoints occurred over a five-year period. Checkpoints took place almost daily, and thousands of motorists were stopped and ticketed, including Plaintiffs.

Defendant Derenda created and oversaw the Checkpoint Program, which was funded in part by a statewide crime control initiative called the "Gun Involved Violence Elimination (GIVE) Initiative[.]" Doc. 280-1 at 3. Checkpoints were expected to take place every day, one to four times per day, unless there were staffing or weather concerns.

Both the Strike Force and the Housing Unit conducted the Checkpoints and operated them in stages. During the first stage, all vehicles were subject to an initial stop, after which BPD officers could direct motorists to pull to the side of the road for a secondary stop. The duration of the stops varied, with some motorists detained briefly and others, including some Plaintiffs, subjected to prolonged stops. *See, e.g.*, Doc. 253-13 at 1, ¶ 5 ("Other times, BPD officers let me go without a ticket after holding and questioning me for a prolonged period.").

Under the "Roadblock Directive" of the Checkpoint Program, BPD officers were instructed to issue tickets and: (1) "[c]heck all drivers and passengers for seatbelts[]"; (2) "[c]heck all vehicles for valid registration stickers[]"; and (3) "[c]heck all vehicles for valid inspection stickers." (Doc. 254-30 at 2.) They were expected to issue tickets for other violations of the NYSVTL as well. Officers were permitted to "[a]ct on any and all

8

probable cause resulting from information obtained from the mobile plate reader or from 'plain view' observations." *Id.* On at least one occasion in a June 29, 2012 email, Defendant Derenda directed officers to "impound as many vehicles as legally possible" and "make arrests and write traffic summons[es,] as many as possible[.]" (Doc. 254-19 at 2.)

The Roadblock Directive directed officers to "[m]ake the [Checkpoint] obvious[,]" with "[o]verhead flashing lights . . . activated on all vehicles taking part in the [Checkpoint]." (Doc. 252-42 at 2.) The Checkpoint could not "be unreasonably intrusive to motorists[]" but should be set up in such a way that minimized the ability of motorists to avoid it. *Id.* BPD officers were directed to conduct a traffic stop of any motorist that attempted to avoid a Checkpoint.

Checkpoints were located throughout the City, including the East Side, which consists of majority Black and Latino neighborhoods. At the start of the Checkpoint Program, Defendant Derenda was responsible for selecting Checkpoint locations. There was no policy that required locations to be selected based on vehicle or traffic safety or violations data, and Defendants "cannot specifically identify any instance where a [C]heckpoint location was chosen due to" motor vehicle accidents or particular traffic violations but deny "that general vehicle and traffic safety concerns did not, at times, play a role in choosing the locations of [C]heckpoints." (Doc. 254-14 at 4.) Neither the BPD nor the City conducted a formal analysis as to whether the Checkpoint Program improved traffic safety.

As mayor of the City, Defendant Brown supported "[t]he [C]heckpoint [P]rogram as it was proposed and administered[.]" (Doc. 268-6 at 45:10-11.) He did not "issue[] any directives prohibiting the [C]heckpoint [P]rogram from continuing." *Id.* at 45:15-16.

The Checkpoint Program was suspended in November 2017. Current BPD Commissioner Alfonso Wright has attested that, under his tenure, "the BPD will not conduct vehicle and traffic safety Checkpoints as they were conducted while . . . the Housing Unit and Strike Force existed." (Doc. 252-6 at 3, ¶ 6.)

9

Plaintiffs Bonds, Evans, Franklin, Hall, Redden, Simmons, and Yeldon were each stopped at one or more Checkpoints under the Checkpoint Program. Plaintiffs Yeldon, Franklin, and Hall did not receive any traffic tickets in the course of their stops. Plaintiffs Bonds, Evans, Redden, and Simmons each received one or more tickets.

Plaintiff Bonds was ticketed across the street from a Checkpoint for expired insurance, although he claims he had renewed his insurance that day and showed BPD officers the receipt of payment. He challenged his ticket in court, and it was dismissed.

Plaintiff Evans received three tickets for seat belt violations for her own lack of a seat belt and improper car seats for her two children, as well as a ticket for driving with only a learner's permit. Plaintiff Evans claims that she removed her seat belt only after she was stopped at the Checkpoint. She does not apparently dispute the claim that she had only a learner's permit or that her children were improperly secured.

Plaintiffs Redden and Simmons each received a ticket for an expired inspection sticker. Plaintiff Redden admits her inspection sticker was expired at the time of her ticket, but Plaintiff Simmons does not recall whether hers was expired.

### 3.      Written BPD Policies and Procedures.

Defendants cite the 1997 version of BPD's MOP, (Doc. 252-40), which was updated in 2013. Because Plaintiffs identify the relevant time period for this action as June 2015 to present, BPD policies and procedures as articulated in the 2013 version of the MOP governed. *See* Doc. 273-4.[5]

---

[5] Section 1.2 of the MOP, entitled "ATTITUDE AND IMPARTIALITY[,]" states "Employees, while vigorous and unrelenting in the enforcement of the law, must maintain a strictly impartial attitude toward complainants, violators, witnesses[,] and suspects." (Doc. 273-4 at 580.) The MOP contains a "Law Enforcement Code of Ethics[,]" which "sets the ideal standards which all members should strive to attain[]" and states that BPD officers "will never act officiously or permit personal feelings, prejudices, animosities[,] or friendships to influence [their] decisions." *Id.* at 552.

In 2021, the BPD issued General Order 2021-009, which identifies the core principles of the BPD's traffic enforcement policy as follows:

Traffic Enforcement and Safety. The purpose of conducting traffic enforcement is to favorably alter the violator's future driving behavior and to foster public safety.

### 4. BPD Ticketing Practices.

BPD officers were not required to satisfy specific ticket quotas[6] but were instructed to keep their numbers high and were questioned when numbers dipped. Defendant Derenda testified in a Fed. R. Civ. P. 30(b)(6) deposition that he would inquire when he thought units were not producing enough tickets because he wanted to "make sure people were doing what they were being paid to do." (Doc. 254-5 at 25:18-19.) Officers had discretion to issue as many citations for tinted windows as there were tinted

---

Members shall engage in traffic enforcement for public safety purposes and not for the purpose of making an arrest.

Constitutional Stops. Members may conduct a brief vehicle stop for a traffic violation when the member has Probable Cause to believe that the driver has committed a traffic violation. The stop may last no longer than the time reasonably required to issue a summons for the violation.

Procedural Justice. Procedural justice refers to the perception of fairness in an encounter. Members shall treat all persons with dignity and respect, give persons a voice during encounters, be impartial in their decision[-]making, and convey trustworthy motives.

Non-Discriminatory Policing. Members shall not consider demographic category (including but not limited to race, ethnicity, national origin, religion, gender, sexual orientation, age, disability, gender identity or expression, or affiliation with any other similar identifiable group) as a factor in conducting a vehicle stop. Targeting specific neighborhoods for traffic enforcement based on these demographic categories is a form of discriminatory policing and is prohibited.

Least Intrusive Response. Considering the circumstances presented at the time, members should always take the least intrusive action, consistent with the goal of public safety. For most minor violations, warrantless arrest is not the preferred option, and certain violations only allow for the issuance of a traffic summons or a traffic stop receipt . . . and not arrest. A member should issue a summons or make an arrest only when doing so directly advances the goal of public safety[] and the situation cannot be effectively resolved in a less intrusive manner with the issuance of a traffic stop receipt.

(Doc. 252-41 at 2-3.)

[6] There is at least one instance from April 2012, however, when a BPD Chief designated a tickets-per-officer goal, prior to the June 2015 time period at issue in this case.

11

windows on a vehicle. This means that a single vehicle could receive multiple tinted window citations.[7]

Plaintiffs Franklin, Palmer, and Yeldon each received multiple tinted window tickets in a single stop. Plaintiff Franklin was issued two tinted window tickets in a single traffic stop. She admits that her windows were tinted, but claims they were lawfully tinted due to an unspecified medical condition. Her tickets were ultimately dismissed on that basis. Plaintiff Franklin recalls that the police officer "was very aggressive[,] would[ ]n[o]t tell [her] why he was pulling [her] over[,]" and asked her questions unrelated to traffic safety, such as why she was driving to where she was driving. (Doc. 291 at 5, ¶ 20.)

Plaintiff Palmer was issued two tinted window tickets in one traffic stop, four tickets in another stop, and four tickets in a third stop. He concedes that his windows were tinted, but attests they were tinted to accommodate medical issues related to light sensitivity and vision problems. Like Plaintiff Franklin, Plaintiff Palmer alleges he was asked questions during these encounters "that had nothing to do with traffic safety, like where [he] was going." (Doc. 290 at 2, ¶ 10.)

Plaintiff Yeldon was issued two tinted window tickets in a single traffic stop while driving a taxi owned by her employer. She acknowledges that her windows were slightly tinted, but disputes that the alleged tint of seventeen percent violates the NYSVTL. According to Plaintiff Yeldon, the BPD officer asked her "non-traffic related questions, such as where [she] was coming and going[]" and told her she was "lucky that he only gave [her] two tinted windows tickets instead of four." (Doc. 293 at 1, ¶ 5, 2 ¶¶ 8, 11.) She recounts that "[t]hroughout the encounter, [the BPD officer's] demeanor was rude and demeaning[,]" *id.* at 2, ¶ 11, but does not provide specific examples.

### 5. Buffalo Traffic Violations Agency ("BTVA").

In 2015, the New York State Legislature authorized, and the City established, the BTVA with the stated goals to (1) "assist the Buffalo City Court in the disposition of

---

[7] *See* N.Y. Veh. & Tr. Law § 375(12-a)(b).

violations of the [NYSVTL] that occur in the City of Buffalo" and (2) "administer punitive punishment that is reasonable, but not more than necessary, to: [] [g]enerate revenue; and, [] [a]chieve rehabilitation of offender-motorists." (Doc. 277-12 at 2.) The BTVA processes non-criminal traffic offenses within the City. Offenses are prosecuted by a salaried city prosecutor ineligible for bonuses or overtime. Motorists may take a plea offer or proceed in traffic court to a trial "held in front of a judicial hearing officer, who makes the final determination." (Doc. 252-22 at 9:21-23.) Motorists can appeal the determination of a judicial hearing officer in Erie County Court or challenge the ticket through a New York Civil Practice Law & Rules Article 78 proceeding.

Prior to the establishment of the BTVA, all revenue derived from traffic tickets went to the State of New York. After its establishment, by state law, the City retained most of the revenue. During the 2018-2019 fiscal year, traffic violation fines and parking tag fines and penalties accounted for approximately $10.1 million, or 2.1%, of the City's reported $492 million total revenue.

## B.    The Disputed Facts.

### 1.    BPD Compensation for Overtime and Time in Court.

Defendants assert that overtime was awarded solely on the basis of seniority[8] and there was no financial incentive associated with issuing tickets. They contend there is no evidence that the BPD ever established ticketing quotas and cite BPD officers' testimony that they were not promised overtime in exchange for a high number of tickets, arrests, or summonses.[9]

In contrast, Plaintiffs argue that BPD emails reveal an expectation that overtime would generate tickets, summonses, and arrests. *See, e.g.*, Doc. 275-19 at 2 (BPD captain instructing lieutenants to inform "officers that [they] are looking for production in the

---

[8] *See, e.g.*, Doc. 331-6 at 4:22-5:1 ("Q. . . . In the [H]ousing [U]nit, how was overtime allocated among officers? A. Seniority, everything is by seniority.").

[9] *See, e.g.*, Doc. 252-26 at 5:4-7 ("Q[.] And did a supervising officer ever tell you that more overtime shifts would be available if Strike Force officers issued a higher number of summonses? A[.] Never."); Doc 331-6 at 7:11-23 (BPD officer testifying that overtime shifts were not rewarded for high number of tickets, arrests, or summonses).

13

form of arrests, summonses, etc.").[10] They claim overtime opportunities were related to "production[,]" *id.*, with one BPD lieutenant's email stating, "[o]fficers will be required to write [NYSVTL] summonses, parking tags, impounds[,] and city ordinances. Numbers will be expected to justify the overtime!" (Doc. 277-11 at 2) (capitalization removed); *see also* Doc. 276 at 2 (a BPD email directing lieutenants to "[i]nstruct officers working [overtime] details . . . to show some activity in the boxes marked [NYS]VTL Summons[es], [Parking Violations Bureau] Tags[,] etc. . . . We must be able to show that to keep our [overtime] levels where they are.").

Plaintiffs further contend that BPD officers were financially incentivized to issue more tickets while working both regular and overtime shifts in order to increase opportunities for overtime. Overtime was viewed by at least some BPD officers as a reward for the production of tickets, summonses, and arrests[11] because officers were paid time and a half.

According to a report by the City's Department of Audit and Control, "[i]n [fiscal year] 2016, 25% of the BPD workforce earned more than $25,000 in [overtime]." (Doc. 281-14 at 6.) BPD officers testified that overtime pay comprised a "pretty substantial" portion of their total pay. (Doc. 269-17 at 6:4); *see also* Doc. 270-4 at 42:22-43:1 (BPD lieutenant describing overtime as a "big part of Strike Force officers' salaries[]"); Doc. 269 at 16:13 (BPD officer describing overtime as a "bump in the paycheck[]"). Overtime increased BPD officers' pensions, which were generally based on the average of the highest-earning three years of their career. BPD officers were also compensated above their salary for their time in court; however, this pay was independent of the outcome.

---

[10] *See also* Doc. 274 at 2 (BPD email to E-District supervisors informing them that "[o]fficers will be held accountable and traffic summons[es] will be expected with a detail[ed] report reflecting daily stat[istic]s. Please let the [o]fficers [know] what will be expected when calling in the overtime[]").

[11] *See, e.g.*, 275-19 at 3 (BPD Captain Serafini opining that overtime was "starting a month" earlier than the previous year as "a reward for the good work that all of [the] officers and [l]ieutenants perform on a daily basis."); Doc. 281-10 at 2 (email to Defendant Derenda describing BPD officers as "highly motivated" and requesting "a limited daytime [overtime] [d]etail[]" as "a great reward" that "would be great for morale[]").

14

## 2. The Primary Purpose of the Checkpoints.

Defendant Brown, former mayor of the City, initially testified that the Strike Force was created to respond to residents' vehicle and traffic complaints and that its mission was focused on vehicle and traffic concerns.[12] He later clarified in the same deposition, however, that he "was misinterpreting the purpose of the traffic stops and the Strike Force. The purpose of the traffic stops [was] for vehicle and traffic issues. The Strike Force was a proactive unit that was designed to address crime overall and in general." (Doc. 268-6 at 27:14-19.)

Plaintiffs claim that Defendants "concede[d]" in their motion for summary judgment "that a *primary* purpose of the Checkpoints was preventing and suppressing crime through 'high visibility' policing." (Doc. 344 at 36) (emphasis in original). Plaintiffs further argue that the design and implementation of the Checkpoint Program, as reflected by where Checkpoints were located and how their success was measured, demonstrate that the true primary purpose was general crime control. They contend that ninety percent of Checkpoints were in majority Black or Latino neighborhoods, *see* Doc. 345 at 50, ¶ 285, and that it was not until news articles and an inquiry by the City Common Council that the BPD began placing Checkpoints in majority white neighborhoods. *See* Doc. 271-18 at 2 (June 29, 2017 email from BPD captain informing lieutenants of "adjustments" to the Checkpoints, with one Checkpoint located "in the designated Hot Spots[]" four days a week and "an area other tha[n] the East Side[]" two days a week, and the "other two daily [C]heckpoints . . . done either on the South, North[,] or West Side of the City.").

---

[12] *See, e.g.*, Doc. 252-11 at 12:4-10 ("Q. Was that a major policy decision of the BPD, the creation of the Strike Force? A. Yes, it was. I think clearly the police department was trying to respond to vehicle and traffic complaints of residents and that was the impetus for the establishment of that unit."); *id.* at 13:16-21 ("A. The mission of the Strike Force in its creation was to deal with vehicle and traffic concerns related to speeding, dangerous driving, going through stop signs, traffic signals, speeding through neighborhoods, speeding past schools, yes.").

15

Defendants respond that "[t]he primary purposes of the Checkpoints were traffic safety and high visibility to curtail the unsafe operation of vehicles." (Doc. 252-46 at 17.) They maintain that the "primary programmatic purpose" of the Checkpoint Program was "vehicle and traffic safety and the enforcement of the [NYSVTL,]" (Doc. 254-13 at 3), although they acknowledge that it served additional purposes including "vehicle and traffic interdiction" (Doc. 254-2:6-7) and high-visibility policing.[13]

Defendant Derenda, former BPD Commissioner, chose the location of the Checkpoints at the onset of the Checkpoint Program, before eventually turning it over to "lieutenants[.]" (Doc. 252-15 at 8:21.) He identified a variety of factors that impacted the Checkpoints' locations, including where Strike Force and Housing Unit officers were assigned; certain crime statistics; and citizen complaints concerning individuals driving without licenses, speeding, and other unsafe driving behavior. Plaintiffs challenge the claim that Checkpoint locations were based on citizen complaints and proffer statistics that show race was the strongest predictor of Checkpoint locations. They cite emails

---

[13] *See, e.g.*, Doc. 252-11 at 14:1-2 (Defendant Brown testifying that "the primary purpose of [C]heckpoints was traffic safety[]"); *id.* at 15:17-16:8 ("It is my testimony that there were a large number of complaints from residents about speed, running through red lights, running through traffic signals, speeding in neighborhoods, speeding past schools[,] and endangering the community. Initially[,] traffic interdiction, traffic [C]heckpoints, were established to address those issues[,] and as a secondary purpose it was found that caught in those traffic [C]heckpoints were people with criminal backgrounds, with illegal guns, with illegal drugs that were threatening the safety of the community and that that was also a major concern of the residents of the City of Buffalo."); Doc. 252-12 at 5:6-18 (Defendant Derenda testifying that "the roadblocks were primarily for traffic safety, but what they also accomplished is high visibility[]"); Doc. 252-14 at 8:17-21 (BPD lieutenant stating that "the [C]heckpoint is for [vehicle and traffic], but we also wanted it for the high visibility[,] and if that resulted in various things, [like] keeping the residents happy or ultimately deterring crime, that was certainly a bonus, too[]"); Doc 252-15 at 6:21-7:5 (retired BPD lieutenant testifying that the primary purpose of the Checkpoints was "for traffic control[]" and to "check the registrations, the inspections, maybe tints, seat belts[]" and that "[a]nother primary purpose" was "to demonstrate high visibility[]"); Doc. 252-16 at 4:7-9 (BPD officer stating that the Checkpoints "were to ensure there w[ere] no expired inspections, registrations, things of that nature[]"); Doc. 252-17 at 4:14-18 (rejecting contention that Checkpoints were conducted to "target gang activity[]" and testifying that the Checkpoints were for "vehicle and traffic, roadway safety[;] [t]hey were specific on vehicle and traffic violations[]"); Doc. 252-18 at 4:13 (BPD officer describing the purpose of the Checkpoints as "safety checkpoints[]").

16

between Defendants that refer to the Checkpoints as a "proactive violence prevention strategy." (Doc. 274-1 at 2.)

### 3.   How the Checkpoints Were Marked.

Defendants claim that, in accordance with the Roadblock Directive, BPD officers placed "a number of [police] cars in the center of the street or on the side with lights on so that [they] could be visible from a long distance away[.]" (Doc. 252-10 at 4:2-5.) Plaintiffs, based on their own experiences, challenge this contention and assert that the BPD did not consistently turn on their police cruiser lights while conducting Checkpoints nor consistently take other steps to alert motorists of the Checkpoints' locations.

### 4.   How Motorists Were Treated During Checkpoint Stops.

Defendants contend that all motorists at Checkpoints were treated with respect. Plaintiffs dispute this characterization and allege that they felt "stigmatized and targeted" (Doc. 297 at 2, ¶ 14) and "discriminated against" because of their race. (Doc. 298 at 4, ¶ 16.) They claim that BPD officers spoke to them "disrespectful[ly,]" *id.*, "were often rude and degrading," (Doc. 291 at 3, ¶ 12), treated them "like criminals[,]" (Doc. 306 at 3, ¶ 13), and asked them irrelevant questions, such as questions about their path of travel.

### 5.   Whether Defendant Brown Attempted to Conceal the Discriminatory Impact of the Checkpoint Program.

According to Plaintiffs, Defendant Brown participated in "an elaborate pretextual coverup to conceal the racially discriminatory impact of the [Checkpoints] . . . from the public." (Doc. 344 at 28.) Some of the cited evidence, however, refers to actions taken by Defendant Derenda, not Defendant Brown.[14] Other evidence cited includes Defendant Brown's alleged contact with the University of Buffalo in an effort to, as characterized by Plaintiffs, "quash a [University of Buffalo] Law School professor's public criticism of the Checkpoints[,]" *id.*, but the document in question only indicates Defendant Brown's plan

---

[14] For this claim, Plaintiffs rely on their CSMF that identifies a series of alleged actions undertaken by Defendant Derenda. *See, e.g.*, Doc. 345 at 51, ¶ 286 ("The BPD had records of the location and frequency of Checkpoints for the requested time period which would have revealed racial disparities in Checkpoint locations. . . . [Defendant] Derenda never gave the records to the [Common] Council.").

17

to share concerns regarding a particular document in response to an invitation to do so by the university. *See* Doc. 310-13 at 2 (email from Defendant Derenda explaining that, "[a]fter hearing our concerns, some members of [the University of Buffalo] committee sent the City the document this morning and have offered to meet, listen to the City's concerns[,] and potentially make modifications before the document is released.").

### 6.    Motivation of Traffic Enforcement Actions.

Plaintiffs rely on statistical evidence, including the number of civil rights complaints filed against the City and BPD,[15] for their contention that Defendants' traffic enforcement actions were racially motivated. They point out that Defendants never conducted a formal analysis as to whether the Checkpoint Program improved traffic safety and argue that this raises questions regarding the true objective of the Checkpoint Program. They also proffer what they describe as direct evidence of discriminatory intent, including Defendant Brown's admission that racism in the police force contributed to police violence in the City and a D-District Police Chief's admission that the Strike Force was disbanded because of racial profiling. Defendants reject this characterization of their motivation, pointing to race-neutral considerations that informed enforcement actions and Checkpoint locations.

### 7.    The Bjerk Report.

Plaintiffs retained David Bjerk, PhD, an economics professor at Claremont McKenna College, to conduct a statistical analysis of the BPD's traffic enforcement practices between January 2012 and December 2022.

---

[15] According to Plaintiffs, thirty-seven complaints between January 2013 and June 2018 "plausibly allege racially discriminatory traffic enforcement[.]" (Doc. 345 at 41, ¶ 197.) "From 2012 to the present, at least 123 people filed 126 complaints to [IAD] alleging racial discrimination, [eighty-four] of which were in the context of traffic enforcement." *Id.* Plaintiffs further note that, "[i]n recent years," *id.* at ¶ 199, fourteen "lawsuits or notices of claims have included allegations that involve racially biased conduct, [eleven] of which were in the context of traffic stops." *Id.* at ¶ 200. "Whether or not the claims had validity, the very assertion of a number of such claims put the [c]ity on notice that there was a possibility that its police officers had" committed constitutional violations. *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328 (2d Cir. 1986), *cert. denied*, 480 U.S. 922 (1987).

18

Dr. Bjerk considered and compared "five distinct time eras: (i) the Pre-Strike[ F]orce Era (January 2012 – June 2012)[;] (ii) the Strike[ F]orce Era (July 2012 – June 2015)[;] (iii) the BTVA Era (July 2015 – January 2018)[;] (iv) the Post-Strike[ F]orce Era (February 2018 – February 2020)[; and] (v) the Current Era (March 2020 onward)." (Doc. 273 at 25, ¶ 85.) He grouped census tract data into categories based on "the percentage of the residents of that tract that are classed as Minority [(Black or Hispanic)], using [American Community Survey] data" produced by the United States Census Bureau. *Id.* at 28, ¶ 94. This resulted in five groups: 0-20% Minority; 20-40% Minority; 40-60% Minority; 60-80% Minority; and 80-100% Minority.

Considering the "mean monthly citation counts by tract type across the five []eras for . . . excessively tinted windows," Dr. Bjerk found that:

> during the Pre-Strike[ F]orce era, there were exceedingly few citations for tinted windows in any type of tracts (an average of less than two such citations per month per tract during this era), with no significant disparity in such citations across tract types. Moving to the Strike[ F]orce and BTVA eras, . . . tinted window citations in 0-20% Minority tracts stayed largely constant and increased to an average of nearly [four] per month in the 20-40% Minority tracts. But tinted window[] citations increased in the higher Minority tracts to a far greater extent. . . . [I]n the 60-80% Minority tracts, the average number of tinted window[] citations went from 1.4 per month Pre-Strike[ F]orce to almost [eleven] per month. In the 80-100% Minority tracts, they went from an average of 1.2 per month Pre-Strike[ F]orce to an average of [sixteen] per month—a more than thirteen-fold increase. Citations for tinted windows dropped substantially in all census tract categories in the Post-Strike[ F]orce era. Even then, however, there were still an average of two to five times as many such citations per month in the [twenty-one] tracts that were 80-100% Minority, relative to the [nineteen] tracts that were 0-20% Minority and the [twenty-one] tracts that were 20-40% Minority tracts, respectively. . . . [T]inted window citations again became infrequent in all tract categories during the Current era.

*Id.* at 59, ¶ 195. Narrowing his analysis to the issuance of multiple tinted window tickets in a single stop and comparing citations of Minority drivers to Non-Minority drivers, Dr. Bjerk found that:

> in the Pre-Strike[ F]orce era, a relatively small fraction of tinted window incidents resulted in multiple tinted window tickets across all races.

19

> However, starting in the Strike[ F]orce era, the fraction of tinted window incidents that led to multiple tinted wi[n]dow tickets went up to just over 50% for those recorded as Non-Minorities, but to almost 65% for those recorded as Minorities. During the BTVA era, the rate at which multiple tinted window[] tickets were issued in incidents involving tinted windows climbed to 75% for drivers recorded as Non-Minorities but almost 90% for drivers recorded as Minorities during the BTVA era. Rates of multiple tinted window tickets in tinted window incidents remained close to as high in the Post-Strike[ F]orce era, as did the racial discrepancy in such multiple ticketing for tinted windows. . . . [T]hese racial discrepancies in the rates at which drivers were issued multiple tinted window citations in incidents involving at least one tinted window citation are compounding upon the already vast underlying racial discrepancies, highlighted earlier, in the rates at which drivers are cited for tinted windows. In other words, Minority drivers are not only much more likely to be cited for tinted windows in the first place, but also more likely to receive multiple tickets if they are cited for tinted []window[] violations. And while it is possible that the underlying rate at which drivers of different races receive tinted[] window[] citations could reflect underlying differences in the rates at which drivers of different races have their windows tinted (or excessively tinted), it seems unlikely that there are racial differences in the rates at which drivers who have one or more windows tinted have multiple windows ticketed, or that underlying behavior with respect to tinted windows changed dramatically between 2012 and 2016.

*Id.* at 109, ¶ 295. Employing a regression prediction analysis, he found that during the Strike Force, BTVA, and Post-Strike Force eras, "the actual likelihood of receiving multiple tinted window citations in tinted window incidents is [ten] to [twelve] percentage points higher for those classified as Minorities than would be predicted if such individuals had been treated the same as Non-Minorities. These differences are all statistically significant at the 1% level." [16] *Id.* at 111, ¶ 299.

When analyzing the relationship between the location of Checkpoints and the racial demographics of neighborhoods surrounding the locations, Dr. Bjerk consolidated

---

[16] "Statistical significance" refers to the likelihood that an observed phenomenon, like racial disparity, will have arisen by chance. Dr. Bjerk's finding that the result is significant at the 1% level "means that there is not more than a [one] percent chance that the observed relationship is purely random." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015).

20

the data into three categories: "(i) High-Minority (60% or more of the population is Black and/or Hispanic), (ii) Mixed-Race (between 40% and 60% of the population is Black and/or Hispanic), or (iii) Low-Minority (40% or less of the population is Black and/or Hispanic)." *Id.* at 29, ¶ 95. His "results show that the BPD overwhelmingly located these [C]heckpoints in higher Minority neighborhoods[]" and that "this greater tendency to set[ ]up [C]heckpoints in higher Minority neighborhoods cannot be fully explained by the BPD simply choosing to locate [C]heckpoints in neighborhoods with high crime or a high number of accidents." (Doc. 273 at 116, ¶ 311.) In particular, he found that:

> 60% of Low-Minority tracts experienced fewer than five [C]heckpoints, less than 15% experienced more than fifteen [C]heckpoints, and none experienced more than thirty [C]heckpoints. By contrast, less than 15% of High-Minority tracts experienced fewer than five [C]heckpoints, and almost 15% experienced more than thirty. Indeed, four High-Minority tracts experienced over 100 [C]heckpoints each. This is particularly notable again given that High-Minority and Low-Minority tracts on average have very similar populations.

*Id.* at ¶ 312.

Controlling for high-violence crime ("HVC") tracts, Dr. Bjerk calculated that "the average number of [C]heckpoints in each High-Minority HVC tract is over six times higher than the average number of [C]heckpoints per tract in each Low-Minority HVC tract." *Id.* at 118, ¶ 316. He opined that this "indicates that whether or not a tract was High-Minority is a much stronger predictor of [C]heckpoints than whether or not a tract had high rates of violent crime." *Id.* Dr. Bjerk then applied a

> regression prediction approach, where [he] estimate[d] how accidents and criminal activity relate to [C]heckpoint counts in Low-Minority tracts, and use[d] th[o]se estimates to predict the number of [C]heckpoint counts that should arise in High-Minority . . . tracts if the relationship between prior accidents and criminal activity and subsequent [C]heckpoint deployment was the same in High-Minority . . . tracts as it was in Low-Minority tracts. [He] then calculate[d] the difference between actual and predicted [C]heckpoint[] counts for each tract to see how much these differ on average.

*Id.* at 119, ¶ 320. Based on this methodology, Dr. Bjerk found that, "on average, between July 2012 and December 2017, High-Minority tracts experienced over [thirty-three] more

21

[C]heckpoints each than would be predicted by how such [C]heckpoints were allocated in Low-Minority tracts. This result is significant at the 1% level." *Id.* at 120, ¶ 322. He concluded that "these discrepancies cannot be fully explained by differences in the rates at which criminal incidents or traffic accidents occurred between High-Minority neighborhoods and Low-Minority neighborhoods." (Doc. 271 at 123, ¶ 331.)

### 8.   The Gennaco Report.

Plaintiffs retained Michael Gennaco, a proffered expert in police practices regarding accountability, supervision, and training, to prepare a report analyzing the BPD's "practices concerning the handling of bias-based complaints relating to traffic enforcement[.]" (Doc. 273-1 at 5.) Mr. Gennaco relied on seventy-four "racial bias complaint investigation files" from January 2012 through March 2024 and which "arose in the context of traffic enforcement and raised an indicium of racial bias," as well as his own experience, deposition testimony, documents, news articles, and other academic and industry materials regarding accepted police practices. *Id.*

He was asked to offer opinions concerning:

a.  Whether the City has responded to the community, institutional, and individual complaints of racially biased policing in an adequate manner and in a manner consistent with generally accepted practices;

b.  Whether the City's investigation and accountability practices and systems are consistent with generally accepted practices and sufficient and adequate to address the problem and risk of racially biased policing;

c.  Whether the City's supervision, oversight, monitoring[,] and training practices and systems are consistent with generally accepted practices and sufficient and adequate to address the problem and risk of racially biased policing;

d.  Whether the City's multiple ticketing and pretextual policing and related supervision practices have any law-enforcement or safety-related benefits and create a risk of racially biased policing.

*Id.*

Mr. Gennaco concluded "that the BPD employs inadequate and deficient practices, policies, and procedures that frequently depart from accepted standards and are indicative

22

of an environment that disregards concerns about racially biased policing." *Id.* at 6. He found that, between 2012 and 2024,

> the number, severity, and scope of . . . complaints should have made clear to the City and [BPD] that there were serious concerns being repeatedly raised about potential racially biased traffic enforcement within the BPD[] and the [BPD] needed to take meaningful steps to reduce the risk of BPD officers targeting people of color in a racially biased manner through traffic enforcement.

*Id.* at 6-7. He opined that BPD's "policies and practices for identifying and addressing racial bias fall well below accepted practices within the policing industry[,]" and described the BPD's intake system as "broken[,]" undermining the BPD's ability to "learn whether an officer has practiced biased policing and to deter future misconduct." *Id.* at 7. Mr. Gennaco further determined that the BPD provides those investigating complaints "with no formal training and scant guidance on how to investigate such matters[.]" (Doc. 273-1 at 8.) Based on documented statements by BPD supervisors, he opined that they have "a mind[-]set predisposed against the complainant as opposed to allowing the facts and evidence developed through the investigative process to determine the outcome." Mr. Gennaco summarized his findings as follows:

> The BPD's policies and practices, including the supervision and accountability deficiencies I have described throughout this report, as well as its failure to create and enforce rules to cabin these tactics, [have] also led officers to engage in aggressive multiple ticketing practices, retaliatory policing, and pretextual policing that can, and [have], contributed to racially disparate policing practices that disproportionately harm Black and Latino drivers. These biased policies and practices have not just resulted in unequal outcomes by race but have marginal or no public safety benefit. In fact, they risk alienating targeted communities[] and undermine the public trust of the department[,] which impacts their ability to solve crime.

> The BPD's affirmative policies and practices and its surrendering of managerial prerogatives designed to identify and address inappropriate police actions, while maintaining an inadequate complaint investigation and supervision system[] that falls below generally accepted practices, create an institutional culture whereby officers can engage in biased traffic enforcement with little concern for detection and intervention. Accountability, supervision, and effective corrective intervention of officers who engage in misconduct is critical to identifying, addressing, and

23

ultimately reducing racially biased policing, but the BPD has declined to engage in any such interventions meaningfully, thereby perpetuating the risk of racially biased misconduct and eroding public trust in the BPD.

*Id.* at 14.

Plaintiffs cite Mr. Gennaco's report as evidence that the BPD engaged in racial stereotyping when selecting the locations of the Checkpoints[17] and as support for their contention that multiple tinted window tickets serve no public safety benefit and are counterproductive.

### 9.    The IAD Declaration.

A former member of BPD IAD (the "IAD Witness"), who served in the BPD for twenty-five years, alleged that the BPD culture was "consistently racist, sexist, and toxic" over her years of service. (Doc. 346 at 2, ¶ 5.) She observed that "BPD supervisors— including Lieutenants responsible for training new recruits or for supervising officers at the District level—were openly racist." *Id.* at ¶ 7. She recalled "instances where white BPD officers used racial slurs when speaking to Buffalo residents from minority backgrounds[,]" including "derogatory language [like] the word 'ghetto,' 'baby daddy,' and 'baby mama' to refer to Black Buffalo residents." *Id.* at ¶ 8. The IAD Witness also "heard former Commissioner Daniel Derenda use terms like 'gangbanger' and 'thug' to refer to young Black men." *Id.* She was not aware of officers being disciplined for using such language.

The IAD Witness asserted she has personal knowledge that BPD officers "frequently" engaged in "racial profiling[.]" *Id.* at 3, ¶ 11. It was her experience that BPD officers believed that "if they stop enough cars containing Black men, they will eventually hit something." *Id.* at ¶ 12. For example, "[i]t was common knowledge within the BPD that tinted window tickets primarily went to Black drivers, even though in [her] experience, motorists of all races drive with tints." (Doc. 346 at 8, ¶ 37.) "Almost all of

---

[17] Plaintiffs argue that Defendants defended the Checkpoints in part by claiming that only the "criminal element" would complain about them, relying on Mr. Gennaco's report for the assertion that Defendants "employ[ed] 'criminal element' as a code word for Black people generally." (Doc. 344 at 80) (citing Doc. 273-1 at 101).

24

the IAD complaints [the BPD] received alleging abusive treatment by BPD officers and officer misconduct during traffic stops, vehicle searches, traffic and non-traffic arrests, and impounds were from Black and Latino complainants." *Id.* at 6, ¶ 24. "Although the BPD Commissioners received these complaints, they rarely resulted in officer discipline during [her] time in IAD." *Id.* According to the IAD Witness, this lack of discipline "emboldened officers to continue doing the wrong thing and continue making questionable stops and searches targeting Black and Latino drivers." *Id.* at 8, ¶ 33.

The IAD Witness claimed that "BPD officers had a direct financial incentive for writing traffic summons[es] and making arrests" because they "knew that the more arrests and summons[es] they made, the more court time they would receive, which translated into overtime income[.]" *Id.* at ¶ 34. She described officers as engaging in "predatory ticketing and traffic enforcement practices in order to boost their salaries." *Id.* at ¶ 35.

## IV. Conclusions of Law and Analysis.

### A. Standard of Review.

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law.'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248).

On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in that party's favor." *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)). The moving party "always bears the initial responsibility of informing the district court of the basis for its motion and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*,

25

477 U.S. 317, 323 (1986) (internal quotation marks omitted). When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. To avoid summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). Where there are "cross-motions for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" *Lumbermens Mut. Cas. Co. v. RGIS Inventory Specialists, LLC*, 628 F.3d 46, 51 (2d Cir. 2010) (quoting *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Clark v. Hanley*, 89 F.4th 78, 95 (2d Cir. 2023) (internal quotation marks omitted) (quoting *Kee v. City of New York*, 12 F.4th 150, 166-67 (2d Cir. 2021)). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52.

"Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

B.      **Whether Defendants or Plaintiffs Are Entitled to Summary Judgment on Plaintiffs' Fourth Amendment Claim (Count I).**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile

26

by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996).

Generally, "[t]he Fourth Amendment requires that an officer making a traffic stop have probable cause or reasonable suspicion that the person stopped has committed a traffic violation or is otherwise engaged in or about to be engaged in criminal activity." *United States v. Wilson*, 699 F.3d 235, 242 (2d Cir. 2012) (alteration, internal quotation marks, and citation omitted). While a "search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing[,] . . . certain regimes of suspicionless searches" have been upheld "where the program was designed to serve 'special needs, beyond the normal need for law enforcement.'" *City of Indianapolis v. Edmond*, 531 U.S. 32, 37 (2000). To be constitutional, the program of suspicionless searches or seizures must both serve a "special need" and be reasonable "on the basis of the individual circumstances." *Wagner v. Swarts*, 827 F. Supp. 2d 85, 96 (N.D.N.Y. 2011) (internal quotation marks and citation omitted).

Defendants argue that Plaintiffs failed to respond to their argument regarding Plaintiffs' non-Checkpoint Fourth Amendment claims and thereby abandoned these claims. *See* Doc. 331-13 at 34. "Federal courts may deem a claim abandoned when a party moves for summary judgment on one claim and the party opposing summary judgment fails to address the argument in any way." *Curry v. Keefe*, 2021 WL 1087444, at *6 (D. Vt. Mar. 22, 2021) (internal quotation marks omitted) (quoting *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003)); *see also Celotex*, 477 U.S. at 323 ("The moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."). The court agrees that Plaintiffs do not address non-Checkpoint traffic stops under the Fourth Amendment in their briefs.[18] Plaintiffs' non-Checkpoint Fourth Amendment claims are thus deemed abandoned.

---

[18] The Tinted Windows class does not assert a Fourth Amendment claim.

27

Defendants' motion for summary judgment on Plaintiffs' non-Checkpoint Fourth Amendment claims is therefore GRANTED.

With respect to the Checkpoints, the parties agree that the Checkpoints constituted suspicionless searches and seizures. Defendants contend that they are entitled to summary judgment on Plaintiffs' Checkpoints Fourth Amendment claim because the Checkpoints' primary purpose was a recognized special need of traffic safety and the Checkpoints were reasonable in light of the gravity of the public concern, their advancement of the public interest, and their limited interference with individual liberty.

In contrast, Plaintiffs claim they are entitled to summary judgment on their cross-motion with respect to their Fourth Amendment claim because the Checkpoints' primary purpose was general crime control, which does not constitute a special need. They alternatively argue that Defendants are not entitled to summary judgment because the primary purpose of the Checkpoints was not traffic safety and the Checkpoints were not reasonable as required by the Fourth Amendment.

### 1. Whether There Is a Genuine Dispute that the Checkpoints Served a "Special Need."

The special needs exception is a "closely guarded" one, *Chandler v. Miller*, 520 U.S. 305, 309 (1997), which "applies only in 'exceptional circumstances." *Jones v. Cnty. of Suffolk*, 936 F.3d 108, 115 (2d Cir. 2019) (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 351 (1985) (Blackmun, J., concurring)).

"[A]s a threshold inquiry, 'a court must conduct []an inquiry into purpose at the programmatic level, applying the special needs doctrine only if the primary programmatic purpose of the searches is unrelated to the government's general interest in crime control.'" *McLennon v. City of New York*, 171 F. Supp. 3d 69, 84 (E.D.N.Y. 2016) (alterations adopted) (quoting *Lynch v. City of New York*, 589 F.3d 94, 100 (2d Cir. 2009)). For that reason, the exception is limited to "special needs, beyond the normal need for law enforcement." *Edmond*, 531 U.S. at 37 (internal quotation marks omitted). Stated differently, "the government's asserted 'special need' must not be isomorphic with law enforcement needs, but rather go beyond them." *Cassidy v. Chertoff*, 471 F.3d 67, 81

28

(2d Cir. 2006); *see also Jones*, 936 F.3d at 115 (observing that a program serves a special need if it "serves as its immediate purpose an objective distinct from the ordinary evidence gathering associated with crime investigation[]") (internal quotation marks and citation omitted).

"To qualify as a special need, the governmental interest in the objective must be 'substantial'; that is, 'sufficiently vital to suppress the Fourth Amendment's normal requirement of individualized suspicion.'" *Jones*, 936 F.3d at 115 (quoting *Chandler*, 520 U.S. at 318). The primary purpose of a program is the "immediate objective of the challenged program, not its ultimate goal." *Id.* (alteration adopted) (citing *Lynch v. City of New York*, 737 F.3d 150, 158 (2d Cir. 2013)). A program may have more than one purpose, "and the mere fact that crime control is one purpose—but not the *primary* purpose—of a program of searches does not bar the application of the special needs doctrine." *Lynch*, 589 F.3d at 102 (emphasis in original) (internal citation omitted).

"To determine a program's 'immediate objective,' [courts] 'conduct a close review' and consider 'all the available evidence.'" *Jones*, 936 F.3d at 115-16 (quoting *Lynch*, 737 F.3d at 157-58). They do not "simply accept the [government's] invocation of a 'special need.'" *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001). This inquiry prevents the "'broader social purpose or objective'" law enforcement serves from "immunizing 'virtually any' warrantless search or seizure." *Jones*, 936 F.3d at 115 (quoting *Ferguson*, 532 U.S. at 84).

"The assumption underlying the search for the 'primary purpose' is that several purposes might have moved the police to set up a particular roadblock. This is why finding the primary or predominant purpose will often prove difficult, as the Supreme Court acknowledged in *Edmond*[.]" *United States v. Davis*, 270 F.3d 977, 982 (D.C. Cir. 2001).

To the extent Plaintiffs argue that "vehicle and traffic safety and the enforcement of the [NYSVTL,]" (Doc. 331-13 at 37), is an impermissible law enforcement purpose

29

and sweeps broader than any special need recognized by courts, they are wrong.[19] The Supreme Court has affirmed the constitutionality of vehicle checkpoints in a variety of contexts. *See, e.g., United States v. Martinez-Fuerte*, 428 U.S. 543, 566 (1976) (to intercept individuals entering the country illegally at a fixed Border Patrol checkpoint); *Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990) (to remove drunk drivers from the road at sobriety checkpoints); *but see Edmond*, 531 U.S. at 43-44 (striking down vehicle checkpoints designed to interdict unlawful drugs when "justified only by the generalized and ever-present possibility that interrogation and inspection may reveal that any given motorist has committed some crime[]").

Although vehicle checkpoints with a primary purpose of vehicle and traffic safety may serve a special need, they must be readily distinguishable "from the general interest in crime control[,]" *Edmond*, 531 U.S. at 44, and "distinct from the ordinary evidence gathering associated with crime investigation." *Jones*, 936 F.3d at 115 (internal quotation marks omitted). As the *Edmond* Court recognized, a state has a "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." 531 U.S. at 39 (internal quotation marks omitted) (quoting *Delaware v. Prouse*, 440 U.S. 648, 658 (1979)).

In this case, BPD officers at Checkpoints were instructed to and did in fact check for valid registrations, valid inspections, and proper seatbelt usage. The Supreme Court in

---

[19] Courts have affirmed the constitutionality of checkpoints related to traffic and vehicle safety. *See, e.g., Wagner v. Swarts*, 827 F. Supp. 2d 85, 94 (N.D.N.Y. 2011) (finding that checkpoints enacted to promote motorcycle safety served a special need and were constitutional); *Wagner v. Sprague*, 489 F. App'x 500, 501 (2d Cir. 2012) (same); *United States v. Henson*, 351 F. App'x 818, 821 (4th Cir. 2009) (holding that vehicle checkpoint with a primary purpose of "promot[ing] traffic safety by allowing police to check drivers' licenses and vehicle registration" was constitutional); *United States v. Regan*, 218 F. App'x 902, 905 (11th Cir. 2007) (holding that vehicle checkpoint with dual purpose of traffic safety and law enforcement had primary purpose of traffic safety and thus served a special need); *United States v. Bowman*, 496 F.3d 685, 692 (D.C. Cir. 2007) ("[A] roadblock is constitutionally permissible where its principal purpose is to regulate vehicular traffic by allowing police to check driver's licenses and vehicle registrations.") (internal quotation marks and alteration omitted).

30

*Edmond* and *Prouse* noted that these legitimate objectives are designed to ensure vehicles are safe for operation and that the individuals operating them are lawfully permitted to do so. Here, the parties agree that a stated purpose of the Checkpoints was "vehicle and traffic safety and the enforcement of the [NYSVTL]." (Doc. 331-13 at 37, Doc. 253-1 at 7.) They diverge, however, regarding whether traffic safety was the primary and immediate objective of the Checkpoints or whether traffic safety was a pretextual justification for general and discriminatory crime control.

Defendants cite testimony from City employees and BPD officials, as well as the Roadblock Directive governing the Checkpoints, as undisputed evidence that the primary purpose of the Checkpoints was traffic safety. Defendant Brown testified that "the primary purpose of [the C]heckpoints was traffic safety[,]" (Doc. 252-11 at 14:1-2), as well as "vehicle and traffic interdiction." (Doc. 254-2 at 18:6-7.)[20] He further attested that the Checkpoints were deployed in response to resident complaints about traffic violations like speeding and running red lights and traffic signals but had a secondary effect of finding illegal guns and drugs. Defendant Derenda likewise testified that "the roadblocks were primarily for traffic safety," with the goal of enforcing the NYSVTL and the added benefit of high police visibility. (Doc. 252-12 at 5:6-7.) BPD officers offered similar statements and Defendants note that the stated purpose of the Checkpoints under the Roadblock Directive was "to ensure 'roadway safety'" by checking for seatbelts and valid registration and inspection stickers, although officers were also allowed to "[a]ct on any and all probable cause resulting from information obtained from the mobile plate reader or from 'plain view' observations." (Doc. 254-30 at 2.)

Plaintiffs argue that the alleged stated purpose of the Checkpoints was pretextual and that the design and implementation of the Checkpoint Program reveals that the true

---

[20] The *Ferguson* court cautioned that courts must not accept the stated purpose on face value, *Ferguson v. City of Charleston*, 532 U.S. 67, 81 (2001), but must probe to determine the true immediate objective. To do so in this case would require an assessment of the credibility of BPD officials, Defendant Brown, and Defendant Derenda. Correspondingly, the court cannot accept Plaintiffs' invitation to weigh other evidence and find these individuals untruthful.

31

primary purpose of the Checkpoints was general crime control, specifically reducing drug, gun, and gang activity. They observe that: (1) the Checkpoints were funded in part by a statewide crime control initiative (the GIVE Initiative); (2) BPD records and officer testimony demonstrate the Checkpoints served a broader crime-prevention strategy; (3) the Checkpoints were operated by police units who missions were crime control, not traffic safety; (4) crime, not traffic, data informed the locations of the Checkpoints; and (5) crime, not traffic, data was used to measure the Checkpoints' success.[21]

To the extent the Checkpoints "formed part of a crime prevention strategy" and thus had a crime control purpose, that, alone, does not render the Checkpoints unconstitutional. *See Lynch*, 589 F.3d at 102. "'The law does not require the police to ignore evidence of other crimes in conducting legitimate roadblocks.'" *United States v. Bernacet*, 724 F.3d 269, 273 (2d Cir. 2013) (quoting *United States v. Lopez*, 777 F.2d 543, 547 (10th Cir. 1985)). Plaintiffs are correct, however, that courts have considered a program's funding when deciphering a search's "programmatic purpose[.]" *Edmond*, 531 U.S. at 46. The Sixth Circuit, for example, held that a vehicle checkpoint did not serve a special need of preventing drunk driving in part because funding for it came from a drug interdiction program. *See United States v. Huguenin*, 154 F.3d 547, 555 (6th Cir. 1998); *but see Wagner*, 827 F. Supp. 2d at 94-95 (upholding a traffic safety checkpoint even though its funding included money for intelligence gathering and criminal enforcement).

The D.C. Circuit has considered the customary duties and responsibilities of the law enforcement officers conducting a roadblock relevant to its programmatic purpose. *See United States v. Bowman*, 496 F.3d 685, 693 (D.C. Cir. 2007) (finding the lower court

---

[21] To rebut Plaintiffs' claim that traffic safety was never measured as an output of the Checkpoints, a point Defendants concede, Defendants note that empirical evidence of the Checkpoints' efficiency is not required to demonstrate a special need. They cite *United States v. Fraire*, in which the Ninth Circuit rejected the argument that the absence of empirical data is a dispositive factor when common sense suggests a checkpoint would be a reasonably efficient tool to meet the governmental goal. 575 F.3d 929 (9th Cir. 2009). Defendants misapprehend Plaintiffs' argument. Plaintiffs do not cite the lack of empirical evidence as dispositive of a lack of a special need but, rather, as a factor to be considered in determining whether the stated purpose of traffic safety was pretextual.

erred in concluding that "there was no evidence to counter the government's description of the roadblock's primary purpose[]" of promoting traffic safety where the general responsibilities of the police force operating the roadblock were to combat crime and retrieve narcotics and guns from the streets) (emphasis, internal quotation marks, and citation omitted); *see also United States v. Hudson*, 2007 WL 1656282, at *6 (D.D.C. June 5, 2007) (considering the primary purpose of police unit conducting roadblocks when determining the primary purpose of the roadblock). Courts have also considered the location of such checkpoints as relevant to their purpose. *See, e.g.*, *Hudson*, 2007 WL 1656282, at *6 (reasoning that a checkpoint location previously used for a crime initiative undermines argument that roadblock's purpose was to reduce speeding); *Huguenin*, 154 F.3d at 555 (finding that when it comes to determining the primary purpose, "actions speak louder than . . . words[]").

The Checkpoints at issue in this case were funded in part by a statewide crime control initiative and were staffed by Strike Force and Housing Unit officers. The mission of the Strike Force was to: "1. Target and eliminate crime hotspots throughout the [C]ity. 2. Remove illegal [g]uns from [the City]. 3. Strict [e]nforcement of the Mayor[']s Zero Tolerance Crime Policy[.] 4. Make [the City] a better place to live, work[,] and raise a family." (Doc. 254-21 at 2.) The Housing Unit was "responsible for all policing and security issues in the BMHA Housing Complexes located throughout the City" and was to work "to maintain strict enforcement of the Mayor's zero tolerance crime policy." (Doc. 254-17 at 7, § 8.5.) Neither unit's mission addressed traffic safety.

BPD officers testified that Checkpoints were often placed in locations experiencing recent violent crime,[22] and Defendant Derenda evaluated the effectiveness of the Strike Force by considering crime trends and statistics. *See* Doc. 268-9 at 61:8-13

---

[22] *See, e.g.*, Doc. 269-19 at 37:11-17 ("[I]f there was a shooting, for example, the night before or if they had problems while they were working the night before, if they heard violence going on in a certain area, then the next day they were expected to set up the traffic safety [C]heckpoint in that area or around that area."); Doc. 270-9 at 13:16-19 ("Q[.] . . . So your testimony is that these [C]heckpoints would have been run to address gun violence and to provide high visibility patrols? A[.] Yes.").

("There were no evaluations done on checkpoints. However, I did do evaluations on the overall effectiveness of the Strike Force and I did that by looking at crime trends and statistics[.]").

Viewing the totality of the evidence, there is a genuine dispute of material fact regarding whether the primary purpose and immediate objective of the Checkpoints was traffic safety or whether it was general crime control which created an environment conducive to discriminatory policing. To decide this issue, credibility determinations and the weighing of competing evidence must be undertaken by the trier of fact. Only then can the court determine the Checkpoints' primary purpose. *Lynch*, 589 F.3d at 102-03 (noting that "even though the [d]istrict [c]ourt found that crime control was one purpose of the breathalyzer policy, the [c]ourt correctly applied the special needs doctrine upon finding that crime control was not the policy's *primary* purpose[]") (emphasis in original).

For the reasons stated above, Defendants' motion for summary judgment on Plaintiffs' Fourth Amendment claim (Count I) is DENIED. For the same reasons, Plaintiffs' cross-motion for partial summary judgment on the same claim is DENIED.

### 2.    Whether the Checkpoints Satisfy the Special Needs Balancing Test.

If a special need is found as a primary purpose, the search or seizure is not "automatically, or even presumptively[,] constitutional." *Jones*, 936 F.3d at 118 (internal quotation marks and citation omitted). The search or seizure "still must be 'reasonable' to comport with the Fourth Amendment." *Torcivia v. Suffolk Cnty., N.Y.*, 17 F.4th 342, 359 (2d Cir. 2021) (citing *Jones*, 936 F.3d at 118). The reasonableness of the search or seizure is determined by the court "balanc[ing] the government's [special] need against the plaintiff's liberty interest[.]" *Jones*, 936 F.3d at 118. The court, not the jury, makes the reasonableness determination. *See MacWade v. Kelly*, 460 F.3d 260, 269 (2d Cir. 2006) ("[T]he court determines whether the search is reasonable by balancing several competing considerations.").

34

Plaintiffs and Defendants disagree regarding the appropriate balancing test. Plaintiffs cite *Torcivia*, which directs courts to balance four factors: "(1) the weight and immediacy of the government interest, (2) the nature of the privacy interest allegedly compromised by the [search or] seizure, (3) the character of the intrusion imposed by the [search or] seizure, and (4) the efficacy of the [search or] seizure in advancing the government interest." *Torcivia*, 17 F.4th at 359 (alterations adopted) (internal quotation marks omitted) (quoting *MacWade*, 460 F.3d at 269); *accord Jones*, 936 F.3d at 118 (quoting *Berg v. Kelly*, 897 F.3d, 99, 108 (2d Cir. 2018)).

Defendants rely on *Wagner v. Sprague*, 489 F. App'x 500 (2d Cir. 2012), which identifies three factors: (1) "the gravity of the public concerns served by the [search or] seizure"; (2) "the degree to which the [search or] seizure advances the public interest"; and (3) "the severity of the interference with individual liberty." *Id.* at 501 (internal quotation marks omitted) (quoting *Brown v. Texas*, 443 U.S. 47, 50-51 (1979)).

The *Torcivia* standard, unlike the *Wagner*, includes a consideration of the privacy interest at issue, which the court agrees is appropriate. It is also precedential whereas *Wagner* is not. Defendants nonetheless argue that the *Wagner* standard is appropriate in the instant case because *Wagner* involved vehicle and traffic safety checkpoints whereas *Torcivia* concerned a firearms-seizure policy. They alternatively argue that, "as a matter of procedure, *Torcivia* did not overturn *Wagner*, so that the two standards should not be read as being inconsistent with each other." (Doc. 331-13 at 45.) The court agrees with Defendants that "[i]n analyzing the severity of the interference with individual liberty, as articulated by *Wagner* [], courts must expressly determine what the nature of that individual liberty or privacy interest is." *Id.* It therefore adopts a blend of *Torcivia* and *Wagner* as the appropriate standard.

Because there are genuine issues of material fact which must be resolved in order for the court to determine the primary purpose of the Checkpoints, the court cannot determine whether, as a matter of law, they were reasonable. Even assuming *arguendo* that the Checkpoints' primary purpose was vehicle and traffic safety, there remain genuine disputes regarding how the Checkpoints were located, administered, marked, and

measured, which, in turn, are relevant to a reasonableness determination. Questions about "the character of the intrusion imposed by the [search or] seizure," *Torcivia*, 17 F.4th at 359 (alteration adopted), are questions of fact to be answered by the jury, not matters of law for the court on summary judgment. *See also Allen v. Schiff*, 908 F. Supp. 2d 451, 461 (S.D.N.Y. 2012) ("Although the reasonableness of a search is a matter of law, the character and manner of the search is a matter of fact.") (citing *O'Connor v. Ortega*, 480 U.S. 709, 726-29 (1987) (finding that district court erred in granting summary judgment where "[t]here was a dispute of fact about the character of the search" and "no findings were made as to the scope of the search[,]" rendering "the record . . . inadequate for a determination on motion for summary judgment of the reasonableness of the search and seizure")). For this reason, the issue of Fourth Amendment reasonableness, which the court must ultimately decide, cannot be determined on summary judgment. Defendants' motion for summary judgment asking the court to find the Checkpoints reasonable as a matter of law is DENIED as is Plaintiffs' cross-motion seeking a declaration that the Checkpoints violate the Fourth Amendment.

## C. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Equal Protection Claim (Count II).

"To state a race-based claim under the Equal Protection Clause, a plaintiff must allege that a government actor intentionally discriminated against him [or her] on the basis of his [or her] race." *Brown v. City of Oneonta, N.Y.*, 221 F.3d 329, 337 (2d Cir. 2000).

> Applying Supreme Court precedent, [the Second Circuit has] generally recognized three types of discriminatory laws: (1) a facially discriminatory law or policy that expressly classifies individuals on the basis of race; (2) a facially neutral law that is enforced in a discriminatory fashion; and (3) a facially neutral law that was adopted with discriminatory intent and resulted in a discriminatory effect.

*Chinese Am. Citizens All. of Greater N.Y. v. Adams*, 116 F.4th 161, 170 (2d Cir. 2024); *see also Pyke v. Cuomo*, 567 F.3d 74, 78 (2d Cir. 2009) ("Plaintiffs challenging . . . facially neutral laws on equal protection grounds bear the burden of making out a prima facie case of discriminatory purpose.") (internal quotation marks and citation omitted).

36

In some contexts, plaintiffs bringing equal protection claims are required "to plead the existence of a similarly situated group that was treated differently." *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (internal quotation marks and citation omitted). However, a plaintiff who

> alleges that a facially neutral law or policy has been applied in an intentionally discriminatory race-based manner, or that a facially neutral statute or policy with an adverse effect was motivated by discriminatory animus, is not obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.

*Id.* at 110.

A plaintiff always retains the burden of demonstrating that the "defendants harbored a discriminatory intent" in addition to disparate impact. *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 50 (2d Cir. 1999). Discriminatory intent "implies that the decision[-]maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). A mere "difference in race between the person stopped [for a traffic violation] and the officer" does not "establish[] a prima facie case of racial discrimination." *Johnson v. Crooks*, 326 F.3d 995, 1000 (8th Cir. 2003) (internal quotation marks omitted).

It is undisputed that BPD policies governing the Checkpoints and tinted window ticketing do not expressly classify motorists on the basis of race. Plaintiffs, instead, argue that the policies were facially neutral policies but: (1) were applied in an intentionally discriminatory manner and (2) had an adverse impact and were motivated by discriminatory animus. Defendants do not dispute the discriminatory effect of the challenged practices but, rather, argue that Plaintiffs proffer insufficient evidence of discriminatory intent to survive summary judgment.

1. **Whether There is a Genuine Dispute that the Checkpoints Were Motivated by a Discriminatory Intent.**

With regard to the Checkpoints, Defendants contend that the evidence shows, at most, an awareness "that, by responding to citizen complaints and proactively enforcing

37

traffic on the East Side [of the City], more minorities would be ticketed[,]" and assert that "mere knowledge of a disparate impact is insufficient to show discriminatory intent." (Doc. 252-46 at 32) (citing *Arlington Heights*, 429 U.S. at 268-70). Correspondingly, they assert "that statistical disparities alone, without evidence of actual discriminatory intent, are insufficient to prove intentional discrimination for equal protection purposes." *Id.* at 33-34.

In support of the claim that statistical evidence alone is insufficient to establish discriminatory intent, Defendants rely on *Vitolo v. Guzman*, which acknowledges that "extreme differences among races may permit an inference of intentional discrimination[.]" 999 F.3d 353, 362 (6th Cir. 2021). Defendants compare the instant case to *Moore v. Bitca*, in which the District of Vermont dismissed a Title VI claim relying in part on racial disparities in Vermont traffic data "because disparate impact alone does not establish intentional discrimination." 2020 WL 5821378, at *23 (D. Vt. Sept. 30, 2020). In *Moore*, however, the court also relied on the fact that the plaintiff's allegations were contradicted by video and audio evidence, leaving the complaint supported by mere conclusory allegations. *See id.* at *22 (observing that plaintiff's allegations of race discrimination "do not alter the conclusion that dismissal is required because they are contradicted by video and audio evidence[]").

Plaintiffs respond that Defendants misrepresent testimonial evidence regarding how Checkpoint locations were chosen. They cite statistical and other evidence which demonstrate that minority neighborhoods were targeted and that white neighborhoods had Checkpoints only after complaints regarding the Checkpoints became public. They argue that substantial evidence of discriminatory impact provides sufficient circumstantial evidence to infer discriminatory intent, rendering the question of intent one for the jury.

The Second Circuit has held that "statistics alone may be sufficient[]" to create a plausible inference of discriminatory intent under the Equal Protection Clause. *Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 69 (2d Cir. 2015) (collecting cases). "[T]he statistics must not only be statistically significant in the mathematical sense, but they must also be of a level that makes other plausible non-discriminatory explanations very

unlikely." *Id.* "Federal cases have recognized that statistical differences greater than two or three standard deviations provide an acceptable basis to infer discrimination[,]" but no "bright-line rule" exists, and "[t]he 'significance' or 'substantiality' of any numerical disparities must be evaluated in light of the facts of each particular case." *Santiago v. Miles*, 774 F. Supp. 775, 799 (W.D.N.Y. 1991) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994-95 (1988)). "The existence of a [five percent] level of statistical significance indicates that it is fairly unlikely that an observed disparity is due to chance, and it can provide indirect support for the proposition that disparate results are intentional rather than random." *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 (2d Cir. 1989).[23]

In this case, Plaintiffs have provided statistical evidence revealing allegedly substantial racial disparities in the locations of the Checkpoints. Regression analysis by Dr. Bjerk concluded that the difference

> in terms of average number of [C]heckpoints per tract . . . is statistically significant at the 1% level between all High-Minority and Low-Minority tracts, and between HVC High-Minority and HVC Low-Minority tracts. Indeed, the average number of [C]heckpoints in each High-Minority HVC tract is over six times higher than the average number of [C]heckpoints per tract in each Low-Minority HVC tract. This . . . indicates that whether or not a tract was High-Minority is a much stronger predictor of [C]heckpoints than whether or not a tract had high rates of violent crime.

(Doc. 273 at 118, ¶ 316.) Controlling for the total population of a tract and the number of minor accidents, injury accidents, violent accidents, and property accidents in a tract, Dr. Bjerk found that "High-Minority tracts experienced over [thirty-three] more [C]heckpoints each than would be predicted by how such [C]heckpoints were allocated in Low-Minority Tracts. This result is significant at the 1% level." *Id.* at 120, ¶ 322. He further found that "these discrepancies cannot be fully explained by differences in the

---

[23] The Second Circuit has been clear, however, that "[b]y no means . . . is a five percent probability of chance (or approximately two standard deviations) considered an exact legal threshold." *Ottaviani v. State Univ. of N.Y. at New Paltz*, 875 F.2d 365, 372 (2d Cir. 1989) (internal quotation marks and citation omitted).

rates at which criminal incidents or traffic accidents occurred between High-Minority neighborhoods and Low-Minority neighborhoods." *Id.* at 123, ¶ 331.

Although a close question, the degree of the racial disparities in Checkpoint locations raises some inference of discriminatory intent in BPD practices. *See, e.g., Crudup v. Dist. of Columbia*, 2023 WL 2682113, at *12 (D.D.C. Mar. 29, 2023) (finding statistics reporting ninety-three percent of stop and frisks and eighty-seven percent of non-traffic stops were of Black individuals could provide inference of unconstitutional discriminatory intent); *Myers v. Cnty. of Nassau*, 2024 WL 3675815, at *7 (E.D.N.Y. Aug. 6, 2024) (holding that statistical evidence met *Burgis* standard where police hiring was roughly three times higher for white than Black applicants).

To bolster their claim of discriminatory intent based on discriminatory impact, Plaintiffs offer alleged direct evidence of intent. Plaintiffs testified that BPD officers at Checkpoints spoke to them "disrespectful[ly,]" (Doc. 298 at 4, ¶ 16), "were often rude and degrading," (Doc. 291 at 3, ¶ 12), treated them "like criminals[,]" (Doc. 306 at 3, ¶ 13), and asked them questions unrelated to traffic safety. They further cite the IAD Declaration, wherein the IAD Witness acknowledged that racial profiling and racial discrimination were rampant throughout the BPD during the relevant time period and condoned or modeled by BPD law enforcement officers in supervisory roles.

Relying on Mr. Gennaco's expert witness report, Plaintiffs point to the number of complaints filed against the City and BPD about the Checkpoints, and the BPD's alleged inadequate investigation of the complaints, as further evidence of discriminatory intent in the form of deliberate indifference.[24] *See, e.g., Floyd v. City of New York*, 959 F. Supp. 2d

---

[24] Mr. Gennaco summarized his opinion as follows:

> The BPD's affirmative policies and practices and its surrendering of managerial prerogatives designed to identify and address inappropriate police actions, while maintaining an inadequate complaint investigation and supervision system[] that falls below generally accepted practices, create an institutional culture whereby officers can engage in biased traffic enforcement with little concern for detection and intervention. Accountability, supervision, and effective corrective intervention of officers who engage in misconduct is critical to identifying, addressing, and ultimately reducing racially biased policing, but the BPD has declined to engage

540, 666-67 (S.D.N.Y. 2013) (holding that, under *Monell v. Dep't of Social Services of City of New York*, 436 U.S. 658 (1978) liability, deliberate indifference constitutes evidence of discriminatory intent); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62-63 (2d Cir. 2014) (finding deliberate indifference when repeated complaints of harassment were well known to a variety of county officials but where not addressed); *Floyd v. City of New York*, 813 F. Supp. 2d 417, 452-53 (S.D.N.Y. 2011) (concluding that statistical evidence of disparate impact coupled with inadequacy of city's remedial steps raised a genuine issue of material fact whether city intentionally discriminated against plaintiffs).

Community complaints about the Checkpoints were also provided to City and BPD officials directly. *See, e.g.*, Doc. 271-4 at 13 (report of the questions from a community and police forum indicating that residents asked why it "seem[ed] that police checks happen only in [B]lack neighborhoods and rarely in white neighborhoods[]" and wanted to know "[w]hat efforts [the BPD would] make to make sure that equal police checks happen in ALL neighborhoods equally[]") (capitalization in original). Plaintiffs emphasize Defendant Brown's survey response that racism on the police force had contributed to police violence in the City[25] and a D-District Police Chief's alleged statement that the Strike Force had been disbanded because of racial profiling.[26]

The statistical disparity in Checkpoint locations unexplained by race-neutral factors coupled with the allegations of direct evidence of discriminatory intent raises a

---

in any such interventions meaningfully, thereby perpetuating the risk of racially biased misconduct and eroding public trust in the BPD.

(Doc. 273-1 at 14.)

[25] Defendant Brown allegedly participated in the 2020 Menino Survey of Mayors (the "Survey"), conducted by Boston University. A record of his responses was created by an interviewer for the Survey, who "was instructed to record [Defendant Brown's] responses as accurately as possible." (Doc. 268-18 at 2.) The Survey asked participants, "If police violence has been a problem in your city, how much do[es racism on the police force] contribute to it?" *Id.* at 35. In response, Defendant Brown allegedly answered, "[a] moderate amount[.]" *Id.* at 20. It is not clear whether Defendant Brown's answer was from a selection of options or in his own words.

[26] Plaintiff Hall attests that, "[o]n July 10, 2019, [he] attended a community meeting" and the "D[-]District Chief at the time[] also attended" and "stated that BPD disbanded the Strike Force Unit because of racial profiling." (Doc. 294 at 6, ¶ 19.)

41

genuine issue of material fact regarding whether Defendants had discriminatory intent in designing and implementing the Checkpoints. "[I]mproper intent" is "a pure issue of fact[,]" *Crawford-El v. Britton*, 523 U.S. 574, 589 (1998), that must be decided by a jury. Defendants' motion for summary judgment on Plaintiffs' Equal Protection claim arising from the Checkpoints is therefore DENIED.

### 2. Whether There Is a Genuine Dispute that Multiple Tinted Window Tickets Were Motivated by a Discriminatory Intent.

Plaintiffs rely on statistics to support their Equal Protection claim regarding tinted window citations. Dr. Bjerk found that, prior to 2012, there were no significant racial disparities, while citations between 2012 and 2015 remained relatively flat in predominantly non-Minority neighborhoods but

> in the 60-80% Minority tracts, the average number of tinted window[] citations went from 1.4 per month Pre-Strike[ F]orce to almost [eleven] per month. In the 80-100% Minority tracts, they went from an average of 1.2 per month Pre-Strike[ F]orce to an average of [sixteen] per month—a more than thirteen-fold increase. Citations for tinted windows dropped substantially in all census tract categories in the Post-Strike[ F]orce era. Even then, however, there were still an average of two to five times as many such citations per month in the [twenty-one] tracts that were 80-100% Minority, relative to the [nineteen] tracts that were 0-20% Minority and the [twenty-one] tracts that were 20-40% Minority tracts, respectively.

(Doc. 273 at 59, ¶ 195.) He also determined that during the Strike Force, BTVA, and Post-Strike Force eras, "the actual likelihood of receiving multiple tinted window citations in tinted window incidents is [ten] to [twelve] percentage points higher for those classified as Minorities than would be predicted if such individuals had been treated the same as Non-Minorities. These differences are all statistically significant at the 1% level." *Id.* at 111, ¶ 299.

Dr. Bjerk was "not aware of any evidence suggesting that among drivers who tint their windows, Non-Minorities are more likely than Minorities to tint only one window" and opined that, "to the extent that there are racial differences in the likelihood of receiving multiple tinted window tickets within tinted window incidents, it is difficult to think of any race-neutral explanation for that discrepancy." (Doc. 273 at 47, ¶ 151.)

42

Plaintiffs note that "while BPD officers may not have known every motorist's race prior to making the initial traffic stop, they unquestionably had ample opportunity to observe each motorist's race prior to deciding how many tickets to issue." (Doc. 344 at 52.)

Plaintiffs proffer evidence of City and BPD officials' awareness of complaints about multiple tinted window tickets as evidence of discriminatory intent. The IAD Witness attested that "[i]t was common knowledge within the BPD that tinted window tickets primarily went to Black drivers, even though in [her] experience, motorists of all races drive with tints." (Doc. 346 at 8, ¶ 37); *see also* Doc. 268-8 at 29:1-7 (Defendant Derenda testifying that he was aware of complaints filed with IAD, including complaints about "writing numerous tickets for one car for tinted windows").

As with the Checkpoints, the severity of the racial disparities and the alleged lack of race-neutral explanations for those disparities raises a genuine dispute as to whether Defendants acted with discriminatory intent in their practices concerning tinted windows ticketing. *See, e.g., Adams*, 116 F.4th at 172 ("[A]ggregate disproportionate impact on a particular racial group *may* be evidence of discriminatory animus or discriminatory effect[.]") (emphasis in original). Defendants' motion for summary judgment on Plaintiffs' Equal Protection claim arising from tinted window ticketing is thus DENIED.

### 3.    Whether There Is a Genuine Dispute that Discriminatory Intent Was Present in Individual Plaintiffs' Claims.

Defendants argue that the individual Plaintiffs have failed to show race played any role in their respective traffic enforcement actions, as each has admitted that he or she was ticketed for legitimate NYSVTL violations and there is allegedly no evidence of individualized racial animus. The Supreme Court has recognized "that the Constitution prohibits selective enforcement of the law based on considerations such as race[]" under the Equal Protection Clause. *Whren*, 517 U.S. at 813.[27]

---

[27] Defendants cannot defeat Plaintiffs' Equal Protection claim based on the presence of probable cause. *See Ballew v. City of Pasadena*, 642 F. Supp. 3d 1146, 1168 (C.D. Cal. 2022) ("[A] traffic stop motivated, at least in part, by race still constitutes an equal protection violation, even if the officers also had a legitimate basis for the stop.").

43

In *McCleskey v. Kemp*, the Supreme Court held that a criminal defendant who brought an Equal Protection claim against an imposed death sentence "must prove that the decision[-]makers in *his* case acted with discriminatory purpose." 481 U.S. at 292 (emphasis in original). The Court rejected the claim because the plaintiff offered "no evidence specific to his own case that would support an inference that racial considerations played a part in his sentence." *Id.* at 292-93. *McCleskey* is arguably distinguishable because it concerned capital sentencing. In the context of capital sentencing, "each particular decision to impose the death penalty is made by a petit jury selected from a properly constituted venire[]" and "[e]ach jury is unique in its composition" and "the Constitution requires that its decision rest on consideration of innumerable factors that vary according to the characteristics of the individual defendant and the facts of the particular capital offense" *Id.* at 294. In contrast, no "innumerable factors that vary according to the characteristics of the individual" motorist play a role in the issuance of a traffic citation. *Id.*

Plaintiffs Redden and Evans were ticketed at Checkpoints and Plaintiffs Franklin, Palmer, and Yeldon received multiple tinted-window tickets in a single stop, coupled with evidence of discriminatory intent or animus. Plaintiffs have thus identified sufficient evidence that they were each subjected to a "neutral law that was discriminatorily applied[,]" *Moore*, 2020 WL 5821378, at *21. Defendants' motion for summary judgment on Count II is therefore DENIED.

### D.    Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Fourteenth Amendment Procedural Due Process Claim (Count III).

"The Fourteenth Amendment places procedural constraints on the actions of government that work a deprivation of interests enjoying the stature of 'property' within the meaning of the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978). "A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process." *Bryant v. N.Y. State Educ. Dep't*, 692 F.3d 202, 218 (2d Cir. 2012).

44

> The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases. This requirement of neutrality in adjudicative proceedings safeguards the two central concerns of procedural due process, the prevention of unjustified or mistaken deprivations and the promotion of participation and dialogue by affected individuals in the decision[-]making process.

*Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980). Plaintiffs' Due Process claim is brought only against the City, and they do not challenge the BTVA's adjudication or appellate procedures as discriminatory.[28] Instead, they allege BPD officers individually and institutionally possessed a pecuniary interest in the issuance of citations and adjudications that undermined the neutrality of the BTVA proceedings. Citing the award of overtime for high ticket production and the institutional interest from the City's reliance on revenue from traffic violations to balance its budget, they claim a Due Process violation on this basis.

In *Jerrico*, the Supreme Court acknowledged that Due Process protections against partiality in the adjudicator can extend to the prosecutor where decisions "were motivated by improper factors or were otherwise contrary to law." *Id.* at 249. It observed that "the decision to enforce—or not to enforce—may itself result in significant burdens on a defendant or a statutory beneficiary, even if he is ultimately vindicated in an adjudication[,]" and explained that "[a] scheme injecting a personal interest, financial or otherwise, into the enforcement process may bring irrelevant or impermissible factors into the prosecutorial decision and in some contexts raise serious constitutional questions." *Id.* at 249-50. Recognizing that police officers are part of the enforcement process, some courts have extended Due Process neutrality requirements to police officers. *See, e.g., Coleman v. Town of Brookside, Ala.*, 663 F. Supp. 3d 1261, 1272 (N.D. Ala. 2023) ("Although judges are held to a stricter standard, constitutional scrutiny has also been applied to the pecuniary interest of prosecutors and police officers in enforcing

---

[28] As Defendants point out, "the availability of Article 78 proceedings adequately serves as a mechanism to cure any bias." *Torres v. City of New York*, 590 F. Supp. 3d 610, 622 (S.D.N.Y. 2022).

the law.") (citing *Brucker v. City of Doraville*, 38 F.4th 876, 886-87 (11th Cir. 2022));
*McNeil v. Cmty. Prob. Servs., LLC*, 2021 WL 365844, at *15 (M.D. Tenn. Feb. 3, 2021)
(applying due process neutrality requirement to probation and parole officers who
traditionally perform both quasi-judicial and enforcement functions).

To find a Due Process violation, however, the personal interest of the government
actor must not be remote. For this reason, the Supreme Court declined to find a Due
Process violation where the salaries of the officials involved in enforcement were fixed
and the revenue collected from enforcement was less than one percent of the entity's
budget, characterizing the "influence alleged to impose bias [as] exceptionally remote."
*Jerrico*, 446 U.S. at 250. The Eleventh Circuit similarly considered the possibility of
police officer bias too remote where, even though penalties and fees generated from
tickets amounted to eleven to twenty-five percent of the city's revenue, police officers'
compensation and employment were not tied to the number of citations they issued. It
explained that "[eleven] to [twenty-five] percent is still a far cry from the kind of bounty
system that raises core due process concerns. . . . [I]t is too low for us to conclude that the
police department was 'financially dependent on the maintenance of a high level of
penalties.'" *Brucker*, 38 F.4th at 888 (quoting *Jerrico*, 446 U.S. at 251). In instances
where courts have found partiality violative of procedural due process, the share of
revenue from fines and penalties constituted close to a majority of municipal revenue or
there was a direct pecuniary interest in the outcome of a case. *See, e.g., Coleman*, 663 F.
Supp. 3d. at 1272 (observing that fines and penalties constituted forty-nine percent of
town's total revenue); *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927) (noting that
mayor's compensation was dependent on conviction).

In this case, like *Jerrico* and *Brucker*, the salary of the officials involved in
adjudication is fixed,[29] police officers' salaries and pay rates are fixed, and the revenue

---

[29] When a motorist receives a traffic ticket, the case is prosecuted by a lawyer whose salary is
fixed and who has no financial stake in the outcome and adjudicated by a neutral hearing officer
with no financial stake in the outcome. *See* Doc. 331-4 at 4:22-6:2 (BTVA prosecutor testifying

collected from traffic enforcement is only one to three percent of the City's budget. Unlike *Brucker*, BPD officers do not try their own cases. There is also no evidence BPD officers were given a quota or bounty per ticket nor threatened with termination or other discipline if they did not satisfy a quota even if they were encouraged to be productive to justify any overtime awarded. Time in court was compensated at an increased rate regardless of the outcome.[30]

Although officers were able to increase their salary significantly with overtime, the ability to do so is virtually universal among police officers, and the availability of overtime pay based on either seniority or productivity is too remote under applicable precedent to constitute a procedural Due Process violation. Defendants' motion for summary judgment with respect to Plaintiffs' Fourteenth Amendment Procedural Due Process claim (Count III) is therefore GRANTED.

E.    **Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Title VI Claim (Count IV).**

Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." Title VI affords a private right of action only for intentional discrimination, *see Alexander v. Sandoval*, 532 U.S. 275, 294 (2001), and requires a plaintiff to show (1) "that the defendant discriminated against him [or her] on the basis of race"; (2) "that that discrimination was intentional"; and (3) "that the discrimination was a substantial or motivating factor for the defendant's actions[.]" *Tolbert v. Queens Coll.*, 242 F.3d 58, 69

---

in deposition that he is compensated under an annual salary determined by the City and is not eligible for bonuses or overtime).

[30] At the October 17, 2025 hearing, Plaintiffs and Defendants disagreed about the rate at which court time was compensated. Plaintiffs represented court time pay as time and a half while Defendants believed it to be four hours' pay. Both parties agree, however, that court time represents pay above an officer's salary.

47

(2d Cir. 2001) (internal quotation marks and citations omitted). Under the statute, "program or activity" includes:

> (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a state or local government[.]

42 U.S.C. § 2000d-4a(1).

In their reply, Defendants argue, for the first time, that the City, because it is a municipality, is not a "program or activity" under Title VI. They cite *Wilkins v. City of Chicago*, in which the Northern District of Illinois concluded that "Chicago is a municipality, not a 'program' or 'activity', and therefore does not fit under the scope of Title VI's coverage." 736 F. Supp. 3d 616, 622 (N.D. Ill. 2024). Because Defendants raise this argument for the first time in their reply, the court will not consider it. *See McBride v. BIC Consumer Prods. Mfg. Co., Inc.*, 583 F.3d 92, 96 (2d Cir. 2009) ("[W]e ordinarily will not consider issues raised for the first time in a reply brief.").[31] Defendants may nonetheless renew this argument in a motion *in limine* or in a motion for a directed verdict.

### 1. Whether Title VI Requires a Nexus Between a Contested Action and a Federally Funded Program.

Defendants allege that, under Title VI, not only must the program or activity be a recipient of federal funds, but the contested action must be in furtherance of a federally

---

[31] Although some courts, like the Northern District of Illinois, have concluded that a municipality does not constitute a "program or activity" under Title VI, the Second Circuit has not decided this issue. Second Circuit courts have permitted Title VI actions against municipalities. *See, e.g., Davis v. City of New York*, 959 F. Supp. 2d 324, 365 (S.D.N.Y. 2013) (allowing Title VI claim to proceed against New York City upon finding it was a recipient of federal financial assistance); *cf. Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 11629176, at *9 (E.D.N.Y. Aug. 5, 2021) (noting that "[a] municipality cannot be liable under Title VI on a theory of *respondeat superior*, and it cannot be liable unless it had actual knowledge of discrimination and was deliberately indifferent to it[]"); *Ass'n Against Discrimination in Emp. v. City of Bridgeport*, 647 F.2d 256 (2d Cir. 1981) (vacating lower court's ruling that city violated Title VI for failure to establish logical nexus between federal funding and challenged practice, not because entity was a city).

funded program. Stated differently, Defendants argue that there must be a nexus between the contested action and a federally funded program. *See Moore v. City of New York*, 2017 WL 35450, at *14 (S.D.N.Y. Jan. 3, 2017), *report & recommendation adopted by* 2017 WL 1064714 (S.D.N.Y. Mar. 20, 2017) (holding that to survive a motion to dismiss, "a plaintiff must sufficiently set forth a logical nexus between the federally funded program and the employment discrimination suffered that is supported by evidence proffered in the complaint[]") (internal quotation marks omitted); *see also Bhanusali v. Orange Reg'l Med. Ctr.*, 2012 WL 13059694, at *9 (S.D.N.Y. Jan. 20, 2012) (determining that an orthopedic surgeon failed to plead a Title VI claim when he failed to show "that the funds were primarily intended to provide employment"). Plaintiffs contend that there is no such requirement.

The Second Circuit articulated the nexus requirement in *Ass'n Against Discrimination in Employment v. City of Bridgeport*, 647 F.2d 256 (2d Cir. 1981), based on the language of 42 U.S.C. § 2000d-3, a provision of Title VI applicable only to claims of discriminatory employment practices. *See id.* at 276 ("[42 U.S.C. § 2000d-3] in effect requires a logical nexus between the use of federal funds and the practice toward which agency action is directed."); *see also* 42 U.S.C. § 2000d-3 ("Nothing contained in this subchapter shall be construed to authorize action under this subchapter by any department or agency with respect to any employment practice of any employer, employment agency, or labor organization except where a primary objective of the Federal financial assistance is to provide employment."). "Defendants have cited no binding Second Circuit precedent extending the logical nexus requirement outside the employment discrimination context." *Alexander v. Hunt*, 2018 WL 3801240, at *8 (D. Vt. Aug. 9, 2018). There is thus no requirement of a logical nexus between the federal funds and the contested action outside the employment practice context. Rather, it is sufficient that the City received federal funds. Defendants agree that this requirement was satisfied.

### 2. Whether There is a Genuine Dispute that the City Intentionally Discriminated Against Plaintiffs.

The parties agree that the discriminatory intent element of the Title VI claim rises or falls with Plaintiffs' Equal Protection claim. Because the court found a genuine issue of material fact concerning discriminatory intent for Plaintiffs' Equal Protection claim, Defendants' motion for summary judgment with respect to Plaintiffs' Title VI claim (Count IV) is also DENIED.

### F. Whether Defendants Are Entitled to Summary Judgment on Plaintiffs' Claim for Injunctive Relief.

Following the court's April 22, 2025 Opinion and Order granting in part and denying in part Plaintiffs' motion to certify class, (Doc. 261), and the court's March 27, 2026 Opinion and Order denying Plaintiffs' motion to reconsider or renew, (Doc. 357), Plaintiffs' requests for injunctive relief have been dismissed. Defendants' motion for summary judgment on Plaintiffs' claim for injunctive relief is therefore DENIED AS MOOT.

### G. Whether Defendants Brown, Derenda, and Lockwood Are Entitled to Qualified Immunity.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). "When a defendant moves for summary judgment based on qualified immunity, courts consider whether the facts shown make out a violation of a constitutional right, and whether the right at issue was clearly established at the time of the defendant's alleged misconduct." *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (alteration adopted) (citation and internal quotation marks omitted).

Whether a defendant's conduct is objectively reasonable for qualified immunity purposes "is always a question of law for the court." *Gonzales v. Duran*, 590 F.3d 855, 864 (10th Cir. 2009) (Ebel, J., concurring); *see also Zellner v. Summerlin*, 494 F.3d 344, 368 (2d Cir. 2007) (observing that if there are no "disputed facts that are material to the

qualified immunity issue, the ultimate determination of whether the officer's conduct was objectively reasonable is to be made by the court[]"). However, where there are disputed issues of material fact, a determination of qualified immunity is often inappropriate at the summary judgment stage. *See Husain v. Springer*, 494 F.3d 108, 133 (2d Cir. 2007) (noting that "summary judgment on qualified immunity grounds is not appropriate when there are facts in dispute that are material to a determination of reasonableness[]") (alteration adopted) (internal quotation marks and citation omitted).

Plaintiffs have established that there are genuine disputes of material fact regarding whether the Checkpoints were a pretext for unlawful discrimination and whether they were motivated by discriminatory intent. Correspondingly, there are genuine disputes of material fact regarding whether Defendants Brown, Derenda, and Lockwood violated the Constitution and, if so, how that violation occurred. The court thus cannot determine whether any constitutional violation was clearly established. Defendants' motion for summary judgment with respect to qualified immunity for Defendants Brown, Derenda, and Lockwood is therefore DENIED.

### H.    Whether Defendant Brown Is Liable Under § 1983.

"To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). A plaintiff must "establish a deliberate, intentional act on the part of the defendant to violate the plaintiff's legal rights." *Tangreti v. Bachman*, 983 F.3d 609, 618 (2d Cir. 2020) (internal quotation marks and citation omitted). "A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002).

In *Ashcroft v. Iqbal*, the Supreme Court clarified that "the term 'supervisory liability' is a misnomer" because, "[a]bsent vicarious liability, each [g]overnment official, his or her title notwithstanding, is only liable for his or her own misconduct." 556 U.S. 662, 677 (2009). After *Iqbal*, "there is no special rule for supervisory liability." *Tangreti*, 983 F.3d at 618. Instead, "[t]he [alleged constitutional] violation must be established

against the supervisory official directly[,]" *id.*, and "a plaintiff must plead that each [g]overnment-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 616 (quoting *Iqbal*, 556 U.S. at 676) (internal quotation marks omitted). The "factors necessary to establish" that a supervisor violated the plaintiff's constitutional rights "will vary with the constitutional provision at issue because the elements of different constitutional violations vary." *Id.* at 618 (internal quotation marks and citation omitted). "The focus is on what the supervisor did or caused to be done, 'the resulting injury attributable to his conduct, and the *mens rea* required of him to be held liable, which can be no less than the *mens rea* required of anyone else.'" *Id.* (quoting *Porro v. Barnes*, 624 F.3d 1322, 1327-28 (10th Cir. 2010) (emphasis omitted)).

A supervisor may generally be held liable as a "direct participant" in a constitutional violation only where he or she "authorizes, orders, or helps others to do the unlawful acts, even if he or she does not commit the acts personally." *Terebesi v. Torreso*, 764 F.3d 217, 234 (2d Cir. 2014) (internal quotation marks and citation omitted). In addition, "'direct participation' by a supervisor in a constitutional violation 'requires intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal.'" *Ruggiero v. Cnty. of Orange*, 2023 WL 7005074, at *11 (S.D.N.Y. Oct. 24, 2023) (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). Sufficient personal involvement has been found to exist where:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference . . . by failing to act on information indicating that unconstitutional acts were occurring.

*Hawthorne by Hawthorne v. Cnty. of Putnam*, 492 F. Supp. 3d 281, 293 (S.D.N.Y. 2020) (alteration in original) (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013)). "If a defendant has not *personally* violated a plaintiff's constitutional rights, the

52

plaintiff cannot succeed on a § 1983 action against the defendant." *Raspardo v. Carlone*, 770 F.3d 97, 115 (2d Cir. 2014) (emphasis in original).

Defendant Brown served as the mayor of the City for almost twenty years, including for most of the time at issue in this action. In his role as mayor, he was a policymaking official of the City, whose role he described as "developing programs and initiatives that help to deliver services to the residents of the community and to introduce legislation that can be reviewed and approved[ and] passed by the City Council." (Doc. 268-6 at 8:15-19.) He was also "the chief executive officer of the administration of City government" and "manage[d] the work of the commissioners that manage the various departments of City government." *Id.* at 10:7-11. Defendant Brown appointed the BPD commissioners, including Defendant Derenda. He was mayor when the Checkpoint Program began. At no point did he issue a formal directive terminating the Checkpoints or preventing them from resuming.

Plaintiffs argue that Defendant Brown's direct participation in the alleged constitutional violations of the Checkpoints stems from his authorization of the Checkpoints and his role in "an elaborate pretextual cover[-]up to conceal the racially discriminatory impact of the [Checkpoints] . . . from the public." (Doc. 344 at 28.) Plaintiffs rely on *Goodall v. New York State Dep't of Corrections & Community Supervision*, in which the court permitted a § 1983 claim to proceed to trial against the acting commissioner of the New York State Department of Corrections for the implementation of a challenged policy. 725 F. Supp. 3d 248, 269 (N.D.N.Y. 2024). The *Goodall* court noted that the acting commissioner had signed the directive at issue, had promulgated rules and regulations for the challenged program, and had the authority to designate facilities where the challenged policy would be administered.

Defendant Brown testified that he "wasn't involved in the creation [of the Strike Force.] It was a recommendation of the police department[.]" (Doc. 268-6 at 24:5-8.) He explained that, as mayor, he reviewed recommendations for BPD policy from BPD commissioners and that he would "offer [his] concerns or recommendations for the concerns of the community and then the commissioner and the commissioner's

53

management team would make decisions." *Id.* at 14:19-15:1. However, there is evidence that Defendant Brown "approved of the Checkpoint Program in all respects[,]" (Doc. 344 at 28), as he testified that, "[t]he [C]heckpoint [P]rogram as it was proposed and administered I did support at the time." (Doc. 268-6 at 45:10-11.) This support may be more than "mere knowledge and acquiescence to unconstitutional conduct, or mere failure to act on a complaint[.]" *Hawthorne*, 492 F. Supp. 3d at 294 (internal quotation marks and citations omitted).

Although a close question, in the light most favorable to Plaintiffs, the undisputed and disputed evidence construed in Plaintiffs' favor supports a conclusion that Defendant Brown was a direct participant in the challenged conduct and alleged ensuing constitutional violations. Defendants' motion for summary judgment with respect to Defendant Brown's liability is therefore DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART AND DENIED IN PART. (Doc. 252.) The court GRANTS Defendants' motion for summary judgment on Count III and on Count I to the extent Plaintiffs assert non-Checkpoint claims. The court DENIES Defendants' motion for summary judgment on Count I to the extent Plaintiffs assert Checkpoint claims, Count II, and Count IV. The court DENIES Defendants' motion for summary judgment with respect to qualified immunity for Defendants Brown, Derenda, and Lockwood and Defendant Brown's liability. The court DENIES AS MOOT Defendants' motion for summary judgment on Plaintiffs' injunctive relief. The court DENIES Plaintiffs' motion for partial summary judgment. (Doc. 253.)

SO ORDERED.

Dated this ___29th___ day of May, 2026.

Christina Reiss, District Judge
United States District Court

54

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| DORETHEA FRANKLIN, TANIQUA SIMMONS, DE'JON HALL, JANE DOE, Individually and on behalf of a class of Others similarly situated, SHIRLEY SARMIENTO, EBONY YELDON, CHARLES PALMER, SHAKETA REDDEN, and JOSEPH BONDS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF BUFFALO, N.Y., BYRON B. BROWN, Mayor of the City of Buffalo, in his individual and official capacities, BYRON C. LOCKWOOD, Commissioner of the Buffalo Police Department, in his individual capacity, DANIEL DERENDA, former Commissioner of the Buffalo Police Department, in his individual capacity,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Case No. 1:18-cv-00719 |

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION TO RECONSIDER OR RENEW THE MOTION TO CERTIFY THE TRAFFIC ENFORCEMENT CLASS AND DENYING PLAINTIFFS' MOTION TO INTERVENE MARKEL NANCE AND THOMAS CHRISTOPHER WILLIAMS, JR. AS PLAINTIFFS AND REPRESENTATIVES OF THE TRAFFIC ENFORCEMENT CLASS**
(Docs. 326 & 327)

## I.    Procedural Background.

Plaintiffs Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, and Jasmine Evans bring this action against the City of Buffalo, New York (the "City"); former City of Buffalo Mayor Byron B. Brown; former Buffalo Police Department ("BPD") Commissioner

Byron C. Lockwood; and former BPD Commissioner Daniel Derenda (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.[1]

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs allege violations under the Fourth Amendment, Fourteenth Amendment Equal Protection Clause, Fourteenth Amendment Due Process Clause, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d).

Plaintiffs filed an amended class action complaint ("Amended Complaint"), (Doc. 63), on May 21, 2020, and a motion for class certification on May 29, 2024. (Doc. 202.) On April 22, 2025, the court certified two distinct classes: (1) a "Checkpoint Class"[2] and (2) a "Tinted Windows Class".[3] (Doc. 261.) The court denied certification for a third class, the "Traffic Enforcement Class," finding the class lacked standing, was unascertainable, and the injunctive relief primarily requested an "obey the law" injunction. *Id.* Only that decision is at issue in Plaintiffs' motion for reconsideration.

Plaintiffs define the Traffic Enforcement Class as: "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." *Id.* Alternatively, they characterize the class as "Black individuals who plan to continue to drive in the City of Buffalo[.]" (Doc. 327-1 at 15.)

---

[1] On October 3, 2025, the court granted Plaintiffs' consent motion to dismiss Black Love Resists in the Rust as a plaintiff and to dismiss claims against Defendants Young, Brinkworth, Serafini, Thomas, and the Unknown Defendants. (Doc. 349.)

[2] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[3] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2025." *Id.*

2

Plaintiffs seek a declaration that Defendants have violated Plaintiffs' constitutional rights and a class-wide injunction mandating significant changes in Defendants' policies, practices and/or customs, as well as an award of monetary damages, attorneys' fees, and costs.

On July 11, 2025, Plaintiffs filed a motion to reconsider the denial of the motion to certify the Traffic Enforcement Class pursuant to Fed. R. Civ. P. 54(b) or, in the alternative, to renew the motion to certify pursuant to Fed. R. Civ. P. 23(c)(1)(C). (Doc. 327.) Simultaneously, Plaintiffs filed a motion to intervene Markel Nance and Thomas Christopher Williams, Jr. (collectively, the "Proposed Intervenors") as plaintiffs and representatives of the Traffic Enforcement Class, seeking either mandatory or permissive intervention in this class action pursuant to Fed. R. Civ. P. 24. (Doc. 326.) Defendants opposed both motions on September 26, 2025, (Doc. 338), and Plaintiffs filed a reply on October 10, 2025. (Doc. 351.) A hearing was held on October 17, 2025, at which time the court took the pending motions under advisement.

Plaintiffs are represented by Andrea Chinyere Ezie, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Claudia Wilner, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., and Jordan Scott Joachim, Esq. Defendants are represented by Peter A. Sahasrabudhe, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

## II.    Plaintiffs' Motion for Reconsideration.

### A.    Standard of Review.

The standard for reconsideration in the Second Circuit is an exacting one. "[R]econsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995). "[A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided." *Id.* A party may "obtain relief only when the [party] identifies an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or

prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Tr.*, 729 F.3d 99, 108 (2d Cir. 2013) (internal quotation marks and citation omitted).

Plaintiffs contend that reconsideration is warranted because the court's standing analysis contained two errors: (1) the court incorrectly limited its standing analysis to Checkpoints and (2) it evaluated injunctive standing based on recent events rather than as of the date individual plaintiffs joined the action.

**B.      Whether the Court Incorrectly Limited Its Standing Analysis.**

The court did not limit its standing analysis to Checkpoints. It instead considered allegations from Plaintiffs concerning "multiple traffic citations unrelated to Checkpoints." (Doc. 261 at 11.) The court recounted allegations from a 2017 traffic stop and 2019 and 2022 tickets issued while vehicles were parked in BMHA-owned parking lots. The court noted that "[a]ll of these incidents refer to past harm." *Id.* The court also considered Plaintiffs' non-Checkpoint claims when determining whether Plaintiffs could establish standing based on statistical disparities. *See id.* at 12 ("To the extent Plaintiffs rely on evidence that non-white motorists are statistically more likely to receive a traffic infraction ticket than white motorists, . . . this evidence also reflects past alleged harms . . . [and] does not rise to a real and immediate threat of future injury.") (internal quotation marks and citation omitted). Because Plaintiffs mischaracterize the court's decision as limiting its standing analysis to Checkpoints, it will not reconsider its previous decision on this basis.

**C.      Whether the Court Evaluated Injunctive Standing Using the Incorrect Date.**

To support their second argument in favor of reconsideration, Plaintiffs cite Second Circuit precedent that "'standing is to be determined as of the commencement of suit,' even for plaintiffs seeking forward-looking relief." *Doe v. McDonald*, 128 F.4th 379, 384 (2d Cir. 2025) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). Plaintiffs do not allege that each individual plaintiff's claims relate back to the date of original filing but, rather, assert that "standing for new plaintiffs is governed by the date on which they sought leave to join the action[,]" which Plaintiffs contend is June 28,

4

2018, the date the action was commenced, for Plaintiffs Simmons, Franklin, Evans, and Hall, and April 23, 2020, the date of the motion for leave to file an amended and supplemental complaint, for Plaintiffs Bonds, Yeldon, Sarmiento, and Redden.[4] (Doc. 327-1 at 18.)

Plaintiffs rely on two Second Circuit cases for their contention that the filing date of the original complaint and any amended complaint are the appropriate dates by which to evaluate standing, *Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993) and *Comer v. Cisneros*, 37 F.3d 775, 791 (2d Cir. 1994). In *Robidoux*, applicants for Vermont public assistance benefits brought an action challenging delays in the processing of their applications. Robidoux filed the complaint and motion for class certification on the same day. Other named plaintiffs later moved to intervene. At the time of both filings, the plaintiffs had not yet received their benefits. The district court denied the motion for class certification two months later. The Second Circuit found that the lower court erred in denying the motion for class certification because "at the material time," which the court determined was the date Robidoux filed her complaint, the injury was "capable of being redressed by declaratory or injunctive relief[.]" 987 F.2d at 938. In *Comer*, the plaintiffs moved for class certification less than two months after filing their complaint. And while the Second Circuit in *Comer* held that class certification would relate back to the date of the original filing, it did so by noting the district "court's failure to pass upon the plaintiffs' motion for class certification for over two years[.]" 37 F.3d at 799.

Defendants rely on *Jobie O. v. Spritzer*, 2007 WL 4302921 (S.D.N.Y. Dec. 5, 2007), to support their claim that "[w]here, as here, a complaint and a motion for class certification are not filed simultaneously, the timing of the motion for class certification is the material time for determining whether plaintiffs have standing." (Doc. 338 at 11.) In *Jobie O.*, the plaintiff intervened in the case in June 2006 and moved for class certification a year later in July 2007. Finding the plaintiff lacked standing in July 2007,

---

[4] Plaintiffs' motion did not mention Plaintiff Palmer, but he was added to the amended and supplemental complaint.

5

the court denied the motion for class certification. In doing so, the district court described the likelihood of future harm as too speculative and dependent upon a series of inferences that the plaintiff "would again become incarcerated in a New York City jail as a parole detainee for an excessive amount of time, awaiting an opening in a suitable MICA program[,]" placement in which was discretionary. *Jobie O.*, 2007 WL 4302921, at *15.

Plaintiffs oversimplify the *Jobie O.* court's ruling by characterizing it as predominantly a mootness analysis. As the court noted, "Because Mr. O. was no longer suffering the injury for which he seeks injunctive relief at the time he moved for class certification, *in order to have standing*, he would need to show that the threat of him suffering from the same injury is '"real and immediate," not "conjectural," or "hypothetical."'" *Id.* at *14 (emphasis supplied) (quoting *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004)). The court distinguished *Comer*, noting it was the plaintiff's failure to file a motion for class certification, not the court's failure to render a decision, that caused the individual plaintiff's claim to become moot. The court also distinguished *Robidoux*, because there the plaintiff filed the motion for class certification a year after his motion to intervene, rather than on the same day. In deciding the operative date for establishing standing, the *Jobie O.* court relied on *White v. Mathews*, 559 F.2d 852 (2d Cir. 1977), wherein the court "suggested that 'the material time' was the date on which the motion for class certification was filed[,]" which controls "when the complaint and the motion for class certification are *not* filed simultaneously[.]" *Jobie O.*, 2007 WL 4302921, at *11 (emphasis in original). In *White*, the Second Circuit evaluated standing for the class as of the date when the named plaintiff "*moved to certify the class* and still had not received a hearing[.]" 559 F.2d at 857 (emphasis supplied).

Plaintiffs filed their motion for class certification six years after their initial complaint. Even if the filing date for the class certification motion was the operative date, the standing analysis would remain unchanged because every Plaintiff and every Proposed Intervenor for the Traffic Enforcement Class alleges infrequent and past harm. Like the plaintiff in *Jobie O.*, their risk of future harm depends upon a speculative chain of inferences based upon a belief that if they continue to drive in Buffalo, they will suffer

discriminatory treatment after they either commit or do not commit a traffic infraction. This type of harm is unparticularized, impossible to redress through a narrowly tailored injunction,[5] and would require an individualized evidentiary analysis of each traffic stop that took place for all Black and Latino drivers, anywhere in Buffalo, for eternity. The court declined to find an imminent risk of concrete, non-speculative, irreparable harm based on those facts.

In denying class certification, the court further found that the Traffic Enforcement Class was unascertainable because it "is virtually limitless because it does not specify a time period for class membership or specify a future duration for the proposed injunction[,]" (Doc. 261 at 9), and because it would encompass every Black and Latino driver who planned to drive in the City. The practices Plaintiffs sought to enjoin other than the Checkpoints, which were discontinued as of the filing of their motion, were similarly unascertainable and amorphous and consisted of alleged discriminatory traffic enforcement writ large as opposed to specific, discrete practices.[6] Enforcement of and

---

[5] "An injunction is a drastic and extraordinary remedy," *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010), that must be narrowly tailored to redress a particularized and non-speculative harm. *See, e.g., Forschner Grp., Inc. v. Arrow Trading Co. Inc.*, 124 F.3d 402, 406 (2d Cir. 1997) (requiring the court "to grant relief no broader than necessary to cure the effects of the harm caused by the violation[]"); *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) ("In fashioning an injunction, the court should make the relief as narrow as required to attain the desired result.").

[6] Plaintiffs sought class certification under Fed. R. Civ. P. 23(a) and 23(b)(2) for the Traffic Enforcement Class. "Rule 23(b)(2) allows class treatment when 'the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief . . . is appropriate respecting the class as a whole.'" *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360 (2011). "The key to the (b)(2) class is 'the indivisible nature of the injunctive . . . remedy warranted—the notion that the conduct is such that it can be enjoined . . . only as to all of the class members or as to none of them.'" *Id.* (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)). "In other words, Rule 23(b)(2) applies only when a single injunction . . . would provide relief to each member of the class. It does not authorize class certification when each individual class member would be entitled to a *different* injunction . . . against the defendant." *Id.* (emphasis in original).

Although "'civil rights cases against parties charged with unlawful, class-based discrimination are prime examples' of what (b)(2) is meant to capture[,]" *id.* at 361 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997), the practices the Traffic Enforcement Class seeks to

7

compliance with such an injunction would, among other things, require law enforcement to make assumptions regarding a vehicle operator's race and may require intervention at every turn. The court could not prohibit law enforcement from issuing tickets for motor vehicle violations, nor could it micromanage how those interactions took place, including whether the operator was Black or Latino, whether a traffic stop or other enforcement mechanism was justified, whether the fines imposed or other consequences were merited by the severity of the infractions, and whether the encounter as a whole was lawful or discriminatory. Plaintiffs cite no precedent for issuing an injunction of that nature.

Finally, in denying class certification, the court determined that the Traffic Enforcement Class primarily requested an impermissible "obey the law" injunction. *Id.* at 9; *see also City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (alteration adopted) (finding that injunctions that "impose[d] on defendants an obligation to act 'in full conformity with applicable laws pertaining to firearms,' and to 'adopt appropriate prophylactic measures to prevent violation' of those laws[]" failed under Rule 65(d)); *Wakefield v. Scott*, 2021 WL 10342467, at *4 (D. Vt. June 24, 2021) (noting plaintiff's claims for injunctive relief failed "because her request for a command to 'direct defendants from violating the law' did not comply with Federal Rule of Civil Procedure 65(d) and Second Circuit precedent requiring that an injunction be more specific than a simple command that the defendant obey the law[]") (citation omitted)). All of these concerns remain and have little to nothing to do with the date of the court's standing analysis.

Because Plaintiffs have failed to satisfy the exacting standard for reconsideration, their motion for reconsideration is DENIED.

## III.    Plaintiffs' Motion to Intervene.

Plaintiffs claim that new evidence in the form of a motion to intervene provides a basis for reconsideration because the Proposed Intervenors have had more recent

---

enjoin are as varied as the number of traffic infractions in the NYSVTL, rendering each individual class member "entitled to a *different* injunction[.]" *Id.* at 360 (emphasis in original).

experiences of what they allege are racist and discriminatory traffic stops and other encounters with law enforcement. They also cite what they claim is new statistical evidence that bolsters their claim of racial disparities in policing that can only be explained by racial discrimination.[7]

Defendants point out that both the intervenors and the statistical evidence are not new; both were reasonably available when Plaintiffs filed their motion for class certification or shortly thereafter, and the allegedly new evidence cures none of the deficiencies the court identified in denying certification to the Traffic Enforcement Class.

### A.   Proposed Intervenors' Factual Allegations.

The following facts are taken from Proposed Intervenors' Class Action Complaint in Intervention. (Doc. 326-3.)

### 1.   Mr. Nance.

Markel Nance is a 25-year-old Black male and Buffalo resident. On May 22, 2021, around 4:00 a.m., Mr. Nance was pulled over by the BPD on his way home with his girlfriend while driving a luxury vehicle. The BPD officer, who is White, told Mr. Nance he stopped him for speeding, which the officer measured using his own cruiser's speed. The BPD officer instructed Mr. Nance to exit his vehicle, patted him down for weapons, and placed him in the back of the patrol car. Mr. Nance contends that the officer had no basis for the pat down or to detain him in the patrol car.

During the traffic stop, the BPD officer spoke to Mr. Nance "in a demeaning manner, addressing him as 'my man,' 'my guy,' and 'dog.'" *Id.* at 5, ¶ 14. In response to Mr. Nance requesting a lieutenant, the BPD officer called Mr. Nance a "smartass[]" and accused him of being racist. *Id.* at ¶ 17 (internal quotation marks omitted). "When Mr. Nance responded that he could[ not] be racist because he is Black, [the officer] responded, 'Must be nice.'" *Id.* at ¶ 18. The officer also allegedly "commented that his supervisor 'is Black, so you guys will have a great conversation.'" *Id.* Mr. Nance was

---

[7] To the extent Plaintiffs developed additional statistical evidence after the court's hearing on class certification, they never requested to supplement the record with it.

issued three tickets for "speed not reasonable and prudent," and failing to observe a traffic signal, which were allegedly unjustified, as well as unlicensed operation. *Id.* at 6, ¶ 19 (internal quotation marks omitted). At the conclusion of the traffic stop, the officer told Mr. Nance "'[p]eace out homie,' and flashed a peace sign[.]" (Doc. 325-3 at 6, ¶ 20.)

Mr. Nance reported the encounter to the BPD's Internal Affairs Division ("IAD") as a racially discriminatory traffic stop. IAD interviewed Mr. Nance but not his girlfriend, who witnessed the stop. IAD told Mr. Nance in a letter that "the Police Commissioner would determine what disciplinary action the officer should face, though [Mr. Nance] was never informed if any such disciplinary action was taken." *Id.* at ¶ 22.

On January 6, 2022, Mr. Nance had another encounter with BPD while driving a rental car. As Mr. Nance drove by BPD officers conducting a different traffic stop, his passenger placed his head out the rental car's window. The officers pulled Mr. Nance over, questioned him about whether his name was on the rental agreement, and issued him four tickets. One ticket was for unlicensed operation. Mr. Nance had a valid license but had only a learner's permit in his possession at the time. The officers also cited him for failing to stop at a stop sign, which Mr. Nance asserts is false. Upon telling the officers he was going to file a complaint with IAD, an officer allegedly responded, "Go to IA. I don't give a f[**]k. What are they going to do?" *Id.* at 7, ¶ 25 (internal quotation marks omitted). Mr. Nance filed a complaint with IAD, which did not interview a witness to the stop or inform Mr. Nance of the outcome of any investigation.

Mr. Nance was pulled over again while driving a rental car in March 2022. The BPD officer told Mr. Nance he did not come to a complete stop at the stop sign, which Mr. Nance claims is untrue. He was issued a ticket for failure to stop. Mr. Nance contested this ticket in court and the case was dismissed.

On November 24, 2023, Mr. Nance was stopped by BPD officers on his way home after passing around a turning car. Two officers made a U-turn and pulled him over before two additional officers arrived. The officers "asked [Mr. Nance] to exit his car [and] then placed him in the back of the patrol car while they searched his car without justification

or permission." *Id.* at 8, ¶ 29. After the search, they "issued him two tickets for imprudent speed and unsafe lane movement and told him he was free to go." *Id.*

Mr. Nance was pulled over again in March 2024. He does not provide information about the operation that initiated this encounter, but he alleges he was issued "six tickets, including two misdemeanors, for [his] single insurance lapse." *Id.* at ¶ 30.

### 2.   Mr. Williams.

Thomas Christoper Williams, Jr. is a 20-year-old African American male who was born and raised on the East Side of the City and continues to live and study in the City.

On March 26, 2024, around 11:30 p.m., Mr. Williams was waiting at a traffic light when a BPD officer driving in the opposite direction "looked at him with a hostile expression that made Mr. Williams fear for his life and then proceeded to make a U-turn and pulled up behind Mr. Williams." (Doc. 326-3 at 9, ¶ 36.) Mr. Williams drove home and the BPD officers, both of whom are White, followed him, turned into his driveway, activated their lights, and "barricad[ed] his car in the driveway." *Id.* at ¶ 37. The officers approached Mr. Williams and asked, "You live here, brother?" *Id.* at ¶ 38 (internal quotation marks omitted). Mr. Williams stated that he did and provided the officers with his license, registration, and insurance information, as well as his father's business card indicating his father was a Sergeant with the Police Department of Anne Arundel County, Maryland.

The officers questioned Mr. Williams about a variety of matters, including "what he was doing, where he was coming from, whether he lived in [the] house, and why he was[ not] wearing a coat[,]" as well as "his gym, his school, his areas of study, his grades, why he was nervous, and if the car was stolen[.]" *Id.* at 10, ¶ 40. They also asked him if he had warrants or had been on probation or parole. He told them "no" and they told him "they had to run his license." *Id.* Despite holding his license, they called him by the wrong name, "James." *Id.* (internal quotation marks omitted).

The officers advised Mr. Williams that "they just had one of these cars stolen and that Mr. Williams 'scared' the officer by pulling into his driveway[.]" (Doc. 326-3 at 10, ¶ 41.) The officers gave different reasons for the stop, including that Mr. Williams had not

11

used his directional signal when turning into his driveway, "that he had pulled all the way into his driveway and appeared nervous, and that they were not sure if he lived in the house." *Id.* at ¶ 42. They later also claimed that he was speeding before turning into the driveway.

As the officers continued to question Mr. Williams, his mother and aunt came out of the house. Mr. Williams's mother confirmed that he was her son, he lived at the house, and the car was not stolen. Mr. Williams's mother called Mr. Williams's father, who also confirmed to the officers that Mr. Williams was his son and was driving the family car. Despite these representations from Mr. Williams's parents, the officers "r[a]n Mr. Williams['s] name and license" and checked for warrants. *Id.* at 11, ¶ 44. They neither ticketed Mr. Williams nor issued him a stop receipt. Mr. Williams claims there was "no legal basis to prolong the stop to run a background check and ask extensive questions unrelated to the stop[.]" *Id.* at ¶ 45.

Following this encounter, Mr. Williams and his family met with E District Chief Todd McAllister regarding their concerns that the traffic stop was racially discriminatory. Chief McAllister allegedly acknowledged that the vehicle driven by Mr. Williams was not the same make or model of any reports of stolen cars that evening and "told them that it was an unfair and bad stop, that the officers did a lot of things wrong, and that they should not have stopped Mr. Williams or pulled into his driveway." *Id.* at 12, ¶ 48. He "described how the E District has had a racial profiling problem in part because . . . there are no Black officers who work at night[.]" *Id.* at ¶ 49. Chief McAllister said he would file a racial discrimination complaint with IAD. Six weeks later, IAD conducted short interviews of Mr. Williams and his father, lasting approximately ten and four minutes, respectively. The interviewer "used an indifferent and curt tone[.]" (Doc. 326-3 at 12, ¶ 50.) At the end of the investigation, all the officers involved were exonerated.

On September 21, 2024, two BPD police cars "sandwiched" a convertible BMW M8, worth over $100,000, in which Mr. Williams and one other Black male were passengers, with one police car in front and one behind the car. *Id.* at 14, ¶ 56. The officers claimed the operator, who was Mr. Williams's brother, did not stop at a stop sign.

The four White officers commented on how expensive the car was and asked the operator who it belonged to and how he got it. They asked everyone for their driver's licenses, and one officer told Mr. Williams he looked familiar despite Mr. Williams having never previously encountered the officer. Mr. Williams describes this encounter as a pretextual and discriminatory stop.

### B.      Standard of Review.

Mr. Nance and Mr. Williams seek to intervene as of right pursuant to Fed. R. Civ. P. 24(a)(2) or, in the alternative, request permissive intervention pursuant to Fed. R. Civ. P. 24(b). Defendants oppose the motion, arguing it is untimely and futile because Proposed Intervenors lack standing.

Pursuant to Rule 24(a)(2), a court "must permit anyone to intervene" if that party "claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as a practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a)(2). A party seeking to intervene as of right must "(1) timely file an application, (2) show an interest in the action, (3) demonstrate that the interest may be impaired by the disposition of the action, and (4) show that the interest is not protected adequately by the parties to the action." *Brennan v. N.Y.C. Bd. of Educ.*, 260 F.3d 123, 128-29 (2d Cir. 2001) (internal quotation marks omitted). "Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application." *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 (2d Cir. 2003) (emphasis in original) (internal quotation marks omitted).

If intervention as of right is not warranted, "[a] district court may grant a motion for permissive intervention if the application is timely and if the 'applicant's claim or defense and the main action have a question of law or fact in common.'" *In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 202 (2d Cir. 2000) (quoting Fed. R. Civ. P. 24(b)(2)). "The court considers substantially the same factors whether the claim for intervention is 'of right' under Fed. R. Civ. P. 24(a)(2), or 'permissive' under Fed. R. Civ. P. 24(b)(2)." *R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006).

## C.    Whether the Motion to Intervene is Timely.

"A district court has broad discretion in assessing the timeliness of a motion to intervene[.]" *Holocaust Litig.*, 225 F.3d at 198.

> Timeliness defies precise definition, although it certainly is not confined strictly to chronology. Among the circumstances generally considered are: (1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness.

*United States v. Pitney Bowes, Inc.*, 25 F.3d 66, 70 (2d Cir. 1994); *see also Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001). "Generally, the court's analysis must take into consideration the totality of the circumstances." *Holocaust Litig.*, 225 F.3d at 198.

This case has been pending since June 28, 2018. As Defendants point out, Proposed Intervenors have had a purported interest in this case since its inception in 2018, their alleged experiences of racial discrimination took place years ago, and Plaintiffs waited "three months after the Class Certification ruling and until the tail-end of summary judgment briefing to move to intervene." (Doc. 338 at 19.) The deadline for joinder of parties was May 14, 2020. *See* Doc. 48. The court agrees that, against this backdrop, Plaintiffs' motion to intervene is not timely and will result in both unreasonable delay and prejudice to Defendants.[8]

### 1.    Notice.

With respect to notice, the relevant inquiry is when an intervenor "became aware that its interest would no longer be adequately represented." *Nat'l Fuel Gas Distrib. Corp. v. Templeton Energy, Inc.*, 1986 WL 12486, at *1 (W.D.N.Y. Nov. 7, 1986). In some cases, the filing of the complaint serves as that triggering event. However, "[i]n cases where the potential intervenor's interest is, at least at the outset, subsumed by that

---

[8] Pending before the court is Defendants' motion for summary judgment (Doc. 252) and Plaintiffs' motion for partial summary judgment, (Doc. 253), both of which have been fully briefed and argued and for which the record exceeds five hundred pages and six hundred exhibits.

14

of a representative litigant, the trigger requiring intervention does not occur until it is apparent that the representative no longer protects the intervenor's interest." *Chen-Oster v. Goldman, Sachs & Co.*, 2015 WL 4619663, at *6 (S.D.N.Y. Aug. 3, 2015). Class actions are one such circumstance, "for as long as the interests of class members are fully represented by the named plaintiffs, there is no incentive, and therefore no obligation, to intervene." *Id.* Prior to certification, potential class members are "mere passive beneficiaries of the action brought in their behalf." *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 552 (1973).

> Not until the existence and limits of the class have been established and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case.

*Id.* For this reason, the Supreme Court has allowed post-judgment intervention by a class member when the named plaintiffs declined to appeal a denial of class certification. *See United Airlines, Inc. v. McDonald*, 432 U.S. 385, 394 (1977) ("In short, as soon as it became clear to the respondent that the interests of the unnamed class members would no longer be protected by the named class representatives, she promptly moved to intervene to protect those interests.").

In this case, the Proposed Intervenors' interests were previously represented and protected by the named plaintiffs seeking class certification and injunctive relief on behalf of the Traffic Enforcement Class. Indeed, as Defendants repeatedly point out, the Proposed Intervenors' interests are identical to those individuals they seek to replace even if based on widely divergent fact patterns. Proposed Intervenors' interests did not become unrepresented by class members who refused to advocate on their behalf. Instead, they apparently claim they will be better suited as class representatives for purposes of standing because their police encounters were more numerous and more recent. Plaintiffs proffer no explanation as to why these class representatives were not previously chosen. Because Plaintiffs had notice of the need for adequate class representatives who had standing, Proposed Intervenors could have been chosen as class representatives much

earlier in the case. The court's denial of class certification did not create that need nor does it render their motion timely.[9]

### 2.  Prejudice to Existing Parties.

Prejudice has been found where potential intervenors sought to "radically change the definition of the proposed class[,]" *Allen v. Dairy Farmers of Am., Inc.*, 2011 WL 1706778, at *6 (D. Vt. May 4, 2011), or where intervention threatened to destroy the settlement reached by the parties and "send[] them back to the drawing board." *Holocaust Litig.*, 225 F.3d at 199; *see also Sheppard v. Phoenix*, 1998 WL 397846, at *2 (S.D.N.Y. July 16, 1998) ("To abort the [s]ettlement at this process, at this late critical stage would prejudice the parties to this litigation."). This action has been pending for seven years. The parties have conducted extensive discovery. Until April 2025, the action proposed a Traffic Enforcement Class for whom solely injunctive relief was sought. As admitted by Plaintiffs, Proposed Intervenors incorporate "the same allegations as Plaintiffs have already made in this action, and they seek the same relief." (Doc. 326-1 at 15) (emphasis omitted). Intervention is effectively an offshoot of Plaintiffs' motion to reconsider, with the proposed intervention characterized as quasi-new evidence which the court must reconsider. As Defendants assert, intervention "would set this case back to the discovery phase[]" and "add, at a minimum, six months to this action" as they "gather paper discovery on the Proposed Intervenors and depose them." (Doc. 338 at 20.) Defendants have therefore established they will suffer unfair prejudice if the motion to intervene is granted.

---

[9] Courts generally expect an intervenor to act promptly upon receipt of notice. *See, e.g., Pike Co. v. Universal Concrete Prods., Inc.*, 284 F. Supp. 3d 376, 394-96 (W.D.N.Y. 2018) (finding motion to intervene was timely when filed within approximately five months of receiving notice); *Range v. Nat'l R.R. Passenger Corp.*, 176 F.R.D. 85, 88-89 (W.D.N.Y. 1997) (holding motion to intervene was timely when filed less than three months after notice); *cf. United States v. New York*, 820 F.2d 554, 557 (2d Cir. 1987) (finding untimely a motion to intervene that was filed fifteen months after proposed intervenor knew or should have known of his interest in the case).

### 3. Prejudice to Applicants.

The Second Circuit has held that if intervenors "remain free to file a separate action, they have not established that they will be prejudiced if their motion to intervene is denied." *Holocaust Litig.*, 225 F.3d at 199. Even where they may face "many significant obstacles" in filing their own lawsuit, permission to intervene need not be granted. *Id.* Plaintiffs argue that Proposed Intervenors "would be greatly prejudiced by a denial of their motion[]" as a result of inefficiency and duplicative work that intervention would prevent. (Doc. 326-1 at 15.) Nothing prevents Proposed Intervenors from filing their own lawsuit against Defendants, however, and mere inconvenience does not suffice to establish prejudice.

### 4. Unusual Circumstances.

Neither Defendants nor Proposed Intervenors have identified any unusual circumstances to militate for or against a finding of timeliness.

### D. Whether Intervention is Futile.

An additional threshold consideration, however, is whether intervenors have standing. If intervenors lack standing, the motion to intervene would be futile and denial appropriate. *See, e.g., Dynamic Sys., Inc. v. Skanska USA Bldg. Inc.*, 2021 WL 6063609, at *2 (S.D.N.Y. Dec. 21, 2021) ("[C]ourts have held that futility is a proper basis for denying a motion to intervene.") (internal quotation marks and citation omitted); *N.Y. Life Ins. Co. v. Sahani*, 730 F. App'x 45, 50 (2d Cir. 2018) (affirming denial of motion to intervene based on futility); *Cross Sound Cable Co. v. Long Island Lighting Co.*, 2022 WL 247996, at *6 (E.D.N.Y. Jan. 27, 2022) (denying motion to intervene as futile because underlying claim did not confer subject matter jurisdiction or standing and would have been untimely).

### 1. Proposed Intervenors' Standing.

The Supreme Court is clear that "standing is not dispensed in gross." *Town of Chester, N.Y. v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) (internal quotation marks and citation omitted). "To the contrary, 'a plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought.'" *Id.* (quoting *Davis v. Fed.*

17

*Election Comm'n*, 554 U.S. 724, 734 (2008)); *see also Los Angeles v. Lyons*, 461 U.S. 95, 106 n.7 (1983) (a plaintiff who has standing to seek damages must also demonstrate standing to pursue injunctive relief). "The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester*, 581 U.S. at 439.

Proposed Intervenors seek to preliminarily and permanently enjoin Defendants:

(a) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;

(b) From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;

(c) To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:

> (i) conducting vehicle Checkpoints for the purpose of general crime control; and

> (ii) enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflect an improper pecuniary motive[;]

(d) To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act;

(e) To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database.

(Doc. 326-3 at 19, ¶ 77.)

The court previously determined that the requested injunctive relief primarily consists of an impermissible "obey the law" injunction. The court further found Plaintiffs lacked standing—not based upon the timing of their complaint or motion for class certification—but based upon their reliance on past, infrequent harm to establish imminent, irreparable, and non-speculative future harm.

Plaintiffs contend that Proposed Intervenors have standing because they have "been subject to a recent discriminatory traffic stop or ticketing by the BPD pursuant to

18

an ongoing municipal policy, custom, or practice targeting Black and Latino motorists on the basis of race[.]" (Doc. 326-1 at 21.) They do not deny, however, that the Proposed Intervenors allege past harm as well as the same harm as the class representatives they seek to replace.

In his declaration, Mr. Nance states that he was subjected to discriminatory stops by the BPD approximately once a year in 2021, 2022, 2023, and 2024. He asserts that, in each instance, he was targeted and ticketed because he was a Black man, citing what he contends is racially demeaning language.

Mr. Williams declared that he was subjected to two traffic stops by the BPD in 2024. In one encounter, two BPD officers allegedly followed Mr. Williams home and unjustifiably barricaded his car in his driveway and interrogated him. In another encounter, the BPD stopped a car in which Mr. Williams was a passenger and his brother was driving. The officers commented on how expensive the car was, questioned Mr. Williams, and asked for everyone's driver's licenses.

In *Floyd v. City of New York*, the Southern District of New York found that a plaintiff seeking an injunction mandating changes to New York City's stop and frisk program had standing because (1) the plaintiff had been stopped and frisked four separate times; (2) the plaintiff's "future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law"; and (3) "the frequency of alleged injuries inflicted by the practices at issue here creates a likelihood of future injury[.]"[10] 283 F.R.D. 153, 169-70 (S.D.N.Y. 2012). *Floyd* is not controlling precedent.

The challenged governmental policy at issue in *Floyd* was ongoing at the time of the lawsuit, involved a specific policy and practice of stop and frisk unrelated to

---

[10] The district court had previously "declar[ed] the Street Crime Unit's ('SCU') practice and/or custom of suspicionless stops and frisks to be unconstitutional." *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 158 (S.D.N.Y. 1999). The court found the individual plaintiffs had established standing because: (1) "there is [a] difference in the number of alleged constitutional violations resulting from the challenged policies"; (2) the victims "claim they have been victimized by [the] unconstitutional practices repeatedly"; and (3) "there is no chain of contingencies making the threat of future harm speculative. . . . [P]laintiffs do not have to break the law to be exposed to the alleged constitutional violations." *Id.* at 161.

19

reasonable suspicion or probable cause, and of the four instances in which the plaintiff had been stopped, three were in the same year as the request for injunctive relief.

Proposed Intervenors allege that the BPD policy of targeting Black and Latino motorists for traffic enforcement is ongoing. However, neither the recency nor the frequency found in *Floyd* is present in this case, traffic enforcement with regard to motor vehicle operators of designated racial backgrounds cannot be entirely enjoined, a discrete practice or policy is not at issue, and past allegations of harm once or twice a year two to four years ago do not "create[] a likelihood of future injury[.]" *Id.* at 170. In addition, unlike in *Floyd*, the alleged constitutional violations are not subject to targeted injunctive relief. Instead, Proposed Intervenors cite widely divergent fact patterns and ask the court to either enjoin those fact patterns in the future or issue a broad "obey the law" injunction.

Because neither Proposed Intervenor has established that he is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,]" *Shain*, 356 F.3d at 215 (internal quotation marks omitted) (quoting *Lyons*, 461 U.S. at 101-02), Proposed Intervenors have failed to established standing for injunctive relief, and intervention would be futile.

For the reasons stated above, Plaintiffs' motion to intervene as of right is therefore DENIED. For the same reasons, Plaintiffs' motion for permissive intervention is DENIED. *See Town of Chester*, 581 U.S. at 439-40.

## IV. Plaintiffs' Motion to Renew.

### A. Standard of Review.

Fed. R. Civ. P. 23(c)(1)(C) provides that "[a]n order that grants or denies class certification may be altered or amended before final judgment." The purpose of this rule is to allow plaintiffs to address a district court's concerns after initial denials of class certification. *See In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 (2d Cir. 2007). "District courts have ample discretion to consider (or to decline to consider) a revised class certification motion after an initial denial." *Id.* However, "the [c]ourt may not disturb its prior certification findings absent some significant intervening event, or a

20

showing of compelling reasons to reexamine the question." *Gortat v. Capala Bros., Inc.*, 2012 WL 1116495, at *2 (E.D.N.Y. Apr. 3, 2012) (alteration adopted) (quoting *Jermyn v. Best Buy Stores, L.P.*, 276 F.R.D. 167, 169 (S.D.N.Y. 2011)).

Plaintiffs move to renew on two bases: (1) the proposed intervention of Mr. Nance and Mr. Williams as plaintiffs and (2) new statistical evidence of the BPD's ongoing program of racially discriminatory pretextual stops. Because the court denied Plaintiffs' motion to intervene, intervention cannot support the motion to renew.

### B. Whether New Evidence Warrants Renewal of the Class Certification Motion.

Where an earlier motion for class certification has been denied, courts in the Second Circuit generally hold that "any renewed motion for class certification by Plaintiffs must be based on a more robust submission that points to admissible evidence where necessary to establish the Rule 23 requirements for class certification." *Vega v. Semple*, 2023 WL 5395479, at *3 (D. Conn. Aug. 22, 2023); *see also Dash v. Seagate Tech. (US) Holdings, Inc.*, 2016 WL 4491822, at *1 (E.D.N.Y. July 12, 2016) ("Plaintiff's counsel is hereby advised that the [renewed] motion shall not contain arguments or evidence previously submitted to the [c]ourt on the prior motion . . . [and] if the [c]ourt finds the renewed motion for class certification to be a frivolous attempt at reargument of the prior motion, costs may be imposed."). "Alternatively, plaintiffs could opt to propose a different and more supportable class definition on a renewed motion, without showing a change in the law or new evidence." *Savinova v. Nova Home Care, LLC*, 2024 WL 3552425, at *7 (D. Conn. July 26, 2024) (citing *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 476-77 (3d Cir. 2020)). This mirrors the standard required for reconsideration.

Plaintiffs neither propose a new definition of the Traffic Enforcement Class nor do they seek more narrowly tailored injunctive relief. Instead, they claim they have developed better and more recent statistical and video evidence of discriminatory traffic enforcement.

In reconsideration cases, evidence within a party's possession prior to the court's ruling is rarely deemed "newly available evidence." *See, e.g., First State Ins. Co. v.*

21

*Ferguson Enters., Inc.*, 2019 WL 2521838, at *5 (D. Conn. June 18, 2019) ("[E]vidence in a party's possession before a court's ruling is not considered 'newly available' evidence."); *Ahmad v. Int'l Bus. Machs. Corp.*, 2013 WL 12221829, at *6 (D. Vt. Mar. 28, 2013) (ruling that evidence party had for two years prior to court's decision was not new); *Winkler v. Grant*, 2008 WL 3539898, at *1 (W.D.N.Y. Aug. 12, 2008) ("Evidence that a party had prior to judgment being entered is not considered new evidence, and does not entitle the party to reconsideration.") (citing *Stewart Park & Rsrv. Coal. Inc. v. Slater*, 374 F. Supp. 2d 243, 253 (N.D.N.Y. 2005)).

Here, the new evidence cited by Plaintiffs includes "emerging statistical evidence" available after depositions taken in the summer and fall of 2024 that allegedly shows "BPD routinely conducts racially disproportionate traffic stops without constitutionally sufficient bases to do so[,]" (Doc. 344 at 57) (capitalization omitted), based on video evidence of allegedly pretextual stops from the last six months of 2024 first provided by Defendants in December 2024. This evidence was not available prior to the October 23, 2024 hearing to certify the Traffic Enforcement Class. However, all of the evidence was available prior to the court's April 22, 2025 ruling on class certification. Plaintiffs did not request to supplement the record with it, nor do they establish it materially transforms the record before the court such that a different outcome is warranted. Accordingly, it does not justify renewal of class certification.

For the same reasons that reconsideration was denied, Plaintiffs' motion to renew is therefore DENIED.

22

## CONCLUSION

For the foregoing reasons, the court DENIES Plaintiffs' motion to reconsider or renew, (Doc. 327), and DENIES Plaintiffs' motion to intervene Market Nance and Thomas Christopher Williams, Jr. as plaintiffs and representatives of the Traffic Enforcement Class. (Doc. 326.)

SO ORDERED.

Dated this ____27th____ day of March, 2026.

Christina Reiss, District Judge
United States District Court

23

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

BLACK LOVE RESISTS IN THE RUST,                )
DORETHEA FRANKLIN, TANIQUA                      )
SIMMONS, DE'JON HALL, JANE DOE,                 )
Individually and on behalf of a class of        )
Others similarly situated, SHIRLEY              )
SARMIENTO, EBONY YELDON,                        )
CHARLES PALMER, SHAKETA                         )
REDDEN, and JOSEPH BONDS,                       )
                                                )
            Plaintiffs,                         )
                                                )
        v.                                      )
                                                )       Case No. 1:18-cv-00719
CITY OF BUFFALO, N.Y., BYRON B.                 )
BROWN, Mayor of the City of Buffalo, in his     )
individual and official capacities, BYRON       )
C. LOCKWOOD, Commissioner of the                )
Buffalo Police Department, in his individual    )
capacity, DANIEL DERENDA, former                )
Commissioner of the Buffalo Police              )
Department, in his individual capacity,         )
AARON YOUNG, officer of the Buffalo             )
Police Department, in his individual capacity,  )
KEVIN BRINKWORTH, PHILIP SERAFINI,              )
officer of the Buffalo Police Department, in    )
his individual capacity, ROBBIN THOMAS,         )
officer of the Buffalo Police Department, in    )
his individual capacity, UNKNOWN                )
SUPERVISORY PERSONNEL 1-10, officers            )
of the Buffalo Police Department, in their      )
individual capacities, UNKNOWN OFFICERS         )
1-20, officers of the Buffalo Police Department,)
in their individual capacities, and ERIE        )
COUNTY DISTRICT ATTORNEY'S                      )
OFFICE,                                         )
                                                )
            Defendants.                         )

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO CERTIFY CLASS
(Doc. 202)

Plaintiffs Shaketa Redden, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Joseph Bonds, Charles Palmer, Shirley Sarmiento, Ebony Yeldon, and Jasmine Evans bring this action against the City of Buffalo, New York (the "City"); City of Buffalo Mayor Byron B. Brown; Buffalo Police Department ("BPD") Commissioner Byron C. Lockwood; former BPD Commissioner Daniel Derenda; Aaron Young; Kevin Brinkworth; Philip Serafini; Robbin Thomas; and 1-10 unknown supervisory officers and 1-20 unknown officers (collectively, "Defendants") on behalf of themselves and other Black and Latino motorists in the City.

Plaintiffs claim that the City has unlawfully targeted Black and Latino motorists through the use of administrative traffic checkpoints (the "Checkpoints"). Even after the Checkpoints were discontinued, they assert City police officers, in accordance with an implicit quota system, continue to systematically target Black and Latino motorists for traffic enforcement, fines, and penalties. Plaintiffs seek to certify three distinct classes: (1) a "Checkpoint Class";[1] (2) a "Tinted Windows Class";[2] and (3) a "Traffic Enforcement Class."[3] (Doc. 211 at 3.)

The Checkpoint Class, represented by Plaintiffs Bonds, Evans, and Redden, asserts claims for: (1) a violation of the Fourth Amendment; (2) a violation of the Fourteenth Amendment Due Process Clause; (3) a violation of the Fourteenth

---

[1] Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.)

[2] Plaintiffs define the Tinted Windows Class as: "All Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.*

[3] Plaintiffs define the Traffic Enforcement Class as: "All Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." *Id.*

2

Amendment Equal Protection Clause; and (4) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d).

The Tinted Windows and Traffic Enforcement Classes assert claims for: (1) a violation of the Fourteenth Amendment Equal Protection Clause; (2) a violation of the Fourteenth Amendment Due Process Clause; and (3) a violation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000(d). Plaintiffs Franklin, Palmer, and Yeldon are the proposed class representatives for the Tinted Windows Class. All individual Plaintiffs in the suit will serve as class representatives for the Traffic Enforcement Class.

Plaintiffs seek a declaration that Defendants have violated Plaintiffs' constitutional rights and a class-wide injunction mandating significant changes in Defendants' policies, practices, and customs, as well as an award of compensatory and punitive damages, attorney's fees, and costs.

Plaintiffs seek class certification under Fed. R. Civ. P. 23(a) and 23(b)(3) for the Checkpoint and Tinted Windows Classes, and class certification under Fed. R. Civ. P. 23(a) and 23(b)(2) for the Traffic Enforcement Class. In their supplemental submission in support of class certification, they advised that "the Checkpoint and Tinted Windows Classes will not seek to recover damages for consequential harms, such as emotional distress and lost wages[.]" (Doc. 241 at 1) (emphasis in original). For these classes, Plaintiffs intend to pursue "(1) general damages in an amount determined by the jury;[] (2) punitive damages in an amount determined by the jury; (3) direct economic damages, consisting of the fines and fees that class members paid in connection with tickets and impounds; and (4) equitable disgorgement of the same." *Id.* at 2.

Plaintiffs are represented by Claudia Wilner, Esq., Andrea Chinyere Ezie, Esq., Andrew J. Timmick, Esq., Anjana Malhotra, Esq., Baher Azmy, Esq., Christine Adrienne Nelson, Esq., Edward Krugman, Esq., Joseph A. Kelemen, Esq., Matthew Alan Parham, Esq., Philip A. Irwin, Esq., Jordan Scott Joachim, Esq. Defendants are represented by Peter A. Sahasrabudhe, Esq., Robert Emmet Quinn, Esq., Cheyenne Nicole Freely, Esq., and Hugh M. Russ, III, Esq.

3

## I.      Plaintiffs' Factual Allegations.

The following facts are derived from Plaintiffs' Amended Complaint and the parties' briefing.

### A.      The Strike Force Checkpoints.

In 2012, Mayor Brown and former Police Commissioner Derenda created "a mobile unit that targeted supposed crime hotspots to reduce guns, drugs, and gang activity[]" (the "Strike Force"). (Doc. 63 at 10, ¶ 35.) The Strike Force operated through the Checkpoints and required any vehicle approaching to be stopped, regardless of whether BPD Officers had "probable cause or reasonable, articulable suspicion that the driver ha[d] violated any criminal or traffic laws." *Id.* at 11, 15, ¶¶ 36, 61. Plaintiffs assert that the Checkpoints were often established on one-way streets and were not marked in any way to alert approaching motorists. BPD officers or their supervisors determined the Checkpoint locations.

Based upon statistical analyses, Plaintiffs allege that a neighborhood's racial composition was a significant factor in determining Checkpoint locations because a majority of the Checkpoints were established in overwhelmingly Black or Latino neighborhoods. BPD Checkpoint data, through June 30, 2017, allegedly reveals that "BPD conducted nearly 40% of all Checkpoints . . . in just three of Buffalo's 77 Census tracts. In each of those three tracts, the Black or Latino population exceeded 86%." *Id.* at 18, ¶ 83. BPD also considered the number of reported crimes in a particular area in determining Checkpoint locations. Plaintiffs contend, however, that crime statistics played only a minor role in designating a Checkpoint, and that the Checkpoint locations were unrelated to traffic safety concerns.

BPD Officers conducted Checkpoints in stages. During the first stage, vehicles passing through the Checkpoint were subject to automatic license plate readings, with BPD Officers checking for "valid licenses, registration, inspection stickers, seatbelts, and anything suspicious in plain view." *Id.* at 11, ¶ 41. At this stage, BPD Officers asked motorists questions such as "Where are you going?" and "Where are you coming from?" *Id.* at ¶ 42 (internal quotation marks omitted). Depending on the outcome of the first

4

stage, BPD Officers directed some motorists to pull over for a second stage, during which motorists were subjected to longer detentions and questioning.

Plaintiffs contend that Strike Force and Housing Unit Officers "conducted the Checkpoints in a uniform manner in accordance with" BPD's policy, (Doc. 211 at 14), which failed to constrain officer discretion, because it was allegedly devoid of "written rules, standards, or guidelines" regarding when officers should direct motorists to secondary stops. (Doc. 63 at 12, ¶ 45.) Plaintiffs assert BPD leadership "do[es] not gather and review statistical information" regarding Checkpoints that would reveal whether they are conducted pursuant to racially discriminatory practices. *Id.* at 38, ¶ 201.

BPD Officers conducting Checkpoints were instructed to complete a Checkpoint Directive, although they did not always comply with this requirement, and some Checkpoints were undocumented as evidenced by ticketing data that reveals citations on dates with no Checkpoint Directives. Plaintiffs contend that these undocumented Checkpoints were operated "as a common practice over a period of years . . . and with the knowledge and approval of senior officers." *Id.* at 14, ¶ 59.

The Strike Force partnered with the BPD Housing Unit to implement Checkpoints near housing complexes operated by the Buffalo Municipal Housing Authority ("BMHA"). These joint Checkpoints were allegedly conducted "to suppress blatant drug/weapons activity and to show a high level of enforcement and visibility." *Id.* at 17, ¶ 74 (internal quotation marks omitted). Plaintiffs allege the Housing Unit focused on patrolling three BMHA properties, all of which have a significant majority of either Black or Latino residents. When concerns arose that Checkpoints were being conducted in a racially discriminatory manner in 2015, BPD "began to conduct Checkpoints in white neighborhoods that had never previously experienced Checkpoints . . . in an effort to demonstrate to the public that it did not conduct Checkpoints in a discriminatory manner." *Id.* at 36, ¶ 184.

The Strike Force and BPD Housing Unit conducted Checkpoints through January 2018. The Strike Force was dissolved in February 2018, and Strike Force officers were transferred to the Division of Traffic Enforcement. Plaintiffs allege that, although

5

Checkpoints are no longer conducted, there is "no formal policy ending the Checkpoint program" and BPD leadership "could direct BPD Officers to resume operating Checkpoints at any time." *Id.* at 38, ¶ 199.

**B.    The BPD's Ticketing Practices.**

In certain circumstances, BPD Officers have the discretion to issue multiple traffic citations for a tinted windows violation on a single vehicle. Plaintiffs contend that "non-White motorists are much more likely to be ticketed by the BPD than are White motorists[,]" (Doc. 63 at 24, ¶ 110), and that a motorist's race is a strong predictor of whether BPD Officers exercise their discretion to issue a single tinted-window citation, or multiple tinted-window citations during a stop. Plaintiffs argue BPD leadership "do[es] not gather and review statistical information about traffic stops outside Checkpoints[]" to determine racially discriminatory traffic law enforcement. *Id.* at 38, ¶ 202.

Plaintiffs allege that BPD's aggressive enforcement of traffic laws is a product of the City's "custom, policy, or practice of generating revenue through traffic enforcement[.]" *Id.* at 25, ¶ 120. Although historically New York State received traffic enforcement proceeds, in 2014, the Buffalo Common Council and New York State legislature established the Buffalo Traffic Violations Agency ("BTVA"), an agency responsible for adjudicating non-misdemeanor traffic violations. Creation of the BTVA allowed the City to retain the revenues generated from traffic law enforcement.

Plaintiffs allege there was a marked increase in the number of citations issued after the BTVA was created. As a result of increased revenues, the City appropriated more money for the BPD, and in turn, the BPD increased spending on overtime for Strike Force officers which substantially increased their pay. The City allegedly has continued this practice, notwithstanding the cessation of Checkpoints and the dissolution of the Strike Force.

6

II.     **Legal Conclusions and Analysis.**

A.      **Whether Plaintiffs' Requested Injunctive Relief Would Merely Require Defendants to Obey the Law.**

In their Amended Complaint, on behalf of the Traffic Enforcement Class, Plaintiffs seek to preliminarily and permanently enjoin Defendants:

(a)     From continuing the policy, practice, and custom of conducting vehicle Checkpoints for the purpose of general crime control;

(b)     From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints in a manner that targets Buffalo residents on the basis of their race and ethnicity;

(c)     From continuing the policy, practice, and custom of conducting traffic stops and vehicle Checkpoints for improper pecuniary purposes;

(d)     From continuing to enforce and assess any of the 13 BTVA fees enumerated in § 175-1 of Buffalo Municipal Code Chapter 175[;]

(e)     To institute and implement policies and programs with respect to training, supervision, and discipline that will eliminate the policy, pattern, practice, and custom of:

      i.      conducting vehicle Checkpoints for the purpose of general crime control;

      ii.     enforcing traffic laws in a manner that targets Buffalo residents on the basis of their race and ethnicity or that reflects an improper pecuniary motive[;]

(f)     To institute and implement appropriate and adequate supervision and discipline of BPD officers and personnel who conduct vehicle Checkpoints;

(g)     To implement appropriate measures to ensure that BPD officers and personnel document all traffic stops and vehicle Checkpoints in sufficient detail as to permit supervisory review for compliance with the Fourth and Fourteenth Amendments and Title VI of the Civil Rights Act; [and]

7

> (h)    To implement appropriate measures to ensure that documentation of all traffic stops and vehicle Checkpoints is retained in a single, up-to-date computerized database[.]

*Id.* at 73-74.

Defendants challenge Plaintiffs' proposed injunctive relief as requesting an "obey the law" injunction. Plaintiffs counter that they seek injunctive relief in the form of "a single, class-wide order directing the City to modify its policies and procedures to prevent the BPD from engaging in racially motivated traffic stops and ticketing and retaining jurisdiction until such time as the City can establish compliance[.]" (Doc. 241 at 4.)

"Under Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law." *Am. Soc'y for the Prevention of Cruelty to Animals v. Animal & Plant Health Inspection Serv.*, 60 F.4th 16, 22 (2d Cir. 2023) (alteration and internal quotation marks omitted) (quoting *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001)). It must instead "'state its terms specifically' and 'describe in reasonable detail . . . the act or acts restrained or required[.]'" *Poor v. Amazon.com Servs. LLC*, 104 F.4th 433, 441 n.8 (2d Cir. 2024) (quoting Fed. R. Civ. P. 65(d)).

Although Plaintiffs provide examples of remedies that they may request,[4] and which may narrow and further define the scope of the requested injunctive relief, their Amended Complaint cannot be amended by their briefing. *See Palm Beach Mar. Museum, Inc. v. Hapoalim Sec. USA, Inc.*, 810 F. App'x 17, 20 (2d Cir. 2020) ("[A] complaint may not be amended by . . . an opposition brief wholly unsupported by factual allegations in the complaint.") (citing *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 541 (S.D.N.Y. 2021) ("[A] plaintiff may not raise new facts in opposing dismissal and ask the [c]ourt to rely

---

[4] Plaintiffs' examples of appropriate relief include: "[c]essation of BPD policies and practices contributing to racially biased traffic enforcement[]"; "[r]eforms to supervision and officer performance evaluation criteria"; "[r]eforms to the Internal Affairs Department"; and "[a] mechanism overseen by a court-appointed monitor[.]" (Doc. 241 at 11.)

8

on those facts in determining whether he or she has stated a claim.") (quoting *Wright*, 152 F.3d at 178).

To the extent Plaintiffs' injunctive relief requests "obey the law" relief, it is not available under Rule 65(d). *See City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011) (alteration adopted) (finding that injunctions that "impose[d] on defendants an obligation to act 'in full conformity with applicable laws pertaining to firearms,' and to 'adopt appropriate prophylactic measures to prevent violation' of those laws[]" failed under Rule 65(d)); *Wakefield v. Scott*, 2021 WL 10342467, at *4 (D. Vt. June 24, 2021) (noting plaintiff's claims for injunctive relief failed "because her request for a command to 'direct defendants from violating the law' did not comply with Federal Rule of Civil Procedure 65(d) and Second Circuit precedent requiring that an injunction be more specific than a simple command that the defendant obey the law[]") (citation omitted)).

## B.    Whether the Traffic Enforcement Class has Standing.

Plaintiffs seek injunctive relief for the Traffic Enforcement Class consisting of "[a]ll Black and/or Latino individuals who have been or will be subjected to traffic stops, traffic tickets, and 'traffic safety' vehicle checkpoints by the BPD." (Doc. 211 at 12.) The Traffic Enforcement Class is virtually limitless because it does not specify a time period for class membership or specify a future duration for the proposed injunction. Plaintiffs concede that BPD leadership "do[es] not gather and review statistical information" regarding traffic stops outside Checkpoints. (Doc. 63 at 38, ¶ 201.)

Although Plaintiffs are correct that the inclusion of future members does not defeat class certification,[5] for purposes of standing, Plaintiffs' proposed relief requires the court to forecast the likelihood of future constitutional violations.

---

[5] *See, e.g.*, *Barrows v. Becerra*, 24 F.4th 116, 130 n.54 (2d Cir. 2022) ("The final class certified by the district court includes[ a]ll Medicare beneficiaries who, on or after January 1, 2009 . . . ."); *Sykes v. Mel S. Harris & Assocs.*, 780 F.3d 70, 79 (2d Cir. 2015) (affirming district court's certification of a class that comprised "all persons who have been or will be sued by the Mel Harris defendants as counsel for the Leucadia defendants"); *Marisol A. v. Giuliani*, 126 F.3d 372, 378 (2d Cir. 1997) (involving certified class comprised of "children who are or will be in

Defendants argue that, because the City ceased using Checkpoints as of January 2018 and disbanded the Strike Force, the Traffic Enforcement Class lacks standing to pursue injunctive relief as any future injury is purely speculative. Plaintiffs respond that Defendants have not disavowed the Checkpoints, which could resume at any time, and that the potential for their revival poses a non-speculative threat of constitutional violations.

In a class action, "[s]tanding is satisfied so long as at least one named plaintiff can demonstrate the requisite injury." *Hyland v. Navient Corp.*, 48 F.4th 110, 117-18 (2d Cir. 2022) (citing *Dep't of Com. v. New York*, 588 U.S. 752, 766 (2019)); *see also Town of Chester v. Laroe Ests., Inc.*, 581 U.S. 433, 439 (2017) ("[W]hen there are multiple plaintiffs[,] [a]t least one plaintiff must have standing[.]"). "[T]he 'irreducible constitutional minimum' of standing consists of three elements." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (citing *Lujan*, 504 U.S. at 560-61).

When seeking injunctive relief, "[a plaintiff] must carry the burden of establishing that 'he [or she] has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct.'" *Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983)). In meeting his or her burden, a plaintiff "cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he [or she] . . . will be injured in the future." *Id.* (internal quotation marks omitted) (quoting *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998)). A showing of an "abstract injury is not enough; rather, '[t]he injury or threat of injury must be both "real and immediate," not "conjectural" or "hypothetical."'" *Id.* (quoting *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

---

the custody of the New York City Administration for Children's Services") (internal quotation marks omitted).

10

At the pleading stage, the burden to establish standing is minimal. As a case progresses, and certainly at class certification, the evidence necessary to satisfy standing increases. *See Carter v. HealthPort Techs. LLC*, 822 F.3d 47, 56 (2d Cir. 2016) ("[T]he showing that must be made in order to withstand a dismissal for lack of standing increases as the suit proceeds."). The Supreme Court has explained:

> At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim. In response to a summary judgment motion, however, the plaintiff can no longer rest on such mere allegations, but must set forth by affidavit or other evidence specific facts, which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

*Lujan*, 504 U.S. at 561 (alteration adopted) (internal citations and quotation marks omitted).

Although Plaintiffs assert there is "no formal policy ending the Checkpoint program[,]" (Doc. 63 at 38, ¶ 199), they cite no evidence that BPD has taken steps to resume them. Several individual Plaintiffs in the Traffic Enforcement Class attest to having received multiple traffic citations unrelated to Checkpoints. Plaintiff Bonds declared "[i]n 2019, I received so many tickets while my car was not in use and parked at my BMHA residence that I eventually had to sell my car because I could not afford to pay for the tickets or to keep my car in a private garage to avoid getting more tickets." (Doc. 202-1 at 2-3, ¶ 12.) Plaintiff Yeldon declared that:

> In December 2017[,] I was driving my taxi in a predominantly white neighborhood on the South Side of Buffalo, when BPD Officer Michael Healy pulled me over and issued me two tickets for tinted windows and one ticket for driving without insurance (even though the car belonged to my employer, and I had insurance at the time). In the summer of 2022 BPD ticketed my car while it was parked in the BMHA-owned parking lot of the Ferry Grider Apartments . . . . When I went to court, the ticket was dismissed.

(Doc. 202-9 at 1-2, ¶¶ 6-7.) All of these incidents refer to past harm.

11

In *Floyd v. City of New York*, 283 F.R.D. 153, 169-70 (S.D.N.Y. 2012), the court found a plaintiff seeking an injunction mandating changes to New York City's stop and frisk program had standing because (1) the plaintiff had been stopped and frisked four separate times; (2) the plaintiff's "future injury does not depend on his being arrested for unlawful conduct and so he cannot avoid that injury by following the law"; and (3) "the frequency of alleged injuries inflicted by the practices at issue here creates a likelihood of future injury[.]"[6] The challenged governmental policy at issue in *Floyd* was ongoing at the time of the lawsuit.

Unlike in *Floyd*, the Checkpoints at issue in this case ceased in 2018, the Strike Force disbanded, and none of the Plaintiffs' attestations pertain to Checkpoints that took place in the past two years. Instead, Plaintiffs rely on the speculative possibility that, at some uncertain date in the future, the Checkpoints may resume. This will not suffice for standing for injunctive relief.

To the extent Plaintiffs rely on evidence that non-white motorists are statistically more likely to receive a traffic infraction ticket than white motorists, and to receive multiple tickets if cited, *see* Doc. 63 at 24, ¶ 110, this evidence also reflects past alleged harms. Although Plaintiffs contend the "frequency of alleged injuries . . . creates a likelihood of future injury[,]" *Floyd*, 283 F.R.D. at 170, it does not rise to a "real and immediate threat of future injury[.]" *Shain*, 356 F.3d at 215; *see also Lyons*, 461 U.S. at 111 ("Absent a sufficient likelihood that he will again be wronged in a similar way, Lyons is no more entitled to an injunction than any other citizen of Los Angeles; and a

---

[6] The district court had previously "declar[ed] the Street Crime Unit's ('SCU') practice and/or custom of suspicionless stops and frisks to be unconstitutional." *Nat'l Cong. for Puerto Rican Rts. v. City of New York*, 75 F. Supp. 2d 154, 158 (S.D.N.Y. 1999). The court found the individual plaintiffs had established standing because: (1) "there is [a] difference in the number of alleged constitutional violations resulting from the challenged policies"; (2) the victims "claim they have been victimized by [the] unconstitutional practices repeatedly"; and (3) "there is no chain of contingencies making the threat of future harm speculative. . . . [P]laintiffs do not have to break the law to be exposed to the alleged constitutional violations." *Id.* at 161.

federal court may not entertain a claim by any or all citizens who no more than assert that certain practices of law enforcement officers are unconstitutional.").[7]

Because no Plaintiff has established that he or she is "immediately in danger of sustaining some direct injury as the result of the challenged official conduct[,]" *Shain,* 356 F.3d at 215 (internal quotation marks omitted) (quoting *Lyons,* 461 U.S. at 101-02), Plaintiffs have failed to establish that the members of the Traffic Enforcement Class have standing. For this reason, the Traffic Enforcement Class's request for class certification DENIED. *See MacNamara v. City of New York,* 275 F.R.D. 125, 132, 140 (S.D.N.Y. 2011) (finding individuals arrested by the NYPD for their protests during the 2004 Republican National Convention did not have standing because they failed to establish the likelihood of a future encounter with the police that would result in unconstitutional arrests and detentions).

C.      **Whether the Remaining Proposed Classes Satisfy Fed. R. Civ. P. 23.**

Plaintiffs seek damages on behalf of the Checkpoint Class and the Tinted Windows Class and request class certification to establish the alleged constitutional violations that give rise to their damages claims. "Class certification is governed by Federal Rule of Civil Procedure 23." *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 345 (2011) ("*Wal-Mart*"). "The party seeking class certification bears the burden of establishing by a preponderance of the evidence that each of Rule 23's requirements has been met." *Myers v. Hertz Corp.,* 624 F.3d 537, 547 (2d Cir. 2010).

Under Rule 23(a), the party seeking certification must establish:

(1)      the class is so numerous that joinder of all members is impracticable;

(2)      there are questions of law or fact common to the class;

---

[7] Part of the standing inquiry is to ensure that the party seeking injunctive relief faces a threatened injury separate and distinct from the public at large. *Israel v. United Nations,* 2025 WL 641566, at *2 (S.D.N.Y. Feb. 26, 2025) ("A litigant raising only a generally available grievance . . . and seeking relief that no more directly and tangibly benefits him than it does the public at large . . . does not state an Article III case or controversy.") (internal quotation marks omitted) (ellipses in original) (quoting *Hollingsworth v. Perry,* 570 U.S. 693, 706 (2013)).

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

*Wal-Mart*, 564 U.S. at 345 (internal quotation marks omitted). These requirements are referred to as "numerosity, commonality, typicality, and adequacy." *Davis v. City of New York*, 296 F.R.D. 158, 163 (S.D.N.Y. 2013).

In determining whether class certification is appropriate, "[i]t is proper for a district court to accept the complaint allegations as true[,]" *Johnson v. N.Y. State Dep't of Corr. & Cmty. Supervision*, 2020 WL 2558160, at *1 (W.D.N.Y. May 19, 2020) (alteration adopted) (internal quotation marks omitted) (quoting *Waggoner v. Barclays PLC*, 875 F.3d 79, 85 n.5 (2d Cir. 2017)), and it may "consider material outside the pleadings . . . , including affidavits." *Id.* (internal quotation marks omitted) (quoting *Cortigiano v. Oceanview Manor Home for Adults*, 227 F.R.D. 194, 203 (E.D.N.Y. 2005)).

While a district court must make factual determinations to ascertain whether the requirements of Fed. R. Civ. P. 23 have been met, "in making such determinations, a district judge should not assess any aspect of the merits unrelated to a Rule 23 requirement[.]" *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

### 1. Whether the Remaining Proposed Classes Meet the Numerosity Requirement.

A proposed class must be "so numerous that joinder of all members is impracticable[.]" Fed. R. Civ. P. 23(a)(1). "Impracticable does not mean impossible[,]" *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993), it means joinder would be "expensive, time-consuming, and logistically unfeasible." *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 290 (2d Cir. 1992). In making this determination, "[c]ourts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement." *Robidoux*, 987 F.2d at 935. Instead, district courts consider factors beyond "mere numbers . . . includ[ing] judicial economy arising from the avoidance of a multiplicity of actions, geographic dispersion of class members, financial

14

resources of class members, the ability of claimants to institute individual suits, and requests for prospective injunctive relief which would involve future class members." *Id.* at 936 (citation omitted).

Plaintiffs allege that the Checkpoint Class contains "at least 3,000 members[,]" and the Tinted Windows Class contains more than 6,000 members. (Doc. 211 at 33.) The total number of individuals in this case is thus estimated to be close to ten thousand. Defendants do not contest numerosity, and the court finds this requirement has been met.[8]

### 2.    Whether the Remaining Proposed Classes Meet the Commonality Requirement.

Fed. R. Civ. P. 23(a)(2) requires that there be common questions of law or fact to the class. "[C]laims for relief need not be identical for them to be common." *Barrows v. Becerra*, 24 F.4th 116, 131 (2d Cir. 2022) (internal quotation marks omitted). Instead, "[c]ommonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury[.]'" *Wal-Mart*, 564 U.S. at 349-50 (quoting *Gen. Tel. Co. of S.W. v. Falcon*, 457 U.S. 147, 157 (1982)). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. "What matters to class certification . . . is . . . the capacity of a class-wide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Wal-Mart*, 564 U.S. at 350 (emphasis in original) (internal quotation marks omitted).

"Plaintiffs seeking class certification based on challenges to a defendant's policies must show that the policies caused every class member's injury." *Black Lives Matter L.A. v. City of Los Angeles*, 113 F.4th 1249, 1263 (9th Cir. 2024) (citing *Wal-Mart*, 564 U.S. at 353, 355); *see V.W. by & through Williams v. Conway*, 236 F. Supp. 3d 554, 573, 575 (N.D.N.Y. 2017) (finding commonality was met where plaintiffs alleged the defendants

---

[8] *See Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("A group [of hundreds of defendants] would make the joinder of individual members as named defendants impracticable. Because numerosity is presumed at a level of 40 members, whether viewed as 700 tax-collecting jurisdictions or 300 assessing jurisdictions, the number of defendants vastly exceeds this threshold.") (citation omitted); *In re Drexel Burnham Lambert Grp.*, 960 F.2d 285, 290 (2d Cir. 1992) (finding numerosity satisfied for a class of "nearly 850 claimants").

15

"ha[d] applied a common course of unlawful conduct to the members of the class"). To determine whether a proposed class meets the commonality requirement, "sometimes it may be necessary for the court to probe behind the pleadings[,]" *Falcon*, 457 U.S. at 160, which entails "some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart*, 564 U.S. at 351.

Defendants argue that none of the proposed classes satisfy the commonality requirement because the determination of general and individualized damages, even with Plaintiffs' narrowing of the relief sought, is ill-suited for class action litigation. Commonality, however, may be satisfied by common questions of law and fact and need not encompass every issue in the case. *See id.* at 359.

Here, commonality for the Checkpoint Class arises out of allegedly uniform and unconstitutional BPD practices conducted at discrete and identifiable Checkpoints raising a legal challenge common to all class members and all Defendants.[9] *See Floyd*, 283 F.R.D. at 173-74 (finding claims based on NYPD's stop-and-frisk policy met the commonality requirement because they "generate[d] from a centralized source and NYPD employs a hierarchical supervisory structure to effect and reinforce its department-wide policies[]"); *Stinson v. City of New York*, 282 F.R.D. 360, 370 (S.D.N.Y. 2012) (finding commonality where plaintiffs allege "a specific policy promulgated by [d]efendants, namely, that [d]efendants have established a practice by which NYPD officers issue summonses without probable cause in order to meet a summons quota[]"). Common questions of law include whether the initial stop was lawful and, if so, whether the secondary stop was lawful as well. *See Plaintiffs #1-21 v. Cnty. of Suffolk*, 2021 WL 1255011, at *14 (E.D.N.Y. Mar. 12, 2021) ("*Cnty. of Suffolk*")

---

[9] This type of commonality is particularly well-suited to class certification. *See, e.g., Ortega-Melendres v. Arpaio*, 836 F. Supp. 2d 959, 989 (D. Ariz. 2011) ("[C]ommonality in cases alleging racial profiling is satisfied when 'the injuries complained of by the named plaintiffs allegedly resulted from the same unconstitutional practice or policy that allegedly injured or will injure the proposed class members.'") (citing *Daniels v. City of New York*, 198 F.R.D. 409, 418 (S.D.N.Y. 2001)).

16

("The putative class members' and named representatives' claims need not arise out of 'the same course of events' based on identical circumstances leading up to the stop, but rather the unconstitutional stops are due to the institutional practices that plaintiffs allege allowed for discriminatory policing.").

Common questions of fact include where and how the Checkpoints were located, who authorized them, the motive for establishing Checkpoints and whether it was the product of racial profiling, whether the officers' discretion was circumscribed and, if so, whether it was namely tailored to achieve a legitimate law enforcement objective, how the officers chose motorists for secondary inspections, how long detentions lasted at each stop and whether they were unreasonably prolonged, and how officers determined whether a motorist would be ticketed. Because Plaintiffs may seek nominal damages for the alleged constitutional violations, there is commonality for that type of relief as well. *See Luxenberg v. Vt. Dep't of Disabilities, Aging & Indep. Living*, 2024 WL 4894383, at *3 (D. Vt. Nov. 26, 2024) (stating "nominal damages are available when a constitutional violation is established[]") (citing *Uzuegbunam v. Preczewski*, 592 U.S. 279, 291 (2021); *Farrar v. Hobby*, 506 U.S. 103, 113 (1992) ("A plaintiff may demand payment for nominal damages no less than he [or she] may demand payment for millions of dollars in compensatory damages.")).

Defendants are correct that individualized claims for economic damages based on the factual basis for each ticket issued require individualized inquiries and Plaintiffs have yet to "offer 'some glue holding the alleged reasons for all those decisions together.'" *Black Lives Matter L.A.*, 113 F.4th at 1263 (citing *Wal-Mart*, 564 U.S. at 352). The possibility of individualized damages, however, does not defeat commonality because the constitutional injury to all class members is the same insofar as it involves an unconstitutional detention. Individual fines and fees are the collateral consequences of that injury. Defendants' challenge regarding individualized damages is thus more properly considered in the context of predominance.

With regard to the Tinted Windows Class, Plaintiffs allege BPD discriminated against Black and Latino motorists and ticketed them to raise revenues which, in turn,

17

were paid in overtime to BPD Officers. Plaintiffs' statistical evidence allegedly reveals common trends documenting this practice despite a change in BPD leadership.[10] They allege that BPD leadership has been made aware of the issue, and has been unwilling or unable to remedy it. In addition, Plaintiffs allege that discriminatory practices emanated from uniform policies at the highest level of the City and the BPD. *See Cnty. of Suffolk*, 2021 WL 1255011, at *14 (finding commonality where plaintiffs "show[ed] that the types of policies, practices, and decisions at issue were made at high levels of the department[]"). These are common questions of fact which will benefit from class treatment.

Defendants nonetheless raise a legitimate concern regarding individualized damages inquiries. Plaintiffs have yet to propose a common methodology for awarding damages based on tinted windows violations. They, however, do not challenge the initial lawfulness of the tinted-window stops, only the racially motivated ticketing practices that resulted therefrom. In this respect, there remain common issues of law and fact such as whether Black and Latino motorists received a statistically greater number of tinted-window tickets than white motorists, whether a policy circumscribed officer discretion, and whether BPD was aware of racial discrepancies and nonetheless allowed them to persist. The court therefore addresses the issue of individualized damages inquiries in the context of predominance rather than commonality.

Because there are common questions of law and fact for both the Checkpoint Class and the Tinted Windows Class, Plaintiffs have established commonality.

### 3. Whether the Remaining Proposed Classes Meet the Typicality Requirement.

Rule 23 requires that class representatives' claims or defenses must be "typical of the claims or defenses of the class[.]" Fed. R. Civ. P. 23(a)(3). "This requirement 'is

---

[10] *See Morrow v. Washington*, 277 F.R.D. 172, 192 (E.D. Tex. 2011) (finding plaintiffs established commonality through statistical evidence that "there was a specific, city-wide policy in Tenaha of targeting racial and ethnic minorities for traffic stops and then illegally detaining and/or arresting them or conducting illegal searches and seizures of their property[]").

satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'" *Brown v. Kelly*, 609 F.3d 467, 475 (2d Cir. 2010) (quoting *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37 (citation omitted).

Plaintiffs claim a violation of the Fourth Amendment under *City of Indianapolis v. Edmond*, 531 U.S. 32, 47 (2000), which holds that "[w]hen law enforcement authorities pursue primarily general crime control purposes at [vehicle] checkpoints . . . , stops can only be justified by some quantum of individualized suspicion." Plaintiffs Bonds, Evans, and Redden are the putative class representatives for the Checkpoint Class and "are Black individuals who were stopped pursuant to the Checkpoint Policy, and all received tickets at those Checkpoints." (Doc. 211 at 39.)[11] All claims "arise[] from the same course of events[.]" *Brown*, 609 F.3d at 475; *see also Floyd*, 283 F.R.D. at 175 (finding "NYPD's centralized program of stops and frisks" constitutes "the same course of conduct"). Although the dates, times, and locations of the stops may be different, "minor variations in the fact patterns underlying individual claims" do not defeat typicality.[12] *Yeend v.*

---

[11] The lack of Latino Class representatives does not preclude a finding of typicality. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153, 175 (S.D.N.Y. 2016) (finding typicality despite defendants' argument that "because none of the named representatives are Latino, they cannot represent the alleged Latino class members who make race-based claims[]") (internal quotation marks omitted).

[12] *See, e.g.*, *Ligon v. City of New York*, 288 F.R.D. 72, 82 (S.D.N.Y. 2013) (finding that where "plaintiffs and the putative class members were allegedly subjected to the same unlawful conduct by NYPD officers under the auspices of a single NYPD program: unjustified *Terry* stops, not supported by reasonable suspicion . . . the experiences of the named plaintiffs are identical to those of the proposed class, [and] the typicality requirement is . . . met"); *Daniels*, 198 F.R.D. at 418 (finding claims arising from suspicionless stop and frisks satisfied the typicality requirement because they challenged "the same unlawful conduct" and because "the named plaintiffs and the class members will allege that these stops were made in violation of the Fourth Amendment because the officers lacked reasonable suspicion to make a stop").

19

*Akima Glob. Servs., LLC*, 2025 WL 959968, at *12 (N.D.N.Y. Mar. 31, 2025) (quoting *Robidoux*, 987 F.2d at 936-37). Plaintiffs have therefore established typicality for the Checkpoint Class.

Plaintiffs Franklin, Palmer, and Yeldon seek to serve as the class representatives for the Tinted Windows Class and are "Black individuals who received multiple tinted-window tickets from BPD officers at a single traffic stop while driving in the City of Buffalo." (Doc. 211 at 39.) Their claims arise from BPD's allegedly unconstitutional practice of issuing multiple citations to Black and Latino motorists for tinted windows as a source of traffic enforcement revenue. This suffices to satisfy typicality because "each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant[s'] liability." *Brown*, 609 F.3d at 475. *See also Cnty. of Suffolk*, 2021 WL 1255011, at *14 (finding that different circumstances prompting a traffic stop do not defeat typicality because plaintiffs all claim that "the unconstitutional stops are due to the institutional practices that plaintiffs allege allowed for discriminatory policing[]").

Defendants argue that the Checkpoint Class and Tinted Windows Class lack typicality because some, but not all, Plaintiffs' individualized damages claims are barred by *Townes v. City of New York*. In *Townes*, the Second Circuit refused to adopt a "fruit of the poisonous tree" doctrine in § 1983 cases. 176 F.3d 138, 145 (2d Cir. 1999). This means a plaintiff seeking damages in a § 1983 action cannot argue that, because a detention or seizure was unconstitutional, all traffic enforcement that flowed from it was impermissible and is compensable by damages as the fruit of the unlawful activity. Defendants further contend that "[n]o matter how characterized, Plaintiffs' request for . . . damages . . . require individual determinations." (Doc. 245 at 8.) In so far as individualized damages are concerned, the court agrees. The court, however, treats this issue as a challenge to predominance. It remains true that the class representatives' claims are "typical of claims . . . of the class." Fed. R. Civ. P. 23(a)(3).

20

**4.      Whether the Remaining Proposed Classes Meet the Adequacy Requirement.**

Rule 23(a)'s adequacy requirement instructs that class representatives must fairly and adequately protect the interests of the class. "Two factors generally inform [whether class representatives satisfy the Rule 23(a)(4) requirement]: '(1) absence of conflict and (2) assurance of vigorous prosecution.'" *Irvin v. Harris*, 944 F.3d 63, 71 (2d Cir. 2019) (internal quotation marks and alteration omitted) (quoting *Robinson v. Metro-N. Commuter R.R. Co.*, 267 F.3d 147, 170 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart*, 564 U.S. 338 (2011)); *see also Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006) ("Adequacy is twofold: the proposed class representative must have an interest in vigorously pursuing the claims of the class, and must have no interests antagonistic to the interests of other class members."). This inquiry focuses on "uncovering 'conflicts of interest between named parties and the class they seek to represent.'" *In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 574 F.3d 29, 35 (2d Cir. 2009) ("*Flag Telecom*") (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)).

Defendants argue that Plaintiffs fail to establish adequacy because "there is a divergence between class representatives who are barred from damages and class representatives and members who may be entitled to damages," purportedly rendering "the class representatives . . . inadequate." (Doc. 220 at 36.) Plaintiffs, however, have amended their requests and no longer seek individualized damages for emotional distress and lost wages. *See* Doc. 241 at 1. For their remaining individual damages claims, adequacy exists because there is no evidence the class representatives' claims conflict with those of other classes or within the class. The fact that one class member may receive greater damages than another is not dispositive provided those awards are not in conflict. *See Allen v. Dairy Farmers of Am., Inc.*, 2012 WL 5844871, at *7 (D. Vt. Nov. 19, 2012) (finding that, although dairy farmers asserted individualized harms as a result of defendants' alleged monopoly, adequacy was established).

A conflict must be "fundamental" to violate Rule 23(a)(4). *See id.*; *Pickett v. Iowa Beef Processors*, 209 F.3d 1276, 1280 (11th Cir. 2000) (quoting 7A Charles Alan Wright

21

& Arthur R. Miller, Federal Practice & Procedure § 1768 (2d ed. 1986) ("It is axiomatic that a putative representative cannot adequately protect the class if his [or her] interests are antagonistic to or in conflict with the objectives of those he [or she] purports to represent.")). In instances where a fundamental conflict does exist, the court may cure the conflict by dividing the class into separate "homogeneous subclasses . . . with separate representation to eliminate conflicting interests of counsel." *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 856 (1999); *see also In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249-50 (2d Cir. 2011) (same); *Allen v. Dairy Farmers of Am., Inc.*, 279 F.R.D. 257, 274 (D. Vt. 2011) (finding a fundamental conflict where "the interests of the class clearly diverge, and the proposed class representatives cannot adequately represent all members of the class[]"). Defendants fail to identify a conflict of this magnitude.

Plaintiffs are represented by three nonprofit civil rights organizations that frequently litigate civil rights cases and a law firm with extensive litigation experience. Defendants do not question the experience and adequacy of Plaintiffs' legal counsel, which are "qualified, experienced[,] and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 222 F.3d 52, 60 (2d Cir. 2000).

The proposed class representatives are similarly situated, if not identical, to the class members they seek to represent, have no antagonistic interests, and thus will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Because the proposed class representatives' and class members' interests align, and because the proposed class representatives do not have "any conflict of interest that would prevent them from serving as a class representative[,]" (Doc. 211 at 41), Plaintiffs have established adequacy.

### 5.    Whether the Remaining Proposed Classes are Ascertainable.

Plaintiffs assert that, because their purported class definitions "identify specific groups of people, subjected to specific acts, within a defined time period[,]" *id.* at 42, the proposed class definitions are based on objective criteria and are therefore ascertainable. The Second Circuit has "recognized an implied requirement of ascertainability in Rule 23

22

of the Federal Rules of Civil Procedure." *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015) (internal quotation marks omitted).

A proposed class "must be 'sufficiently definite' and 'defined by objective criteria' *so that* 'it is administratively feasible for the court to determine whether a particular individual is a member[.]'" *In re Petrobras Sec.*, 862 F.3d 250, 269 n.20 (2d Cir. 2017) (emphasis in original) (quoting *Brecher*, 806 F.3d at 24-25). The Second Circuit has, however, rejected "administrative feasibility as an absolute standard[,]" *id.* 267, and "only preclude[s] certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. "[T]he use of objective criteria cannot alone determine ascertainability when those criteria, taken together, do not establish the definite boundaries of a readily identifiable class." *Id.* at 266 (footnote and internal quotation marks omitted).

Defendants contend the Checkpoint and Tinted Windows Classes are not ascertainable because only members issued invalid tickets are appropriate class members and because Plaintiffs allegedly arbitrarily selected the Classes' determining characteristics. Defendants, however, cannot redefine Plaintiffs' proposed classes.

Plaintiffs define the Checkpoint Class as: "All individuals who received a ticket or were arrested at a BPD 'traffic safety' vehicle checkpoint on or after June 28, 2015." (Doc. 211 at 12.) This class therefore only includes individuals who were ticketed or arrested when passing through a Checkpoint. By narrowing the Checkpoint Class in this manner, Plaintiffs have identified a specific group of drivers determinable by BPD records and other public records who belong to the purported class.

The Tinted Windows Class includes "[a]ll Black and/or Latino individuals who received multiple tinted windows tickets from the BPD in a single traffic stop on or after June 28, 2015." *Id.* Although the proposed definition for the Tinted Windows Class is considerably broader and encompasses a ten-year time period, because the class is limited to Black and Latino drivers who received a ticket for tinted windows, the class remains ascertainable. Plaintiffs have obtained electronic records detailing data of traffic citations and arrests by BPD that "includes the name and driver license number of the person

23

stopped, the location of the stop or arrest, the specific violation(s) alleged, and the identity of the issuing or arresting officer[.]" *Id.* at 54-55.

The Checkpoint and Tinted Windows Classes may be defined with "objective criteria that are administratively feasible[.]" *Petrobras*, 862 F.3d at 266 (internal quotation marks omitted). Plaintiffs have established ascertainability. *See Godson v. Eltman, Eltman & Cooper, P.C.*, 328 F.R.D. 35, 47 (W.D.N.Y. 2018) (finding that "[s]ince [p]laintiff may easily identify the members of the Settlement Class by reviewing [d]efendants' own records pertaining to the timeframe circumscribed by the class definition, the implied requirement of ascertainability is satisfied[]") (citing *Lizondro-Garcia v. Kefi LLC*, 300 F.R.D. 169, 176 (S.D.N.Y. 2014)).

## D. Whether the Remaining Proposed Classes Meet the Rule 23(b)(3) Requirements.

In addition to Rule 23(a)'s requirements, where damages are sought, Rule 23(b)(3) requires "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action [be] superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). These requirements are referred to as "predominance" and "superiority."

### 1. Whether the Remaining Proposed Classes Meet the Predominance Requirement.

Plaintiffs contend that they will "establish that [a] City policy, custom, or deliberate indifference caused their injuries[,]"and because they challenge BPD policies and practices, "the evidence in support . . . [will allegedly] not vary from class member to class member" for either the Checkpoint Class or the Tinted Windows Class. (Doc. 211 at 44.) Rule 23(b)(3)'s predominance requirement "is satisfied if: (1) resolution of any material 'legal or factual questions . . . can be achieved through generalized proof,' and (2) 'these [common] issues are more substantial than the issues subject only to individualized proof.'" *Petrobras*, 862 F.3d at 270 (alterations in original) (quoting *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir. 2016)).

> An individual [legal or factual] question is one where members of a proposed class will need to present evidence that varies from member to

24

member, while a common question is one where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized class-wide proof.

*Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

"Even if Rule 23(a)'s commonality requirement" is met, "the predominance criterion is far more demanding[,]" *Amchem Prods.*, 521 U.S. at 623-24, "and is not satisfied simply by showing that the class claims are framed by the common harm suffered by potential plaintiffs." *Petrobras*, 862 F.3d at 270 (citing *Amchem Prods.*, 521 U.S. at 623-24). "Rule 23(b)(3), however, does *not* require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 469 (2013) (alterations adopted) (emphasis in original) (citation and internal quotation marks omitted).

Defendants assert that predominance may not be found because each traffic stop requires an individualized determination as to its lawfulness. Plaintiffs counter that no individualized determinations are necessary because all Checkpoint stops were unconstitutional and all Tinted Windows class members' stops were lawful but resulted in racially motivated ticketing. Neither Class thus requires an individualized determination of liability. Defendants respond that questions of individualized damages nonetheless predominate. To the extent Plaintiffs seek general, nominal, and punitive damages, Defendants' concern is unfounded. *See Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (finding inquiries related to individualized damages tied to "the return of money extracted from [plaintiffs] as a result of . . . fraudulent judgments" were "not sufficient grounds on which to conclude that the district court's determination that individualized damages issues will not predominate in this case was an abuse of discretion[]"). "[P]laintiffs can—subject to qualified immunity—generally recover damages that are proximately caused by any Fourth Amendment violation." *Cnty. of L.A., Cal. v. Mendez*, 581 U.S. 420, 430-31 (2017). The Second Circuit has recognized that "loss of liberty is a distinct form of damage for which 'general damages' may be recovered." *Betances v. Fischer*, 2022 WL 765963, at *10 (S.D.N.Y. Mar. 14, 2022)

25

(citing *Kerman v. City of New York*, 374 F.3d 93, 125 (2d Cir. 2004)). Punitive damages may also be awarded on a class-wide basis. *See Brown*, 609 F.3d at 479 (noting the defendants in a putative class action "[we]re subject to claims for damages, including in some cases punitive damages[]").

To the extent Plaintiffs seek individualized economic damages for fines and fees, Defendants' argument gains some traction. Although it may be possible, and Plaintiffs suggest it will be probable, to establish a formula for damages, they have not yet proposed one. It would neither be efficient nor effective to certify a class to address common constitutional claims and then engage in a member-by-member determination of the recoverable damages for fees and fines. *Townes* instructs that the court cannot merely treat those economic injuries as fruit of the poisonous tree and instruct a jury to award damages on that basis.

Because Plaintiffs' requests for individual economic damages for fines and fees will require a determination of whether those economic consequences are justified in each class member's case, common questions of law and fact will not predominate for the damages portion of this case. *See Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013) (finding district court improperly certified class where "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class[]"). A court may, however, address this issue by decertifying the class to pursue such damages. *See Betances*, 2022 WL 765963, at *16 ("The class can be decertified after [trial] for purposes of pursuing individualized damages issues."). In the alternative, Plaintiffs may amend their request for individualized relief and propose a formula for general damages. In light of these options, denial of class certification on predominance grounds is not warranted at this time.

For the reasons stated above, although a close question, Plaintiffs have established predominance for the Checkpoint Class and the Tinted Windows Class.

26

### 2. Whether the Remaining Proposed Classes Meet the Superiority Requirement.

Class actions are deemed superior when "they facilitate the redress of claims where the costs of bringing individual actions outweigh the expected recovery." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013) (citing *Amchem Prods.*, 521 U.S. at 617).

> Rule 23(b)(3) identifies four factors for a court to weigh when determining whether a proposed class action satisfies . . . superiority[:] . . . (A) the class members' interests in individually controlling the actions; (B) the extent and nature of any ongoing, related litigation; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Wentworth v. Metrodata Servs., Inc.*, 2020 WL 13527954, at *8 (W.D.N.Y. Nov. 9, 2020) (internal quotation marks omitted) (quoting Fed. R. Civ. P. 23(b)(3)) (citing *Sykes* 780 F.3d at 82).

"Manageability is the most important consideration," *id.* (citing *Sykes*, 780 F.3d at 82), and courts must be mindful of "the inability of the poor or uninformed to enforce their rights and the improbability that large numbers of class members would possess the initiative to litigate individually." *Id.* (internal quotation marks omitted). The need for judicial economy and the financial resources of the potential class members buttress this conclusion. *See Deposit Guar. Nat'l Bank v. Roper*, 445 U.S. 326, 339 (1980) ("Where it is not economically feasible to obtain relief within the traditional framework of a multiplicity of small individual suits for damages, aggrieved persons may be without any effective redress unless they may employ the class-action device.").

At this juncture, there is no apparent interest by putative class members to individually litigate their cases, nor would it be economically feasible to do so. There is also apparently no ongoing related litigation. It is both necessary and appropriate to locate the class action in this forum where the constitutional violations allegedly took place so that witnesses and parties may readily attend the trial. According to Plaintiffs, the facts and circumstances foreclose separate lawsuits because many of the proposed

27

class members "have limited income and lack access to counsel for individual litigation." (Doc. 211 at 54.)

Based on the foregoing, the court finds class certification a superior means of adjudicating this case for the Checkpoint and Tinted Windows Classes.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to certify class is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated this _22^nd_ day of April, 2025.

Christina Reiss, District Judge
United States District Court

28

**U.S. DISTRICT COURT**
**U.S. District Court, Western District of New York (Buffalo)**
**CIVIL DOCKET FOR CASE #: 1:18-cv-00719-CCR**

Black Love Resists et al v. City of Buffalo et al
Assigned to: Chief District Judge Christina Clair Reiss
Cause: 42:1983 Civil Rights Act

Date Filed: 06/28/2018
Jury Demand: Both
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Black Love Resists in the Rust**
*by and through its Co-Directors Natasha Soto and Shaketa*
*Redden and on behalf of its members*
*TERMINATED: 10/03/2025*
*agent of*
Just Resisting
*TERMINATED: 10/03/2025*

represented by **Andrea Chinyere Ezie**
Center for Constitutional Rights
666 Broadway Floor 7
New York, NY 10012
212 614-6467
Fax: 212 614-6467
Email: cezie@ccrjustice.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
Center for Constitutional Rights
666 Broadway Floor 7
New York, NY 10012
212-614-6427
Fax: 212-614-6499
Email: bazmy@ccrjustice.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Adrienne Nelson**
Covington & Burling, LLP (NY)
30 Hudson Yards
New York, NY 10001-2170
212-841-1000
Email: cnelson@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
National Center for Law and Economic Justice
50 Broadway
Suite 1500
New York, NY 10004-3821
212-633-6967
Fax: 212-633-6371
Email: wilner@nclej.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Kelemen**
Western New York Law Center, Inc.
37 Franklin Street
2nd Floor, Suite 210
Buffalo, NY 14203
816-855-0203, Ext. 2
Fax: 716-855-0203
Email: jkelemen@wnylc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
Western New York Law Center, Inc.
37 Franklin Street
2nd Floor, Suite 210
Buffalo, NY 14203
716-855-0203
Fax: 716-270-4005
Email: mparham@wnylc.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
Covington & Burling, LLP (NY)
30 Hudson Yards
New York, NY 10001-2170
212-841-1000
Email: pirwin@cov.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
Covington & Burling, LLP (NY)
30 Hudson Yards
New York, NY 10001-2170
212-841-1000
Email: atimmick@cov.com
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
National Center for Law and Economic Justice
275 7th Avenue
Suite 1506
New York, NY 10001
917-583-5849
Email: malhotra@nclej.org
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
National Center for Law and Economic Justice
275 7th Avenue
Suite 1506
New York, NY 10001
212-633-6967
Email: wilson@nclej.org
*TERMINATED: 03/19/2021*

**Darius Charney**
Center for Constitutional Rights
666 Broadway Floor 7
New York, NY 10012
212 614-6475
Fax: 212-614-6499
Email: dcharney@ccrjustice.org
*TERMINATED: 09/16/2021*

**Edward Krugman**
Law Office of Edward P. Krugman
247 West 12th Street
Suite Ph-A
New York, NY 10014-1992
917-834-4663
Fax: 517-487-0827
Email: epk@epklaw.net
*TERMINATED: 09/04/2025*

**Jordan Scott Joachim**
Covington & Burling, LLP (NY)
30 Hudson Yards
New York, NY 10001-2170
212-841-1086
Email: jjoachim@cov.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
Neighborhood Legal Services, Inc.
237 Main Street
Suite 400
Buffalo, NY 14203
716-847-0655
Email: kwilliams@nls.org
*TERMINATED: 11/02/2023*

**Marc Cohan**
National Center for Law and Economic Justice
275 Seventh Avenue

Suite 1506
New York, NY 10001
212-633-6967
Fax: 212-633-6371
Email: cohan@nclej.org
*TERMINATED: 03/19/2021*

**Theresa Lau**
National Center for Law and Economic Justice
275 7th Avenue
Suite 1506
New York, NY 10001
*TERMINATED: 07/25/2018*

**Travis W. England**
National Center for Law and Economic Justice
275 7th Avenue
Suite 1506
New York, NY 10001
212-633-6967
Email: england@nclej.org
*TERMINATED: 03/24/2020*

**Plaintiff**

**Dorethea Franklin**                    represented by   **Andrea Chinyere Ezie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Kelemen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Marc Cohan**
(See above for address)
*TERMINATED: 03/19/2021*

**Theresa Lau**
(See above for address)
*TERMINATED: 07/25/2018*

**Travis W. England**
(See above for address)
*TERMINATED: 03/24/2020*

**Plaintiff**

**Taniqua Simmons**                                  represented by  **Andrea Chinyere Ezie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Kelemen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**

(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Marc Cohan**
(See above for address)
*TERMINATED: 03/19/2021*

**Theresa Lau**
(See above for address)
*TERMINATED: 07/25/2018*

**Travis W. England**
(See above for address)
*TERMINATED: 03/24/2020*

**Plaintiff**

**De'Jon Hall**                                    represented by   **Andrea Chinyere Ezie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Kelemen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Marc Cohan**
(See above for address)
*TERMINATED: 03/19/2021*

**Theresa Lau**
(See above for address)
*TERMINATED: 07/25/2018*

**Travis W. England**
(See above for address)
*TERMINATED: 03/24/2020*

**Plaintiff**

**Jane Doe**
*individually and on behalf of a class of others similarly situated*

represented by **Andrea Chinyere Ezie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Baher Azmy**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Joseph A. Kelemen**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**

(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Marc Cohan**
(See above for address)
*TERMINATED: 03/19/2021*

**Theresa Lau**
(See above for address)
*TERMINATED: 07/25/2018*

**Travis W. England**
(See above for address)
*TERMINATED: 03/24/2020*

**Plaintiff**

**Shirley Sarmiento**                    represented by   **Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Andrea Chinyere Ezie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Ebony Yeldon      represented by    **Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrea Chinyere Ezie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

Charles Palmer      represented by    **Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*

*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Andrea Chinyere Ezie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Shaketa Redden**                    represented by    **Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)

*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Andrea Chinyere Ezie**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Joseph Bonds**              represented by   **Christine Adrienne Nelson**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Claudia Wilner**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Matthew Alan Parham**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Philip A. Irwin**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*

**Anjana Malhotra**
(See above for address)
*TERMINATED: 08/06/2025*

**Britney Renee Wilson**
(See above for address)
*TERMINATED: 03/19/2021*

**Darius Charney**
(See above for address)
*TERMINATED: 09/16/2021*

**Edward Krugman**
(See above for address)
*TERMINATED: 06/24/2025*

**Jordan Scott Joachim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Keisha Alecia Williams**
(See above for address)
*TERMINATED: 11/02/2023*

**Andrea Chinyere Ezie**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Buffalo, N.Y.**        represented by   **Robert Emmet Quinn**
Buffalo Public Schools
65 Niagara Square
Ste 713 City Hall

Buffalo, NY 14202
716-816-3102
Email: rquinn@buffalony.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ava J. Horgan**
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street
Suite 100
Buffalo, NY 14202
716-848-1401
Email: ahorgan@hodgsonruss.com
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
Hodgson Russ, LLP
The Guaranty Building
140 Pearl Street
Suite 100
Buffalo, NY 14202
716-848-1609
Email: cfreely@hodgsonruss.com
*ATTORNEY TO BE NOTICED*

**David A. Short**
Sequor Law
1200 G Street N.W.
Suite 340
Washington, DC 20005
305-372-8282
Email: dshort@sequorlaw.com
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
Hodgson Russ LLP
The Guaranty Building
140 Pearl Street
Suite 100
Buffalo, NY 14202
(716) 856-4000
Fax: 716-849-0349
Email: hruss@hodgsonruss.com
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
Manatt, Phelps & Phillips, LLP
2049 Century Park East
Suite 1700
Los Angeles, CA 90067
310-312-4284
Email: kclimaco@manatt.com
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
Office of the Federal Public Defender
4 Clinton Square
3rd Floor
Syracuse, NY 13202
315-701-0080
Email: Peter_Sahasrabudhe@fd.org
*TERMINATED: 04/21/2026*

**Defendant**

**Byron B Brown**
*Mayor of the City of Buffalo, in his individual and official capacities*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ava J. Horgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**Defendant**

**Byron C Lockwood**
*Commissioner of the Buffalo Police Department, in his
individual capacity*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ava J. Horgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**Defendant**

**Daniel Derenda**
*former Commissioner of the Buffalo Police Department, in his
individual capacity*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ava J. Horgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**Defendant**

**Aaron Young**
*officer of the Buffalo Police Department, in his individual*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*

*capacity*
*TERMINATED: 10/03/2025*

*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**Defendant**

**Kevin Brinkworth**
*TERMINATED: 10/03/2025*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**Defendant**

**Philip Serafini**
*officer of the Buffalo Police Department, in his individual*
*capacity*
*TERMINATED: 10/03/2025*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**Defendant**

**Robbin Thomas**
*officer of the Buffalo Police Department, in his individual*

represented by **Robert Emmet Quinn**
(See above for address)

*capacity*
*TERMINATED: 10/03/2025*

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**<u>Defendant</u>**

**Unknown Supervisory Personnel 1-10**
*officers of the Buffalo Police Department, in their individual*
*capacities*
*TERMINATED: 10/03/2025*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**<u>Defendant</u>**

**Unknown Officers 1-20**
*officers of the Buffalo Police Department, in their individual*
*capacities*
*TERMINATED: 10/03/2025*

represented by **Robert Emmet Quinn**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Cheyenne Nicole Freely**
(See above for address)
*ATTORNEY TO BE NOTICED*

**David A. Short**
(See above for address)
*TERMINATED: 06/15/2022*

**Hugh M. Russ , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Katelyn A. Climaco**
(See above for address)
*TERMINATED: 08/12/2022*

**Peter A. Sahasrabudhe**
(See above for address)
*TERMINATED: 04/21/2026*

**<u>Intervenor</u>**

**Markel Nance**

represented by **Andrea Chinyere Ezie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Thomas Christopher Williams Jr.**

represented by **Andrea Chinyere Ezie**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew J. Timmick**
(See above for address)
*TERMINATED: 03/16/2026*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Movant**

**Erie County District Attorney's Office**
*TERMINATED: 07/22/2021*

represented by **Michael J. Hillery**
Erie County District Attorney's Office
25 Delaware Avenue
Buffalo, NY 14202
(716) 858-2522
Fax: (716) 858-7922
Email: michael.hillery@erie.gov
*TERMINATED: 07/22/2021*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/28/2018 | 1 | COMPLAINT against City of Buffalo $ 400 receipt number 0209-3149240, filed by Black Love Resists. (Attachments: # 1 Civil Cover Sheet, # 2 Civil Cover Sheet Attachment, # 3 Summons, # 4 Summons, # 5 Summons, # 6 Summons, # 7 Summons, # 8 Summons, # 9 Summons, # 10 Summons, # 11 Attachment, # 12 Exhibit Summons)(Williams, Keisha) (Entered: 06/28/2018) |
| 06/29/2018 | | Case assigned to Hon. Christina Clair Reiss. Notification to chambers of on-line civil opening. (KLH) (Entered: 06/29/2018) |
| 06/29/2018 | | Notice of Availability of Magistrate Judge: A United States Magistrate of this Court is available to conduct all proceedings in this civil action in accordance with 28 U.S.C. 636c and FRCP 73. The Notice, Consent, and Reference of a Civil Action to a Magistrate Judge form (AO-85) is available for download at http://www.uscourts.gov/services-forms/forms. (KLH) (Entered: 06/29/2018) |
| 06/29/2018 | | AUTOMATIC REFERRAL to Mediation The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative-dispute-resolution. (KLH) (Entered: 06/29/2018) |
| 06/29/2018 | 2 | Summons Issued as to Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Aaron Young. (KLH) (Entered: 06/29/2018) |
| 07/24/2018 | 3 | AFFIDAVIT of Service for Summons & Complaint served on Daniel Derenda on July 9, 2018, filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Williams, Keisha) (Entered: 07/24/2018) |
| 07/24/2018 | 4 | SUMMONS Returned Executed by Jane Doe, Dorethea Franklin, Black Love Resists in the Rust, Taniqua Simmons, De'Jon Hall. Byron C Lockwood served on 7/9/2018, answer due 7/30/2018. (Williams, Keisha) (Entered: 07/24/2018) |
| 07/24/2018 | 5 | SUMMONS Returned Executed by Jane Doe, Dorethea Franklin, Black Love Resists in the Rust, Taniqua Simmons, De'Jon Hall. City of Buffalo, N.Y. served on 7/9/2018, answer due 7/30/2018. (Williams, Keisha) (Entered: 07/24/2018) |
| 07/30/2018 | 6 | ANSWER to 1 Complaint, by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Attachments: # 1 Certificate of Service)(Quinn, Robert) (Entered: 07/30/2018) |
| 07/31/2018 | | ADR Plan electronically forwarded to attorneys. The ADR Plan is available for download at http://www.nywd.uscourts.gov/alternative-dispute-resolution.(KLH) (Entered: 07/31/2018) |
| 08/22/2018 | 7 | ORDER regarding Scheduling Conference set for 10/9/2018 03:00 PM in US Courthouse, 2 Niagara Square, Buffalo, NY 14202-3350 before Hon. Christina Clair Reiss, who will appear by videoconference. Signed by Hon. Christina Clair Reiss on 8/21/2018. (Attachments: # 1 Case Management Order Template)(KLH) (Entered: 08/22/2018) |
| 09/17/2018 | 8 | SUMMONS Returned Executed by Jane Doe, Dorethea Franklin, Black Love Resists in the Rust, Taniqua Simmons, De'Jon Hall. Philip Serafini served on 9/8/2018, answer due 10/1/2018. (Williams, Keisha) (Entered: 09/17/2018) |
| 09/17/2018 | 9 | SUMMONS Returned Executed by Jane Doe, Dorethea Franklin, Black Love Resists in the Rust, Taniqua Simmons, De'Jon Hall. Kevin Brinkworth served on 9/11/2018, answer due 10/2/2018. (Williams, Keisha) (Entered: 09/17/2018) |
| 09/17/2018 | 10 | SUMMONS Returned Executed by Jane Doe, Dorethea Franklin, Black Love Resists in the Rust, Taniqua Simmons, De'Jon Hall. Aaron Young served on 9/5/2018, answer due 9/26/2018. (Williams, Keisha) (Entered: 09/17/2018) |

| 09/17/2018 | 🌐11 | SUMMONS Returned Executed by Jane Doe, Dorethea Franklin, Black Love Resists in the Rust, Taniqua Simmons, De'Jon Hall. Byron B Brown served on 9/6/2018, answer due 9/27/2018. (Williams, Keisha) (Entered: 09/17/2018) |
|---|---|---|
| 09/17/2018 | 🌐12 | SUMMONS Returned Executed by Jane Doe, Dorethea Franklin, Black Love Resists in the Rust, Taniqua Simmons, De'Jon Hall. Robbin Thomas served on 9/8/2018, answer due 10/1/2018. (Williams, Keisha) (Entered: 09/17/2018) |
| 09/19/2018 | 🌐13 | DISCOVERY PLAN by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons.(Wilner, Claudia) (Entered: 09/19/2018) |
| 10/09/2018 | 🌐14 | Minute Entry for proceedings held before Hon. Christina Clair Reiss. Scheduling Conference via video conference held on 10/9/2018.<br><br>Parties have agreed to select a mediator and complete first mediation session by 12/1/2018.<br><br>Discovery schedule, potential class action, proposed protective order and general case management issues discussed.<br><br>The Court will schedule a further telephone conference in 60 days.<br><br>Parties may contact the Court directly for assistance with discovery issues.<br><br>Appearances: Darius Charney, Esq., Anjana Malhotra, Esq., and Claudia Wilner, Esq., on behalf of plaintiffs; Robert Quinn, Esq., on behalf of defendants. (Court Reporter FTR Gold.) (JDK) (Entered: 10/09/2018) |
| 10/09/2018 | 🌐15 | ORDER. The 13 Joint Discovery Plan is SO ORDERED. Please note: This docket entry does not contain every detail of this order. It is your responsibility to read and download the pdf to this document for future reference. Motions to Join Parties/Amend Pleadings due by 5/14/2019, Discovery completed by 6/14/2019, Expert Witness List due by 9/13/2019, Motions due by 10/9/2019. Signed by Hon. Christina Clair Reiss on 10/9/2018. (KLH) (Entered: 10/09/2018) |
| 10/12/2018 | 🌐 | NOTICE of Hearing: Telephone Status Conference set for 12/21/2018 11:00 AM before Hon. Christina Clair Reiss. Call-in instructions will be emailed shortly before this conference is held. (LMD) (Entered: 10/12/2018) |
| 10/29/2018 | 🌐16 | NOTICE of Appearance by Andrea Chinyere Ezie on behalf of All Plaintiffs (Ezie, Andrea) (Entered: 10/29/2018) |
| 11/06/2018 | 🌐17 | Stipulation-Selection of Mediator by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young (Attachments: # 1 Certificate of Service)(Quinn, Robert) (Entered: 11/06/2018) |
| 12/21/2018 | 🌐18 | Minute Entry for proceedings held before Hon. Christina Clair Reiss. Telephone Status Conference held on 12/21/2018.<br><br>Discovery issues discussed.<br><br>The Court will not intervene in discovery dispute at this time, but directs the parties to contact the Court within the next 30 days either individually or jointly regarding issues that can not be resolved.<br><br>The Court will schedule either a telephone conference or a video conference following report of the parties.<br><br>Appearances: Claudia Wilner, Esq., Andrea Ezie, Esq., Britney Wilson, Esq., Darius Charney, Esq., Travis England, Esq., Anjana Malhotra, Esq., on behalf of plaintiffs; Robert Quinn, Esq., on behalf of defendants. (Court Reporter FTR Gold.) (JDK) (Entered: 12/21/2018) |
| 01/22/2019 | 🌐19 | Letter filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *re Current Status of Discovery*. (Charney, Darius) (Entered: 01/22/2019) |
| 01/25/2019 | 🌐20 | TEXT ORDER granting 19 letter request for an extension of time. Signed by Hon. Christina Clair Reiss on 1/25/2019. (KLH) (Entered: 01/28/2019) |
| 01/29/2019 | 🌐21 | Letter filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Michael Menard, Taniqua Simmons as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *re Current Status of Discovery*. (Wilner, Claudia) (Entered: 01/29/2019) |
| 05/06/2019 | 🌐22 | First MOTION for Extension of Time to Complete Discovery , *Move to Amend Pleadings, and Make Dispositive Motions* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons.(Charney, Darius) (Entered: 05/06/2019) |
| 05/22/2019 | 🌐 | NOTICE of Hearing: Telephone Status Conference set for 5/30/2019 03:30 PM before Hon. Christina Clair Reiss in the Cattaraugus Courtroom. Call-in information will be provide to the attorneys via email. (LB) (Entered: 05/22/2019) |
| 05/28/2019 | 🌐23 | Letter filed by Black Love Resists in the Rust as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *to supplement May 9, 2019 letter motion (ECF 22) with regard to outstanding discovery issues*. (Attachments: # 1 Exhibit A - First Set of RFPs, # 2 Exhibit B - Supplemental Responses to First Set of RFPs, # 3 Exhibit C - 311 Records - Police Issue (excerpt), # 4 Exhibit D - SF Daily Reports Redacted (excerpt))(Wilner, Claudia) (Entered: 05/28/2019) |
| 05/29/2019 | 🌐24 | LETTER regarding 22 First MOTION for Extension of Time to Complete Discovery , *Move to Amend Pleadings, and Make Dispositive Motions* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Attachments: # 1 Exhibit A - First Set of RFPs, # 2 Exhibit B - Supplemental Responses to First Set of RFPs, # 3 Exhibit C - 311 Records - Police Issue (excerpt), # 4 Exhibit D - SF Daily Reports Redacted (excerpt))(Wilner, Claudia) Modified on 5/30/2019 to correct event and description (KLH). (Entered: 05/29/2019) |
| 05/30/2019 | 🌐25 | Minute Entry for proceedings held before Hon. Christina Clair Reiss. Telephone Status Conference held on 5/30/2019.<br><br>Parties identify several discovery disputes.<br><br>The Court provides instructions for narrowing the scope for production of documents, redaction of documents and privilege logs. |

| | | |
|---|---|---|
| | | Plaintiffs request an extension of the discovery schedule. The Court will sign off on an agreed to revised discovery schedule, otherwise a motion will be required.<br><br>The Court will schedule a further status conference in 90 days absent a request for an earlier date.<br><br>Appearances: Claudia Wilner, Esq., Darius Charney, Esq., Anjana Malhotra, Esq., on behalf of plaintiffs; Robert Quinn, Esq., on behalf of defendants.<br><br>(Court Reporter FTR Gold.) (JDK) (Entered: 05/31/2019) |
| 05/31/2019 | 26 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 10/9/2018, before Judge Christina Clair Reiss. Court Reporter/Transcriber Christi A. Macri, Contact Info christimacri50@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/21/2019. Redacted Transcript Deadline set for 7/1/2019. Release of Transcript Restriction set for 8/29/2019. (CM) (Entered: 05/31/2019) |
| 05/31/2019 | 27 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 12/21/2018, before Judge Christina Clair Reiss. Court Reporter/Transcriber Christi A. Macri, Contact Info christimacri50@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/21/2019. Redacted Transcript Deadline set for 7/1/2019. Release of Transcript Restriction set for 8/29/2019. (CM) (Entered: 05/31/2019) |
| 06/03/2019 | 28 | Consent MOTION to Modify Scheduling Order by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons.(Wilner, Claudia) (Entered: 06/03/2019) |
| 06/05/2019 | 29 | TEXT ORDER granting 28 Consent Motion to modify the scheduling order. Issued by Hon. Christina Clair Reiss on 6/5/2019. (KLH) (Entered: 06/05/2019) |
| 06/05/2019 | | Set/Reset Deadlines: Motions to Join Parties/Amend Pleadings due by 11/14/2019. Discovery completed by 12/13/2019. Expert Reports due by 1/31/2020. Motions due by 4/30/2020. (KLH) (Entered: 06/05/2019) |
| 06/12/2019 | 30 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 5/30/2019, before Judge Christina Clair Reiss. Court Reporter/Transcriber Christi A. Macri, Contact Info christimacri50@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/3/2019. Redacted Transcript Deadline set for 7/15/2019. Release of Transcript Restriction set for 9/10/2019. (CM) (Entered: 06/12/2019) |
| 06/26/2019 | 31 | MOTION to Withdraw as Attorney *Anjana Malhotra* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons.(Malhotra, Anjana) (Entered: 06/26/2019) |
| 07/02/2019 | 32 | TEXT ORDER granting 31 Motion to Withdraw as Attorney. Attorney Anjana Malhotra terminated. Signed by Hon. Christina Clair Reiss on 7/1/2019. (KLH) (Entered: 07/02/2019) |
| 07/18/2019 | 33 | MOTION to Compel *Non-Party Erie County Central Police Services to Comply with Subpoena* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Attachments: # 1 Memorandum in Support of Motion to Compel, # 2 Declaration in support of Motion to Compel, # 3 Exhibit A - Subpoena with Proof of Service, # 4 Exhibit B - Responses to Document Requests, # 5 Exhibit C - Jan. 18 letter, # 6 Exhibit D - Service of Subpoena on Defendants, # 7 Exhibit E - Emails to ECCPS)(Wilner, Claudia) (Entered: 07/18/2019) |
| 07/24/2019 | 34 | MOTION to Compel *Defendants to Comply with May 30, 2019 Discovery Order and Other Discovery Obligations* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Attachments: # 1 Memorandum in Support of Motion to Compel, # 2 Declaration in support of Motion to Compel, # 3 Exhibit A - Supp Response to First RFPs, # 4 Exhibit B - Response to Second RFPs, # 5 Exhibit C - Interrogatories (excerpt), # 6 Exhibit D - Supp Response to Interrogatories (excerpt), # 7 Exhibit E - 11.15 email, # 8 Exhibit F - 1.3 email, # 9 Exhibit G - 1.18 letter, # 10 Exhibit H - 1.21 email, # 11 Exhibit I - 1.28 email, # 12 Exhibit J - 2.4-12 email chain, # 13 Exhibit K - 2.27 email, # 14 Exhibit L - 3.6 email, # 15 Exhibit M - 3.18 letter, # 16 Exhibit N - 3.25 email & attachments, # 17 Exhibit O - 5.6 email, # 18 Exhibit P - 6.5 email, # 19 Exhibit Q - 6.6-11 email chain, # 20 Exhibit R - 6.20 letter, # 21 Exhibit S - 6.21 email, # 22 Exhibit T - 6.27-7.9 email chain, # 23 Exhibit U - 7.3-8 email chain, # 24 Exhibit V - Housing Unit Monthly Report)(Wilner, Claudia) (Entered: 07/24/2019) |
| 08/06/2019 | 35 | TEXT ORDER denying as moot 22 Motion for Extension of Time to Complete Discovery, based on the court's granting of the consent motion to extend time to complete discovery. Issued by Hon. Christina Clair Reiss on 8/6/2019. (KLH) (Entered: 08/06/2019) |
| 08/08/2019 | 36 | Mediation Certification by Michael Menard(AGW) (Entered: 08/08/2019) |
| 08/13/2019 | 37 | Letter filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *withdrawing Motion to Compel Non-Party Erie County Central Police Services to Comply with Plaintiffs' May 17, 2019 Subpoena*. (Wilner, Claudia) (Entered: 08/13/2019) |
| 08/19/2019 | 38 | MOTION for Entry of Order Granting Motion to Compel re 34 MOTION to Compel *Defendants to Comply with May 30, 2019 Discovery Order and Other Discovery Obligations* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Attachments: # 1 Text of Proposed Order)(Wilner, Claudia) (Entered: 08/19/2019) |
| 08/19/2019 | 39 | Letter filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda . (Quinn, Robert) (Entered: 08/19/2019) |
| 08/20/2019 | 40 | DECLARATION re 34 MOTION to Compel *Defendants to Comply with May 30, 2019 Discovery Order and Other Discovery Obligations* filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Michael Menard, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Michael Menard, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # |

| | | 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K) (Quinn, Robert) (Entered: 08/20/2019) |
|---|---|---|
| 08/26/2019 | 41 | REPLY to Response to Motion re 38 MOTION for Entry of Order Granting Motion to Compel re 34 MOTION to Compel *Defendants to Comply with May 30, 2019 Discovery Order and Other Discovery Obligations* filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Wilner, Claudia) (Entered: 08/26/2019) |
| 08/30/2019 | 42 | MOTION to Compel *Production of BPD Internal Affairs Division Files* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Attachments: # 1 Memorandum in Support Plaintiffs Memorandum of Law In Support of Motion to Compel Production of BPD Internal Affairs Division Files, # 2 Declaration Declaration of Darius Charney In Support of Motion to Compel Production of BPD Internal Affairs Division Files Files, # 3 Exhibit Charney Decl Exhibit A- Defendants' 1st Supplemental Responses to Plaintiffs' First Set of Document Requests, # 4 Exhibit Charney Decl Exhibit B- Charney Oct 15, 2018 email to Quinn and Proposed Confidentiality Order, # 5 Exhibit Charney Decl Exhibit C- Wilner Jan 18, 2019 Letter to Quinn, # 6 Exhibit Charney Decl Exhibit D- Wilner March 18, 2019 Letter to Quinn, # 7 Exhibit Charney Decl Exhibit E- Parties' July 12-15, 2019 email exchange, # 8 Exhibit Charney Decl Exhibit F- Parties' July 18, 2019 email exchange, # 9 Exhibit Charney Decl Exhibit G- Charney July 24, 2019 email to Quinn and Highlighted Spreadsheets, # 10 Exhibit Charney Decl Exhibit H- Parties' July 29-30 email exchange)(Charney, Darius) (Entered: 08/30/2019) |
| 09/03/2019 | 43 | First MOTION for Extension of Time to File Response/Reply as to 38 MOTION for Entry of Order Granting Motion to Compel re 34 MOTION to Compel *Defendants to Comply with May 30, 2019 Discovery Order and Other Discovery Obligations* , 34 MOTION to Compel *Defendants to Comply with May 30, 2019 Discovery Order and Other Discovery Obligations*, 40 Declaration,,, *with supporting Declaration and Certificate of Service* by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Quinn, Robert) (Entered: 09/03/2019) |
| 09/05/2019 | 44 | TEXT ORDER: The court finds good cause for Defendants untimely opposition and will consider it in conjunction with the merits of the parties dispute. Plaintiffs motion for entry of an order granting their motion to compel 38 solely on the grounds of Defendants untimely opposition is thus DENIED. The court does not set briefing schedules sua sponte, but rather expects the parties to follow the deadlines set forth in the Federal Rules of Civil Procedure unless otherwise ordered. Signed by Hon. Christina Clair Reiss on 9/5/2019. (KLH) (Entered: 09/05/2019) |
| 09/13/2019 | 45 | DECLARATION re 42 MOTION to Compel *Production of BPD Internal Affairs Division Files* filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Memorandum in Support, # 7 Certificate of Service)(Quinn, Robert) (Entered: 09/13/2019) |
| 09/20/2019 | 46 | REPLY to Response to Motion re 42 MOTION to Compel *Production of BPD Internal Affairs Division Files* filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Charney, Darius) (Entered: 09/20/2019) |
| 09/30/2019 | 47 | Mediation Certification by Michael Menard. Not settled, mediation to continue on 10/18/2019.(AGW) (Entered: 09/30/2019) |
| 11/05/2019 | 48 | MOTION to Modify Scheduling Order re 29 Order on Motion for Miscellaneous Relief by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons.(England, Travis) (Entered: 11/05/2019) |
| 11/13/2019 | 49 | TEXT ORDER granting 48 Motion to modify the scheduling order. Signed by Hon. Christina Clair Reiss on 11/13/2019. (KLH) (Entered: 11/13/2019) |
| 11/13/2019 | | Set/Reset Scheduling Order Deadlines: Motions to Join Parties/Amend Pleadings due by 5/14/2020. Discovery completed by 6/12/2020. Motions to Compel Discovery due by 6/12/2020. Motions due by 10/30/2020. (KLH) (Entered: 11/13/2019) |
| 11/14/2019 | 50 | Mediation Certification by Michael Menard. Mediation adjourned to 1/21/20.(AGW) (Entered: 11/14/2019) |
| 12/19/2019 | 51 | OPINION AND ORDER granting in part and denying in part 34 and 42 Plaintiffs' Motions to Compel. Signed by Hon. Christina Clair Reiss on 12/19/2019. (KLH) (Entered: 12/19/2019) |
| 01/02/2020 | 52 | TEXT ORDER denying as moot 43 Motion for Extension of Time to File Response/Reply as to 38 Motion for Entry of Order Granting Motion to Compel. Issued by Hon. Christina Clair Reiss on 1/2/2020. (KLH) (Entered: 01/02/2020) |
| 01/21/2020 | 53 | Letter filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *re Production of BPD IAD Files*. (Attachments: # 1 Text of Proposed Order Proposed Attorneys' Eyes Only Protective Order)(Charney, Darius) (Entered: 01/21/2020) |
| 01/24/2020 | 54 | PROTECTIVE ORDER. Signed by Hon. Christina Clair Reiss on 1/23/20. (SG) (Entered: 01/24/2020) |
| 03/18/2020 | 55 | MOTION to Withdraw as Attorney *Travis England, Esq.* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons.(England, Travis) (Entered: 03/18/2020) |
| 03/24/2020 | 56 | ORDER granting 55 Motion to Withdraw as Attorney. Attorney Travis W. England terminated. Signed by Hon. Christina Clair Reiss on 3/24/20. (SG) (Entered: 03/24/2020) |
| 04/23/2020 | 57 | MOTION for Leave to File *Amended and Supplemental Class Action Complaint* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons. (Attachments: # 1 Memorandum of Law in Support of Plaintiffs' Motion to Amend and Supplement Complaint, # 2 Declaration of Claudia Wilner in Support of Plaintiffs' Motion to Amend and Supplement Complaint, # 3 Exhibit 1 - Plaintiffs' Proposed Amended and Supplemental Class Action Complaint, # 4 Exhibit 2 - Redline of Plaintiffs' Proposed Amended and Supplemental Class Action Complaint Reflecting Changes, # 5 Exhibit 3 - Plaintiffs' First Set of Requests for the Production of Documents on Defendants dated November 5, 2018, # 6 Exhibit 4 - Defendants' Responses and Objections to Plaintiffs First Set of Requests for Production dated December 8, 2018, # 7 Exhibit 5 - Defendants' Supplemental Responses and Objections to Plaintiffs First Set of Requests for Production dated March 15, 2019, # 8 Exhibit 6 - Plaintiffs' Third-Party Subpoena on the Erie County Central Police Services (ECCPS) dated March 15, 2019, # 9 Exhibit 7 - Plaintiffs' Second Set of Requests for the Production of Documents on Defendants dated April 19, 2019)(Ezie, Andrea) (Entered: 04/23/2020) |

| 04/24/2020 | 58 | Mediator Recusal by Michael Menard(Menard, Michael) (Entered: 04/24/2020) |
|---|---|---|
| 04/30/2020 | 59 | CONTINUATION OF EXHIBITS to 57 MOTION for Leave to File *Amended and Supplemental Class Action Complaint -Corrected Proposed Amended Complaint & Redline (replacing Dkt Items 57.3 and 57.4).* (Attachments: # 1 Corrected Redline of Proposed Amended Complaint)(Ezie, Andrea) (Entered: 04/30/2020) |
| 05/15/2020 | 60 | Consent MOTION *to Modify Scheduling Order* by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Taniqua Simmons.(Wilner, Claudia) (Entered: 05/15/2020) |
| 05/15/2020 | 61 | TEXT ORDER granting 60 Motion to modify Scheduling Order. Signed by Hon. Christina Clair Reiss on 5/15/20. (SG) (Entered: 05/15/2020) |
| 05/15/2020 | | Set/Reset Deadlines:( Discovery completed by 12/12/2020.), Set/Reset Hearings:, Set/Reset Scheduling Order Deadlines:( Discovery completed by 12/12/2020., Motions due by 4/30/2021.) (SG) (Entered: 05/15/2020) |
| 05/21/2020 | 62 | TEXT ORDER granting, as unopposed, 57 Motion for Leave to File an Amended Complaint. Signed by Hon. Christina Clair Reiss on 5/21/20. (SG) (Entered: 05/21/2020) |
| 05/21/2020 | 63 | AMENDED COMPLAINT against All Defendants, filed by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds.(Ezie, Andrea) (Entered: 05/21/2020) |
| 06/04/2020 | 64 | ANSWER to 63 Amended Complaint by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Attachments: # 1 Certificate of Service)(Quinn, Robert) (Entered: 06/04/2020) |
| 10/22/2020 | 65 | MOTION to Compel *Defendants to Comply with the Court's December 19, 2019 Order and Other Discovery Obligations* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Memorandum in Support)(Wilner, Claudia) (Entered: 10/22/2020) |
| 10/22/2020 | 66 | DECLARATION re 65 MOTION to Compel *Defendants to Comply with the Court's December 19, 2019 Order and Other Discovery Obligations* filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24)(Wilner, Claudia) (Entered: 10/22/2020) |
| 11/06/2020 | 67 | AFFIDAVIT in Opposition re 65 MOTION to Compel *Defendants to Comply with the Court's December 19, 2019 Order and Other Discovery Obligations* filed by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I)(Quinn, Robert) (Entered: 11/06/2020) |
| 11/13/2020 | 68 | REPLY to Response to Motion re 65 MOTION to Compel *Defendants to Comply with the Court's December 19, 2019 Order and Other Discovery Obligations* filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Wilner, Claudia) (Entered: 11/13/2020) |
| 11/13/2020 | 69 | DECLARATION re 68 Reply to Response to Motion, filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Wilner, Claudia) (Entered: 11/13/2020) |
| 11/17/2020 | 70 | Consent MOTION Modify Scheduling Order by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 11/17/2020) |
| 12/01/2020 | 71 | TEXT ORDER granting 70 Motion to Modify Scheduling Order. Signed by Hon. Christina Reiss on 12/1/2020. (CGJ) (Entered: 12/01/2020) |
| 12/03/2020 | | NOTICE of Hearing: Status Conference set for 12/14/2020 10:00 AM before Hon. Christina Reiss. This proceeding will be conducted through Zoom for Government. (LMD) (Entered: 12/03/2020) |
| 12/07/2020 | 72 | MOTION to appear pro hac vice *filed on behalf of Jordan Joachim* ( Filing fee $ 200 receipt number 0209-4070967.) by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 J. Joachim Admission Petition Form, # 2 Affidavit of Chinyere Ezie, # 3 J. Joachim Attorney Oath, # 4 J. Joachim Civility Principles & Guidelines Oath, # 5 J. Joachim ECF Registration Form)(Ezie, Andrea) (Entered: 12/07/2020) |
| 12/08/2020 | | Verified admission to the New York State Bar for Attorney Jordan Scott Joachim. (MD) (Entered: 12/08/2020) |
| 12/08/2020 | 73 | TEXT ORDER granting 72 MOTION to appear pro hac vice. Signed by Hon. Christina Reiss on 12/8/2020. (JLV) (Entered: 12/08/2020) |
| 12/10/2020 | 74 | Letter filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *regarding depositions*. (Attachments: # 1 Exhibit Correspondence with R. Quinn)(Wilner, Claudia) (Entered: 12/10/2020) |
| 12/14/2020 | 75 | Minute Entry for proceedings held before Hon. Christina Reiss: Status Conference held on 12/14/2020. <br><br>The Court informs the parties it intends to take up 65 MOTION to Compel *Defendants to Comply with the Court's December 19, 2019 Order and Other Discovery Obligations* filed by Taniqua Simmons, Dorethea Franklin, Charles Palmer, Ebony Yeldon, Joseph Bonds, Shaketa Redden, Jane Doe, Shirley Sarmiento, De'Jon Hall, Black Love Resists in the Rust. |

| | | |
|---|---|---|
| | | The Court resolves in part Plaintiff's 65 Motion to Compel as stated on the record.<br><br>The parties are directed to notify the Court within 60 days the discovery issues that cannot be resolved.<br><br>An additional status conference will be scheduled.<br><br>The Court defers ruling on attorney's fees and expenses.<br><br>Appearances: Claudia Wilner, Esq., Darius Charney, Esq., Jordan Joachim, Esq., on behalf of plaintiffs; Robert Quinn, Esq., on behalf of defendants.<br><br>All Appearances by Zoom for Government (JDK) (Entered: 12/14/2020) |
| 12/21/2020 | 76 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Status Conference Proceedings held on 12/14/2020, before Judge Christina Clare Reiss. Court Reporter/Transcriber Megan E. Pelka, RPR, Contact Info (716)364-6449. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 1/11/2021. Redacted Transcript Deadline set for 1/21/2021. Release of Transcript Restriction set for 3/22/2021. (JLV) (Entered: 12/21/2020) |
| 01/22/2021 | 77 | MOTION to set ESI benchmarks and compel scheduling of depositions by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 01/22/2021) |
| 01/25/2021 | | E-Filing Notification: 77 MOTION; the assigned judge does not accept e-filed letter motions. ACTION REQUIRED: Reformat the document and re-file using the motion event. (JLV) (Entered: 01/25/2021) |
| 01/25/2021 | 78 | Letter filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *re status update on ESI benchmarks*. (Attachments: # 1 Exhibit 1)(Wilner, Claudia) (Entered: 01/25/2021) |
| 02/02/2021 | | NOTICE of Hearing: Status Conference set for 2/8/2021 11:30 AM before Hon. Christina Reiss. This Status Conference is a Zoom for Government Status Conference. Counsel will receive the Zoom for Government invite via email. (LMD) (Entered: 02/02/2021) |
| 02/05/2021 | 79 | Letter filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *in response to DKT 78 & 79*. (Quinn, Robert) (Entered: 02/05/2021) |
| 02/08/2021 | 80 | Minute Entry for proceedings held before Hon. Christina Reiss: Status Conference held on 2/8/2021.<br><br>The Court addresses the parties filings outlining current discovery issues.<br><br>The Court sets a benchmark for defendants to complete production of 3 ESI custodians per week, and to prepare a certification once each custodian search has been completed.<br><br>The parties shall continue to dialogue.<br><br>The parties may contact the Court should further issues arise.<br><br>Appearances: Claudia Wilner, Esq., Darius Charney, Esq., Jordan Joachim, Esq., Andrea Ezie, Esq., Edward Krugman, Esq., on behalf of plaintiffs; Robert Quinn, Esq., on behalf of defendants.<br><br>All Appearances by Zoom for Government (JDK) (Entered: 02/08/2021) |
| 02/12/2021 | 81 | STATUS REPORT *Regarding Plaintiffs' Fourth Request for Production of Documents* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Wilner, Claudia) (Entered: 02/12/2021) |
| 02/16/2021 | 82 | TEXT ORDER granting Plaintiffs' request for a two week extension to continue conferring with Defendants regarding discovery. Signed by Hon. Christina Reiss on 2/16/2021. (JLV) (Entered: 02/16/2021) |
| 02/18/2021 | 83 | Consent MOTION Modify Scheduling Order by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Joachim, Jordan) (Entered: 02/18/2021) |
| 02/19/2021 | 84 | TEXT ORDER granting 83 Consent Motion to Modify Scheduling Order. Signed by Hon. Christina Reiss on 2/19/2021. (JLV) (Entered: 02/19/2021) |
| 03/01/2021 | 85 | STATUS REPORT *re: Plaintiffs' Fourth Request for Production of Documents* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Joachim, Jordan) (Entered: 03/01/2021) |
| 03/15/2021 | 86 | STATUS REPORT *re Motion to Compel* by Black Love Resists in the Rust. (Krugman, Edward) (Entered: 03/15/2021) |
| 03/19/2021 | 87 | MOTION to Withdraw as Attorney *for Plaintiffs (Wilson)* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilson, Britney) (Entered: 03/19/2021) |
| 03/19/2021 | 88 | MOTION to Withdraw as Attorney *for Plaintiffs (Cohan)* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilson, Britney) (Entered: 03/19/2021) |
| 03/19/2021 | 89 | TEXT ORDER granting 87 Motion to Withdraw as Attorney. Attorney Britney Renee Wilson terminated; granting 88 Motion to Withdraw as Attorney. Attorney Marc Cohan terminated. Signed by Hon. Christina Reiss on 3/19/2021. (JLV) (Entered: 03/19/2021) |

| 04/26/2021 | 🌐 90 | NOTICE by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon re 65 MOTION to Compel *Defendants to Comply with the Court's December 19, 2019 Order and Other Discovery Obligations Withdrawl of Motion Without Prejudice* (Krugman, Edward) (Entered: 04/26/2021) |
|---|---|---|
| 05/05/2021 | 🌐 | NOTICE OF HEARING. A Status Conference is scheduled for May 11, 2021 at 12:00 PM before Hon. Christina Reiss to be held remotely via Zoom for Government. The Court will send counsel a separate email link to join the conference. (JDK) (Entered: 05/05/2021) |
| 05/10/2021 | 🌐 91 | STATUS REPORT *For May 11, 2021 Status Conference* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit Map of Terms and Custodians, # 2 Exhibit April 1 e-mail, # 3 Exhibit May 4 e-mail, # 4 Exhibit May 7 Buffalo News Article, # 5 Exhibit December 2017 Letter to Attorney General, # 6 Exhibit e-mail and attached map, # 7 Exhibit ECAC Objections to Subpoena, # 8 Exhibit Responses and Objections to 5th RFP)(Krugman, Edward) (Entered: 05/10/2021) |
| 05/11/2021 | 🌐 92 | NOTICE of Appearance by Anjana Malhotra on behalf of All Plaintiffs (Malhotra, Anjana) (Entered: 05/11/2021) |
| 05/11/2021 | 🌐 93 | Minute Entry for proceedings held before Hon. Christina Reiss: Status Conference held on 5/11/2021.<br><br>The Court hears concerns from the Plaintiff's on the progress of discovery and rules as follows: The Court ORDERS the production of the metadata spreadsheet no later than 5/31/2021, failure to comply with this deadline may subject Defendant to sanctions; the Court ORDERS the production of non-e-mail ESI for the original 20 custodians no later than 5/31/2021, failure to comply with this deadline may subject Defendant to sanctions.<br><br>The Court ORDERS the parties to resolve the additional disputes as set forth on the record.<br><br>Following the 5/31/2021 deadline, Plaintiff's may file a motion to compel further discovery as deemed necessary.<br><br>Appearances: Claudia Wilner, Esq., Darius Charney, Esq., Jordan Joachim, Esq., Edward Krugman, Esq., Keisha Williams, Esq., Anjana Malhotra, Esq., on behalf of plaintiffs; Robert Quinn, Esq., on behalf of defendants.<br><br>All Appearances by Zoom for Government (JDK) (Entered: 05/11/2021) |
| 05/15/2021 | 🌐 94 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings (STATUS CONFERENCE) held via Zoom for Government on 05/11/2021, before Judge CHRISTINA CLAIR REISS. Transcriber Karen J. Clark, RPR, KarenClark1013@AOL.com. Transcript may be viewed at the court public terminal or purchased through the Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 6/7/2021. Redacted Transcript Deadline set for 6/15/2021. Release of Transcript Restriction set for 8/13/2021. (KJC) (Entered: 05/15/2021) |
| 05/21/2021 | 🌐 95 | Consent MOTION to Modify Scheduling Order by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Joachim, Jordan) (Entered: 05/21/2021) |
| 05/21/2021 | 🌐 96 | TEXT ORDER granting 95 Motion to Modify Scheduling Order. Signed by Hon. Christina Reiss on 5/21/2021. (JLV) (Entered: 05/21/2021) |
| 06/04/2021 | 🌐 97 | Letter filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda . (Quinn, Robert) (Entered: 06/04/2021) |
| 06/09/2021 | 🌐 98 | REPLY/RESPONSE to re 97 Letter, *and in further support of Letter re redaction* filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Michael Menard, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Krugman, Edward) (Entered: 06/09/2021) |
| 06/11/2021 | 🌐 99 | MOTION to Quash by Erie County District Attorney's Office.(Hillery, Michael) (Entered: 06/11/2021) |
| 06/25/2021 | 🌐 100 | DECLARATION signed by Darius Charney re 99 MOTION to Quash filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall. (Attachments: # 1 Exhibit 1)(Charney, Darius) (Entered: 06/25/2021) |
| 07/22/2021 | 🌐 101 | DECLARATION re 99 MOTION to Quash filed by Erie County District Attorney's Office . (Hillery, Michael) (Entered: 07/22/2021) |
| 09/01/2021 | 🌐 102 | Consent MOTION for Extension of Time to Complete Discovery by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit 1: 7-20-2021 e-mail re discovery, # 2 Exhibit 2: 8-23-2021 e-mail re discovery)(Krugman, Edward) (Entered: 09/01/2021) |
| 09/02/2021 | 🌐 103 | ORDER granting 102 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 9/2/2021. (JLV) (Entered: 09/02/2021) |
| 09/06/2021 | 🌐 104 | MOTION for Discovery *re Issuance of Subpoena to NYS Dept of Motor Vehicles* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit A - Proposed Order, # 2 Exhibit B - Proposed Subpoena, # 3 Declaration of Edward P. Krugman iso motion) (Krugman, Edward) (Entered: 09/06/2021) |
| 09/06/2021 | 🌐 105 | MOTION to Expedite *to Shorten time to respond to ECF #104* by Erie County District Attorney's Office, Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Michael Menard, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Krugman, Edward) (Entered: 09/06/2021) |
| 09/13/2021 | 🌐 106 | TEXT ORDER granting in part and denying in part 105 Motion to Expedite. The response is due September 17, 2021, and the reply is due September 21, 2021. Signed by Hon. Christina Reiss on 9/13/2021. (JLV) (Entered: 09/13/2021) |
| 09/13/2021 | 🌐 | E-Filing Notification: 103 ORDER; removed from docket per Chambers. Entered in error. (JLV) (Entered: 09/13/2021) |
| 09/13/2021 | 🌐 107 | TEXT ORDER granting and adopting the schedule set forth in paragraph 11 of 102 Consent MOTION for Extension of Time to Complete Discovery Signed by Hon. Christina Reiss on 9/13/2021. (JLV) (Entered: 09/13/2021) |

| | | |
|---|---|---|
| 09/15/2021 | 108 | MOTION to Withdraw as Attorney by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Charney, Darius) (Entered: 09/15/2021) |
| 09/16/2021 | 109 | TEXT ORDER granting 108 Motion to Withdraw as Attorney. Attorney Darius Charney terminated. Signed by Hon. Christina Reiss on 9/16/2021. (JLV) (Entered: 09/16/2021) |
| 09/27/2021 | 110 | TEXT ORDER DENYING WITHOUT PREJUDICE 104 Motion for Issuance of Subpoena to New York State Department of Motor Vehicles. The subpoena seeks a vast number of records. The motion contains no analysis of the likely costs and time that will be incurred in the response. Signed by Hon. Christina Reiss on 9/27/2021. (CGJ) (Entered: 09/27/2021) |
| 09/28/2021 | 111 | MOTION to Compel *Discovery* , MOTION for Sanctions by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Michael Menard, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Krugman, Edward). Added MOTION for Sanctions on 9/29/2021 (JLV). (Entered: 09/28/2021) |
| 09/28/2021 | 112 | MEMORANDUM IN SUPPORT re 111 MOTION to Compel *Discovery and For Sanctions* byBlack Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Krugman, Edward) (Entered: 09/28/2021) |
| 09/28/2021 | 113 | DECLARATION re 111 MOTION to Compel *Discovery and For Sanctions* filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon *Declaration of Edward P. Krugman*. (Attachments: # 1 Exhibit 3 - 4-28-2021 e-mail, # 2 Exhibit 4 - Chart - multiple ticketing by unit, # 3 Exhibit 5 - e-mails re P.O. Thomas (redacted), # 4 Exhibit 6 - e-mails re P.O. Macy, # 5 Exhibit 7 - e-mails re D.C. Gramaglia, # 6 Exhibit 8 - e-mails re M DeGeorge, # 7 Exhibit 9 - June 2020 Press Release, # 8 Exhibit 10 - PPG stop receipt analysis, # 9 Exhibit 11 - Internship Project Report re speed cameras, # 10 Exhibit 12 - ENTCAD printout, # 11 Exhibit 13 - 7-20-2021 e-mail, # 12 Exhibit 14 - 7-23-2021 e-mail, # 13 Exhibit 15 - 7-27-2021 e-mail, # 14 Exhibit 16 - 7-27-2021 e-mail response, # 15 Exhibit 17 - 7-29-2021 e-mails, # 16 Exhibit 18 - 8-4-2021 e-mail, # 17 Exhibit 19 - 8-23-2021 e-mail, # 18 Exhibit 20 - 8-23-2021 e-mail response, # 19 Exhibit 21 - 8-26-2021 e-mail, # 20 Exhibit 22 - 9-7-2021 e-mail, # 21 Exhibit 1 - May 4 e-mail re ECAC project files, # 22 Exhibit 2 - April 1 e-mail re Relativity and Metadata)(Krugman, Edward) (Entered: 09/28/2021) |
| 09/29/2021 | 114 | NOTICE by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon re 111 MOTION to Compel *Discovery and For Sanctions*, 113 Declaration,,,,, *Regarding ECF exhibit sequence* (Krugman, Edward) (Entered: 09/29/2021) |
| 09/29/2021 | | E-Filing Notification: 111 MOTION to Compel; added additional relief, MOTION for Sanctions. (JLV) (Entered: 09/29/2021) |
| 10/09/2021 | 115 | DECLARATION re E-Filing Notification, 114 Notice (Other), 111 MOTION to Compel *Discovery and For Sanctions* MOTION for Sanctions, 113 Declaration,,,,, 112 Memorandum in Support, filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *In Opposition* filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda. (Attachments: # 1 Exhibit A)(Quinn, Robert) (Entered: 10/09/2021) |
| 10/12/2021 | 116 | Consent MOTION for Order Modifying the Existing Protective Order Governing Production of Attorneys Eyes Only Confidential Materials by Party Consent and Accompanying Memorandum of Law re 54 Protective Order by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Text of Proposed Order Proposed Order Modifying the Existing Protective Order Governing Production of Attorneys Eyes Only Confidential Materials by Party Consent)(Ezie, Andrea) (Entered: 10/12/2021) |
| 10/12/2021 | 117 | Consent MOTION for Extension of Time to File Response/Reply as to 111 MOTION to Compel *Discovery and For Sanctions* MOTION for Sanctions by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Krugman, Edward) (Entered: 10/12/2021) |
| 10/12/2021 | 118 | ORDER granting 116 Motion Modifying Protective Order Governing Production of Attorneys' Eyes Only Confidential Materials. Signed by Hon. Christina Reiss on 10/12/2021. (JLV) (Entered: 10/12/2021) |
| 10/12/2021 | 119 | TEXT ORDER granting 117 Motion for Extension of Time to File Response/Reply. Signed by Hon. Christina Reiss on 10/12/2021. (JLV) (Entered: 10/12/2021) |
| 10/26/2021 | 120 | REPLY to Response to Motion re 111 MOTION to Compel *Discovery and For Sanctions* MOTION for Sanctions filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Krugman, Edward) (Entered: 10/26/2021) |
| 10/26/2021 | 121 | DECLARATION signed by Edward P. Krugman re 111 MOTION to Compel *Discovery and For Sanctions* MOTION for Sanctions, 120 Reply to Response to Motion, filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall *Reply Declaration* filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall. (Attachments: # 1 Exhibit 1 - Giammaresi e-mails, # 2 Exhibit 2 - Overtime e-mails, # 3 Exhibit 3 - e-mail) (Krugman, Edward) (Entered: 10/26/2021) |
| 10/28/2021 | 122 | Second MOTION for Discovery *Renewed Motion for Issuance of subpoena to NYDMV* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit B - Form of Proposed Subpoena)(Krugman, Edward) (Entered: 10/28/2021) |
| 10/28/2021 | 123 | DECLARATION signed by Edward P. Krugman re 122 Second MOTION for Discovery *Renewed Motion for Issuance of subpoena to NYDMV* filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon . (Attachments: # 1 Exhibit 1 - e-mail to DMV)(Krugman, Edward) (Entered: 10/28/2021) |
| 10/28/2021 | 124 | MOTION to Expedite *and Shorten Time to Respond to ECF #122* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Declaration of Edward P. Krugman)(Krugman, Edward) (Entered: 10/28/2021) |

| 11/04/2021 | 125 | TEXT ORDER granting in part and denying in part 124 Motion to Expedite. Any opposition must be filed by 11/9/2021. Signed by Hon. Christina Reiss on 11/4/2021. (JLV) (Entered: 11/04/2021) |
|---|---|---|
| 11/15/2021 | 126 | TEXT ORDER granting 122 Motion for Discovery. No objection filed. The Clerk of Court is respectfully directed to issue the subpoena set forth in Document 122. Signed by Hon. Christina Reiss on 11/15/2021. (JLV) (Entered: 11/15/2021) |
| 11/29/2021 | 127 | Consent MOTION for Extension of Time to Complete Discovery by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Krugman, Edward) (Entered: 11/29/2021) |
| 11/30/2021 | 128 | TEXT ORDER granting 127 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 11/30/2021. (JLV) (Entered: 11/30/2021) |
| 12/21/2021 | | NOTICE of Hearing on Motion 111 MOTION to Compel *Discovery and For Sanctions* MOTION for Sanctions : Motion Hearing set for 12/28/2021 02:30 PM before Hon. Christina Reiss. This Oral Argument will be held via Zoom for Government. You will receive the Zoom for Government invite shortly. (LMD) (Entered: 12/21/2021) |
| 12/21/2021 | | SCHEDULING NOTICE: Oral Argument on 111 MOTION to Compel Discovery and 111 MOTION for Sanctions is scheduled for 12/28/2021 @ 02:30 PM before Hon. Christina Reiss to be held remotely via Zoom for Government. The Court will send counsel a separate email link to join the conference. (JDK) (Entered: 12/21/2021) |
| 12/28/2021 | 129 | Minute Entry for proceedings held before Hon. Christina Reiss: Oral Argument on 111 MOTION to Compel Discovery and 111 MOTION for Sanctions held on 12/28/2021.<br><br>Argument is held.<br><br>The Court resolves plaintiffs 111 MOTION to Compel Discovery as set forth on the record. Plaintiff is directed to submit a proposed order within 14 days as discussed.<br><br>The Court resolves plaintiffs 111 MOTION for Sanctions as follows: plaintiff shall submit a request for attorney's fees as discussed.<br><br>Appearances: Claudia Wilner, Esq., Jordan Joachim, Esq., Edward Krugman, Esq., Anjana Malhotra, Esq., Andrea Ezie, Esq., on behalf of plaintiffs; Robert Quinn, Esq., on behalf of defendants.<br><br>All Appearances by Zoom for Government (JDK) (Entered: 12/30/2021) |
| 01/11/2022 | 130 | NOTICE by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon re 111 MOTION to Compel *Discovery and For Sanctions* MOTION for Sanctions (Attachments: # 1 Text of Proposed Order)(Krugman, Edward) (Entered: 01/11/2022) |
| 01/12/2022 | 131 | ORDER RE DISCOVERY. Signed by Hon. Christina Reiss on 1/11/2022. (JLV) (Entered: 01/12/2022) |
| 02/24/2022 | 132 | Consent MOTION for Extension of Time to Complete Discovery by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Joachim, Jordan) (Entered: 02/24/2022) |
| 02/25/2022 | 133 | NOTICE of Appearance by Hugh M. Russ, III on behalf of Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young (Russ, Hugh) (Entered: 02/25/2022) |
| 02/25/2022 | 134 | NOTICE of Appearance by Peter A. Sahasrabudhe on behalf of Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young (Sahasrabudhe, Peter) (Entered: 02/25/2022) |
| 03/21/2022 | 135 | TEXT ORDER granting 132 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 3/21/2022. (JLV) (Entered: 03/21/2022) |
| 04/25/2022 | 136 | NOTICE of Appearance by David A. Short on behalf of City of Buffalo, N.Y. (Short, David) (Entered: 04/25/2022) |
| 05/13/2022 | 137 | Consent MOTION for Extension of Time to Complete Discovery by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Short, David) (Entered: 05/13/2022) |
| 05/13/2022 | 138 | TEXT ORDER granting 137 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 5/13/2022. (CGJ) (Entered: 05/13/2022) |
| 06/15/2022 | 139 | NOTICE of Withdrawal of Attorney: David Alastair Short no longer appearing for Defendants Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.<br><br>CLERK TO FOLLOW UP.<br><br>(Short, David) (Entered: 06/15/2022) |
| 07/06/2022 | 140 | NOTICE of Appearance by Katelyn Amalie Rauh on behalf of All Defendants (Rauh, Katelyn) (Entered: 07/06/2022) |
| 07/28/2022 | 141 | Joint MOTION for Extension of Time to Complete Discovery by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 07/28/2022) |
| 08/01/2022 | 142 | TEXT ORDER granting 141 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 8/1/2022. (JLV) (Entered: 08/01/2022) |
| 08/10/2022 | 143 | Consent MOTION for Discovery *for issuance of subpoena to NYS DMV* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # |

| | | |
|---|---|---|
| | | 1 Text of Proposed Order (Exhibit A to Motion), # 2 Exhibit B - Form of Subpoena, # 3 Declaration of Edward P Krugman iso Motion) (Krugman, Edward) (Entered: 08/10/2022) |
| 08/11/2022 | 144 | ORDER granting 143 Motion for Discovery. Signed by Hon. Christina Reiss on 8/11/2022. (Attachments: # 1 Exhibit A- Issued Subpoena) (JLV)<br><br>This was mailed to: Edward Krugman. (Entered: 08/11/2022) |
| 08/12/2022 | 145 | NOTICE of Withdrawal of Attorney: Katelyn Rauh no longer appearing for Defendants Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.<br><br>**CLERK TO FOLLOW UP.**<br><br>(Sahasrabudhe, Peter) (Entered: 08/12/2022) |
| 11/15/2022 | 146 | MOTION to Adjourn Deadlines in Case Management Order by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 11/15/2022) |
| 11/17/2022 | 147 | TEXT ORDER granting 146 Motion to Adjourn Deadlines in Case Management Order. Signed by Hon. Christina Reiss on 11/17/2022. (JLV) (Entered: 11/17/2022) |
| 12/15/2022 | 148 | MOTION to Take Deposition from 11 Additional Witnesses by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Memorandum in Support of Motion for Leave to Take Additional Depositions, # 2 Declaration of Philip Irwin, # 3 Declaration of Claudia Wilner, # 4 Exhibit A to Wilner Decl., # 5 Exhibit B to Wilner Decl., # 6 Exhibit C to Wilner Decl., # 7 Exhibit D to Wilner Decl., # 8 Declaration of Edward Krugman, # 9 Exhibit 1 to Krugman Decl., # 10 Exhibit 2 to Krugman Decl., # 11 Exhibit 3 to Krugman Decl.)(Wilner, Claudia) (Entered: 12/15/2022) |
| 12/19/2022 | 149 | Letter filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon as to Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda . (Wilner, Claudia) (Entered: 12/19/2022) |
| 01/10/2023 | 150 | MOTION for Extension of Time to File Response/Reply as to 148 MOTION to Take Deposition from 11 Additional Witnesses by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 01/10/2023) |
| 01/10/2023 | | E-Filing Notification: 150 MOTION; The assigned judge does not permit the electronic filing or mailing of letters unless a letter formatted request is submitted pursuant to Rule 7 (2)(c) to exceed page limits. Every filing must have a caption with the courts name, a case title and a file number and should be prepared following Local Rule of Civil Procedure 10 and Local Rule of Criminal Procedure 49 (d). (JLV) (Entered: 01/10/2023) |
| 01/10/2023 | 151 | MOTION for Extension of Time to File Response/Reply as to 148 MOTION to Take Deposition from 11 Additional Witnesses by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 01/10/2023) |
| 01/12/2023 | 152 | TEXT ORDER granting 151 Motion for Extension of Time to File Response/Reply. Responses due by 1/17/2023. Signed by Hon. Christina Reiss on 1/12/2023. (JLV) (Entered: 01/12/2023) |
| 01/17/2023 | 153 | MEMORANDUM in Opposition re 148 MOTION to Take Deposition from 11 Additional Witnesses filed by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Sahasrabudhe, Peter) (Entered: 01/17/2023) |
| 01/24/2023 | 154 | REPLY to Response to Motion re 148 MOTION to Take Deposition from 11 Additional Witnesses filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Joachim, Jordan) (Entered: 01/24/2023) |
| 02/15/2023 | 155 | MOTION to appear pro hac vice *filed on behalf of Jessica M. Vosburgh* ( Filing fee $ 200 receipt number ANYWDC-4799006.) by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Motion For Pro Hac Vice Admission - Jessica M. Vosburgh, # 2 Jessica M. Vosburgh Petition for Pro Hac Vice Attorney Admission, # 3 Jessica M. Vosburgh - Sponsorship Form, # 4 Signed Attorney Oath - Jessica M. Vosburgh, # 5 Jessica M. Vosburgh Civility Form, # 6 Jessica M. Vosburgh ECF Registration)(Ezie, Andrea) (Entered: 02/15/2023) |
| 02/15/2023 | 156 | MOTION to appear pro hac vice *filed on behalf of Andrew J. Timmick* ( Filing fee $ 200 receipt number ANYWDC-4799052.) by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Motion for Pro Hac Vice Admission for Andrew J. Timmick, # 2 Andrew J. Timmick Petition for Pro Hac Vice Attorney Admission, # 3 Attorney Sponsorship Form for Andrew J. Timmick, # 4 Andrew J. Timmick Signed Attorney Oath, # 5 Andrew J. Timmick Civility Principles, # 6 Andrew J. Timmick ECF Registration)(Ezie, Andrea) (Entered: 02/15/2023) |
| 02/16/2023 | | E-Filing Notification: 155 MOTION to appear pro hac vice *filed on behalf of Jessica M. Vosburgh*, 156 MOTION to appear pro hac vice *filed on behalf of Andrew J. Timmick* ACTION REQUIRED: As required by L.R. Civ. P. 83.2(a)(1), PHV attorneys are required to obtain local counsel or submit a motion for waiver of that requirement. File appropriate documents using Docketing Event: Continuation of Exhibits. (DDS) (Entered: 02/16/2023) |
| 03/09/2023 | 157 | CONTINUATION OF EXHIBITS to E-Filing Notification, *Local Counsel Letters for Jessica Vosburgh & Andrew Timmick, pursuant to L.R. Civ. P. 83.2(a)(1)*. (Attachments: # 1 Local Counsel Letter)(Ezie, Andrea) (Entered: 03/09/2023) |
| 03/10/2023 | 158 | MOTION for Extension of Time to Complete Discovery by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Sahasrabudhe, Peter) (Entered: 03/10/2023) |

| | | |
|---|---|---|
| 03/28/2023 | 159 | TEXT ORDER granting 158 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 3/28/2023. (JLV) (Entered: 03/28/2023) |
| 04/10/2023 | 160 | TEXT ORDER: Recognizing that the scope of discovery is broad under Fed. R. Civ. P. 26, but also recognizing Plaintiffs' initial request for forty-two depositions was burdensome, the court initially limited Plaintiffs to twenty depositions. Plaintiffs now seek to take an additional eleven depositions. Although this is a complex case and alleges constitutional violations that took place over a period of several years, not all of the depositions sought are necessary and commensurate with Plaintiffs' needs for discovery. The court is also mindful of the burden on Defendants. Plaintiffs' motion for leave to take additional depositions 148 is thus GRANTED IN PART AND DENIED IN PART. Plaintiffs may depose Officers Michael Healy, Jared Domaracki, Charles Miller, and Adam Wigdorski, as well as Octavio Villegas and Donna Estrich. Plaintiffs may also identify three deponents from the list of Officers Michael Acquino, Kelvin Sharpe, Richard Hy, Justin Tedesco, and Andrew Whiteford. It is unlikely that the court will authorize additional depositions absent compelling circumstances in light of the depositions authorized to date. Signed by Hon. Christina Reiss on 4/10/2023. (JLV) (Entered: 04/10/2023) |
| 04/27/2023 | 161 | NOTICE of Appearance by Cheyenne Nicole Freely on behalf of All Defendants (Freely, Cheyenne) (Entered: 04/27/2023) |
| 05/11/2023 | 162 | Consent MOTION for Discovery *for Issuance of a Second Updating Subpoena to NY DMV* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit A - Proposed Order, # 2 Exhibit B - Form of Subpoena, # 3 Declaration of Edward Krugman iso Motion)(Krugman, Edward) (Entered: 05/11/2023) |
| 05/12/2023 | 163 | ORDER granting 162 Motion for Discovery. Signed by Hon. Christina Reiss on 5/11/2023. (Attachments: # 1 Exhibit A- Issued Subpoena) (CGJ)<br><br>This was mailed to: Claudia Wilner. (Entered: 05/12/2023) |
| 05/18/2023 | 164 | MOTION to appear pro hac vice *filed on behalf of Christine Nelson* ( Filing fee $ 200 receipt number ANYWDC-4877527.) by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons. (Attachments: # 1 Motion for Pro Hac Vice Admission for Christine Nelson, # 2 Christine Nelson Petition for Pro Hac Vice Attorney Admission, # 3 Attorney Sponsorship Form for Christine Nelson, # 4 Christine Nelson Signed Attorney Oath, # 5 Christine Nelson Civility Principles, # 6 Christine Nelson ECF Registration, # 7 Local Counsel Letter)(Williams, Keisha) (Entered: 05/18/2023) |
| 05/18/2023 | 165 | TEXT ORDER granting 164 Motion for Pro Hac Vice. Signed by Hon. Christina Reiss on 5/18/2023. (CGJ) (Entered: 05/18/2023) |
| 06/01/2023 | 166 | MOTION to Permit Sufficient Time to Depose Named Defendant Byron Lockwood by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Claudia Wilner, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D)(Wilner, Claudia) (Entered: 06/01/2023) |
| 06/14/2023 | 167 | MOTION to Modify the Scheduling Order by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Joachim, Jordan) (Entered: 06/14/2023) |
| 06/15/2023 | 168 | TEXT ORDER granting 167 Motion to Modify the Scheduling Order. Signed by Hon. Christina Reiss on 6/15/2023. (JLV) (Entered: 06/15/2023) |
| 06/15/2023 | 169 | RESPONSE in Opposition re 166 MOTION to Permit Sufficient Time to Depose Named Defendant Byron Lockwood filed by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Attachments: # 1 Exhibit A- Young Excerpt, # 2 Exhibit B- Brinkworth Excerpts, # 3 Exhibit C Part 1- Derenda First Session, # 4 Exhibit C Part 2- Derenda Second Session, # 5 Exhibit C Part 3- Derenda Third Session, # 6 Memorandum in Support of Defendants' Opposition to Plaintiffs' Motion to Question Defendant Lockwood for Fourteen Hours)(Sahasrabudhe, Peter) (Entered: 06/15/2023) |
| 06/22/2023 | 170 | REPLY/RESPONSE to re 166 MOTION to Permit Sufficient Time to Depose Named Defendant Byron Lockwood *[Reply in Further Support of Plaintiffs' Motion]* filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Joachim, Jordan) (Entered: 06/22/2023) |
| 06/29/2023 | 171 | ORDER granting in part and denying in part Plaintiffs' 166 Motion to Permit Sufficient Time to Depose Defendant Byron Lockwood. Signed by Hon. Christina Reiss on 6/29/2023. (JLV) (Entered: 06/29/2023) |
| 07/17/2023 | | E-Filing Notification: ***Motions terminated: 155 MOTION to appear pro hac vice *filed on behalf of Jessica M. Vosburgh* 156 MOTION to appear pro hac vice *filed on behalf of Andrew J. Timmick.* ACTION REQUIRED: Refile motions, exhibits and letters requesting waiver of local counsel for each attorney. (DDS) (DDS) (Entered: 07/17/2023) |
| 08/07/2023 | 172 | Consent MOTION to Amend/Correct 118 Order on Motion for Miscellaneous Relief *[Consent Motion for Order Supplementing Protective Order Governing Production of Attorneys' Eyes Only and Confidential Materials]* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Text of Proposed Order Supplementing the Modified Protective Order at ECF Dkt. No. 118)(Joachim, Jordan) (Entered: 08/07/2023) |
| 08/08/2023 | 173 | ORDER granting 172 Motion Supplementing Protective Order Governing Production of Attorneys' Eyes Only Confidential Materials. Signed by Hon. Christina Reiss on 8/8/23. (RE) (Entered: 08/08/2023) |
| 09/08/2023 | 174 | Consent MOTION for Extension of Time to Complete Discovery *and to Extend Deadlines in the Court's Case Management Order* by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 09/08/2023) |
| 09/11/2023 | 175 | TEXT ORDER granting 174 Motion for Extension of Time to Complete Discovery and to Extend Deadlines in the Court's Case Management Order. Signed by Hon. Christina Reiss on 9/11/2023. (JLV) (Entered: 09/11/2023) |
| 10/24/2023 | 176 | Consent MOTION for Extension of Time to Complete Discovery by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 10/24/2023) |

| | | |
|---|---|---|
| 10/27/2023 | 177 | TEXT ORDER granting 176 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 10/27/2023. (JLV) (Entered: 10/27/2023) |
| 10/31/2023 | 178 | MOTION to Withdraw as Attorney *for Plaintiffs* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons.(Williams, Keisha) (Entered: 10/31/2023) |
| 11/02/2023 | 179 | TEXT ORDER granting 178 Motion to Withdraw as Attorney. Attorney Keisha Alecia Williams terminated. Signed by Hon. Christina Reiss on 11/2/2023. (JLV) (Entered: 11/02/2023) |
| 11/06/2023 | 180 | NOTICE of Appearance by Matthew Alan Parham on behalf of All Plaintiffs (Parham, Matthew) (Entered: 11/06/2023) |
| 11/20/2023 | 181 | Consent MOTION for Extension of Time to Complete Discovery by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 11/20/2023) |
| 11/29/2023 | 182 | TEXT ORDER granting 181 Stipulated Motion for Adjournment of Deadlines in Case Management Order. Signed by Hon. Christina Reiss on 11/29/2023. (LAW)<br><br>Clerk to Follow up (Entered: 11/29/2023) |
| 12/11/2023 | 183 | MOTION to Take Deposition from Buffalo Police Benevolent Association by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Matthew A. Parham, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D)(Parham, Matthew) (Entered: 12/11/2023) |
| 12/11/2023 | 184 | MOTION to Expedite *Hearing on Motion for Leave to Take the Deposition of the Buffalo Police Benevolent Association* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Text of Proposed Order)(Parham, Matthew) (Entered: 12/11/2023) |
| 12/12/2023 | 185 | TEXT ORDER granting 184 Motion to Expedite. Signed by Hon. Christina Reiss on 12/12/2023. (JLV) (Entered: 12/12/2023) |
| 12/12/2023 | 186 | TEXT ORDER granting Plaintiff's 183 MOTION to Take Deposition from Buffalo Police Benevolent Association. SO ORDERED. Issued by Hon. Christina Reiss on 12/12/2023. (JDK) (Entered: 12/12/2023) |
| 01/03/2024 | 187 | MOTION to Adjourn Deadlines in Case Management Order by City of Buffalo, N.Y..(Sahasrabudhe, Peter) (Entered: 01/03/2024) |
| 01/16/2024 | 188 | TEXT ORDER granting 187 Motion to Adjourn Deadlines in Case Management Order. Signed by Hon. Christina Reiss on 1/16/2024. (JLV) (Entered: 01/16/2024) |
| 02/19/2024 | 189 | Consent MOTION for Extension of Time to Complete Discovery by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 02/19/2024) |
| 02/22/2024 | 190 | TEXT ORDER granting 189 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 2/22/2024. (TMK) (Entered: 02/22/2024) |
| 03/21/2024 | 191 | Consent MOTION for Extension of Time to Complete Discovery by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Freely, Cheyenne) (Entered: 03/21/2024) |
| 03/25/2024 | 192 | TEXT ORDER granting 191 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 3/25/2024. (LB) (Entered: 03/25/2024) |
| 04/12/2024 | 193 | MOTION for Leave to File Excess Pages by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Parham, Matthew) (Entered: 04/12/2024) |
| 04/12/2024 | 194 | Joint MOTION to Adjourn Remaining Deadlines in Case Managemnet Order by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 04/12/2024) |
| 04/15/2024 | 195 | TEXT ORDER granting 193 Motion for Leave to File Excess Pages. Signed by Hon. Christina Reiss on 4/15/24. (DDS) (Entered: 04/15/2024) |
| 04/16/2024 | 196 | TEXT ORDER granting 194 Motion to Adjourn Remaining Deadlines in Case Management Order. Signed by Hon. Christina Reiss on 4/16/24. (DDS) (Entered: 04/16/2024) |
| 04/30/2024 | | E-Filing Notification: Motion Terminated: 194 Motion to Adjourn Remaining Deadlines in Case Management Order. Signed by Hon. Christina Reiss on 4/16/24. (DDS) (DDS) (Entered: 04/30/2024) |
| 05/14/2024 | 197 | MOTION to appear pro hac vice *filed on behalf of Philip A. Irwin* ( Filing fee $ 200 receipt number ANYWDC-5181730.) by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Parham, Matthew) (Entered: 05/14/2024) |
| 05/14/2024 | 198 | MOTION to appear pro hac vice *filed on behalf of Andrew J. Timmick* ( Filing fee $ 200 receipt number ANYWDC-5181732.) by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F)(Parham, Matthew) (Entered: 05/14/2024) |
| 05/15/2024 | 199 | TEXT ORDER granting 197 Motion for Pro Hac Vice; granting 198 Motion for Pro Hac Vice. Signed by Hon. Christina Reiss on 5/15/24. (DDS) (Entered: 05/15/2024) |
| 05/16/2024 | 200 | Consent MOTION to adjourn case deadlines by Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 05/16/2024) |
| 05/17/2024 | 201 | TEXT ORDER granting 200 Motion. Signed by Hon. Christina Reiss on 5/17/24. (DDS) (Entered: 05/17/2024) |

| 05/29/2024 | 202 | MOTION to Certify Class by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Declaration of Joseph Bonds, # 2 Declaration of Jasmine Evans, # 3 Declaration of Dorethea Franklin, # 4 Declaration of De'Jon Hall, # 5 Declaration of Charles Palmer, # 6 Declaration of Shaketa Redden, # 7 Declaration of Shirley Sarmiento, # 8 Declaration of Taniqua Simmons, # 9 Declaration of Ebony Yeldon)(Joachim, Jordan) (Entered: 05/29/2024) |
|---|---|---|
| 05/29/2024 | 203 | DECLARATION signed by Claudia Wilner re 202 MOTION to Certify Class filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 204 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. to 203 Declaration,,, filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit 22, # 2 Exhibit 23, # 3 Exhibit 24, # 4 Exhibit 25, # 5 Exhibit 26, # 6 Exhibit 27, # 7 Exhibit 28, # 8 Exhibit 29, # 9 Exhibit 30, # 10 Exhibit 31, # 11 Exhibit 32, # 12 Exhibit 33, # 13 Exhibit 34, # 14 Exhibit 35, # 15 Exhibit 36, # 16 Exhibit 37, # 17 Exhibit 38, # 18 Exhibit 39, # 19 Exhibit 40, # 20 Exhibit 41)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 205 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. to 203 Declaration,,, filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit 43, # 2 Exhibit 44, # 3 Exhibit 45, # 4 Exhibit 46, # 5 Exhibit 47, # 6 Exhibit 48, # 7 Exhibit 49, # 8 Exhibit 50, # 9 Exhibit 51, # 10 Exhibit 52, # 11 Exhibit 53, # 12 Exhibit 54, # 13 Exhibit 55, # 14 Exhibit 56, # 15 Exhibit 57, # 16 Exhibit 58, # 17 Exhibit 59, # 18 Exhibit 60, # 19 Exhibit 61, # 20 Exhibit 62)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 206 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. to 203 Declaration,,, filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit 64, # 2 Exhibit 65, # 3 Exhibit 66, # 4 Exhibit 67, # 5 Exhibit 68, # 6 Exhibit 69, # 7 Exhibit 70, # 8 Exhibit 71, # 9 Exhibit 72, # 10 Exhibit 73, # 11 Exhibit 74, # 12 Exhibit 75, # 13 Exhibit 76, # 14 Exhibit 77, # 15 Exhibit 78, # 16 Exhibit 79, # 17 Exhibit 80, # 18 Exhibit 81, # 19 Exhibit 82, # 20 Exhibit 83)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 207 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. to 203 Declaration,,, filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit 85, # 2 Exhibit 86, # 3 Exhibit 87, # 4 Exhibit 88, # 5 Exhibit 89, # 6 Exhibit 90, # 7 Exhibit 91, # 8 Exhibit 92, # 9 Exhibit 93, # 10 Exhibit 94, # 11 Exhibit 95, # 12 Exhibit 96, # 13 Exhibit 97, # 14 Exhibit 98, # 15 Exhibit 99, # 16 Exhibit 100, # 17 Exhibit 101, # 18 Exhibit 102, # 19 Exhibit 103, # 20 Exhibit 104)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 208 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. to 203 Declaration,,, filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit 106, # 2 Exhibit 107, # 3 Exhibit 108, # 4 Exhibit 109, # 5 Exhibit 110, # 6 Exhibit 111, # 7 Exhibit 112, # 8 Exhibit 113, # 9 Exhibit 114, # 10 Exhibit 115, # 11 Exhibit 116, # 12 Exhibit 117, # 13 Exhibit 118, # 14 Exhibit 119, # 15 Exhibit 120, # 16 Exhibit 121, # 17 Exhibit 122, # 18 Exhibit 123, # 19 Exhibit 124, # 20 Exhibit 125)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 209 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. to 203 Declaration,,, filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Exhibit 127, # 2 Exhibit 128, # 3 Exhibit 129, # 4 Exhibit 130, # 5 Exhibit 131, # 6 Exhibit 132, # 7 Exhibit 133, # 8 Exhibit 134, # 9 Exhibit 135, # 10 Exhibit 136, # 11 Exhibit 137, # 12 Exhibit 138, # 13 Exhibit 139, # 14 Exhibit 140, # 15 Exhibit 141, # 16 Exhibit 142, # 17 Exhibit 143, # 18 Exhibit 144, # 19 Exhibit 145)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 210 | DECLARATION signed by Edward P. Krugman re 202 MOTION to Certify Class filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6A, # 7 Exhibit 6B, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14)(Joachim, Jordan) (Entered: 05/29/2024) |
| 05/29/2024 | 211 | MEMORANDUM in Support re 202 MOTION to Certify Class filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Joachim, Jordan) (Entered: 05/29/2024) |
| 05/30/2024 | 212 | AMENDED DOCUMENT by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. Amendment to 203 Declaration,,, *Amended Exhibit 3*. (Joachim, Jordan) (Entered: 05/30/2024) |
| 06/06/2024 | 213 | STIPULATION *[Stipulated Motion for Briefing Schedule on Class Certification]* by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Sahasrabudhe, Peter) (Entered: 06/06/2024) |
| 06/17/2024 | 214 | TEXT ORDER granting 213 Stipulation. Defendants' opposition to Plaintiffs' motion for class certification (Doc. 202) shall be filed no later than July 3, 2024. Plaintiffs' reply shall be filed no later than July 31, 2024. Signed by Hon. Christina Reiss on 6/17/2024. (CGJ) (Entered: 06/17/2024) |
| 06/18/2024 | 215 | Joint MOTION to Adjourn Remaining Deadlines in Case Managemnet Order by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel |

| | | |
|---|---|---|
| | | 1-10, Aaron Young.(Sahasrabudhe, Peter) (Entered: 06/18/2024) |
| 06/20/2024 | 216 | TEXT ORDER granting 215 Motion to Adjourn Remaining Deadlines in Case Management Order. Signed by Hon. Christina Reiss on 6/20/2024. (CGJ) (Entered: 06/20/2024) |
| 06/26/2024 | 217 | STIPULATION *[Stipulated Motion to Amend Briefing Schedule Deadlines on Class Certification]* by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Sahasrabudhe, Peter) (Entered: 06/26/2024) |
| 06/27/2024 | 218 | TEXT ORDER GRANTING re 217 STIPULATED MOTION TO AMEND BRIEFING SCHEDULE DEADLINES ON CLASS CERTIFICATION, filed by Byron C Lockwood, Daniel Derenda, Unknown Officers 1-20, Aaron Young, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Kevin Brinkworth, Philip Serafini, City of Buffalo, N.Y. Signed by Hon. Christina Reiss on 6/27/24. (DDS) (Entered: 06/27/2024) |
| 07/12/2024 | 219 | DECLARATION re 202 MOTION to Certify Class filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda *[Freely Declaration in Opposition to Motion for Class Certification]* filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29)(Freely, Cheyenne) (Entered: 07/12/2024) |
| 07/12/2024 | 220 | MEMORANDUM in Opposition re 202 MOTION to Certify Class *[City of Buffalo Defendants' Memorandum of Law in Opposition to Motion for Class Certification]* filed by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Freely, Cheyenne) (Entered: 07/12/2024) |
| 07/25/2024 | 221 | MOTION for Leave to File Excess Pages by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Parham, Matthew) (Entered: 07/25/2024) |
| 07/30/2024 | 222 | TEXT ORDER granting 221 Motion for Leave to File Excess Pages. Signed by Chief District Judge Christina Clair Reiss on 7/30/24. (DDS) Modified on 8/1/2024 to show as Text Order (DDS). (Entered: 07/30/2024) |
| 08/01/2024 | | E-Filing Notification: 222 TEXT ORDER Modified on 8/1/2024 to show as Text Order (DDS). (DDS) (Entered: 08/01/2024) |
| 08/09/2024 | 223 | REPLY to Response to Motion re 202 MOTION to Certify Class filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Wilner, Claudia) (Entered: 08/09/2024) |
| 08/09/2024 | 224 | DECLARATION re 202 MOTION to Certify Class filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall filed by Shirley Sarmiento, Shaketa Redden, Black Love Resists in the Rust, Jane Doe, Dorethea Franklin, Charles Palmer, Taniqua Simmons, Ebony Yeldon, Joseph Bonds, De'Jon Hall. (Attachments: # 1 Exhibit A)(Wilner, Claudia) (Entered: 08/09/2024) |
| 08/14/2024 | 225 | SCHEDULING NOTICE: Motion Hearing re 220 MOTION to Certify Class filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon on Thursday, December 12, 2024 at 1:00 PM before Hon. Christina Reiss to be held by Zoom for Government. The Court will send counsel a separate email link to join the conference. (JLV) (Entered: 08/14/2024) |
| 08/14/2024 | 226 | Joint MOTION Amend Scheduling Order by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 08/14/2024) |
| 08/15/2024 | 227 | TEXT ORDER granting 226 Motion to Amend Scheduling Order. Signed by Chief District Judge Christina Clair Reiss on 8/15/24. (DDS) (Entered: 08/15/2024) |
| 09/10/2024 | 228 | Joint MOTION to Amend Scheduling Order by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 09/10/2024) |
| 09/13/2024 | 229 | TEXT ORDER granting 228 Motion to Amend Scheduling Order. Signed by Chief District Judge Christina Clair Reiss on 9/13/2024. (DDS) (Entered: 09/13/2024) |
| 09/19/2024 | 230 | SCHEDULING NOTICE:<br><br>**IN-PERSON** Motion Hearing set for 202 MOTION to Certify Class on 10/23/2024 at 10:00 AM in Buffalo Courtroom, 9th Floor East, 2 Niagara Square, Buffalo, NY before Chief District Judge Christina Reiss.<br><br>The previously scheduled Zoom proceeding on December 12, 2024 is hereby cancelled. (JLV) (Entered: 09/19/2024) |
| 10/02/2024 | 231 | Joint MOTION for Extension of Time to Complete Discovery by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon and all Defendants. (Joachim, Jordan) Modified on 10/3/2024 (DDS). (Entered: 10/02/2024) |
| 10/03/2024 | 232 | TEXT ORDER granting 231 Motion for Extension of Time to Complete Discovery. Signed by Chief District Judge Christina Clair Reiss on 10/3/2024. (DDS) (Entered: 10/03/2024) |
| 10/07/2024 | 233 | NOTICE by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young re 219 Declaration,,,, 220 Memorandum in Opposition to Motion, *[Defendants' Notice of Supplemental Authority]* (Attachments: # 1 Exhibit A)(Freely, Cheyenne) (Entered: 10/07/2024) |
| 10/14/2024 | 234 | REPLY/RESPONSE to re 233 Notice (Other), filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Wilner, Claudia) (Entered: 10/14/2024) |

| 10/14/2024 | 🌐 235 | NOTICE by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon *of Supplemental Authority* (Attachments: # 1 Exhibit A)(Wilner, Claudia) (Entered: 10/14/2024) |
|---|---|---|
| 10/15/2024 | 🌐 236 | Consent MOTION to Authorize Remote Hearing Participation by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 10/15/2024) |
| 10/16/2024 | 🌐 237 | TEXT ORDER granting 236 Motion to Authorize Remote Hearing Participation. Signed by Chief District Judge Christina Clair Reiss on 10/16/2024. (DDS) (Entered: 10/16/2024) |
| 10/23/2024 | 🌐 238 | Minute Entry for proceedings held before Chief District Judge Christina Clair Reiss: Motion Hearing held on 10/23/2024 re 202 MOTION to Certify Class. Claudia Wilner, Esq., Anjana Malhotra, Esq., Jordan Joachim, Esq., Christine Nelson, Esq., and Matthew Parham, Esq., present for pltf. Hugh Ross, Esq., Cheyenne Frely, Esq., and Peter Sahasrabhe, Esq., present for dft. The court makes inquiries. Statements by counsel. ORDERED: plaintiffs may file supplemental briefing. Dft's have 14 days to respond to briefing. Court will take the matter under advisement thereafter. (Court Reporter Diane Martens.) (JR) (Entered: 10/24/2024) |
| 11/11/2024 | 🌐 239 | Consent MOTION to Amend Schedule by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe.(Wilner, Claudia) (Entered: 11/11/2024) |
| 11/15/2024 | 🌐 240 | TEXT ORDER granting 239 Motion to Amend Schedule. Signed by Chief District Judge Christina Clair Reiss on 11/15/2024. (DDS) (Entered: 11/15/2024) |
| 11/19/2024 | 🌐 241 | MEMORANDUM/BRIEF re 202 MOTION to Certify Class *(Supplemental)* by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Wilner, Claudia) (Entered: 11/19/2024) |
| 11/21/2024 | 🌐 242 | Consent MOTION to Adjourn Court-Ordered Deadlines in Case Management Order by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood.(Sahasrabudhe, Peter) (Entered: 11/21/2024) |
| 11/25/2024 | 🌐 243 | TEXT ORDER granting 242 Motion to Adjourn. Signed by Chief District Judge Christina Clair Reiss on 11/25/2024. (CGJ) (Entered: 11/25/2024) |
| 12/04/2024 | 🌐 244 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing held on October 23, 2024, before Judge Christina Clair Reiss. Court Reporter Diane S. Martens, dmartensreporter@gmail.com. Transcript may be viewed at the court public terminal or purchased through the Court Reporterbefore the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/26/2024. Redacted Transcript Deadline set for 1/6/2025. Release of Transcript Restriction set for 3/4/2025. (DSM) (Entered: 12/04/2024) |
| 12/06/2024 | 🌐 245 | REPLY/RESPONSE to re 241 Memorandum/Brief, *[Brief in Response to Plaintiffs' Supplemental Submission in Support of Class Certification]* filed by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood. (Attachments: # 1 Declaration of Cheyenne Freely, Esq., # 2 Exhibit 1)(Freely, Cheyenne) (Entered: 12/06/2024) |
| 12/18/2024 | 🌐 246 | Consent MOTION to Adjourn Deadline in Case Management Order by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood.(Sahasrabudhe, Peter) (Entered: 12/18/2024) |
| 12/20/2024 | 🌐 247 | TEXT ORDER granting 246 Motion to Adjourn Deadlines in Case Management Order. Signed by Chief District Judge Christina Clair Reiss on 2/20/2024. (DDS) (Entered: 12/20/2024) |
| 01/28/2025 | 🌐 248 | Joint MOTION to Adjourn Deadlines in Case Management Order *(Stipulated)* by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Taniqua Simmons, De'Jon Hall, Jane Doe.(Joachim, Jordan) (Entered: 01/28/2025) |
| 01/31/2025 | 🌐 249 | TEXT ORDER granting 248 Motion to Adjourn Deadlines in Case Management Order. Signed by Chief District Judge Christina Clair Reiss on 1/31/2025. (DDS) Modified on 1/31/2025 (DDS). (Entered: 01/31/2025) |
| 01/31/2025 | 🌐 | E-Filing Notification: 249 TEXT ORDER granting 248 Motion to Adjourn Deadlines in Case Management Order. Signed by Chief District Judge Christina Clair Reiss on 1/31/2025. (DDS) Modified to correct entry title on 1/31/2025 (DDS). (DDS) (Entered: 01/31/2025) |
| 02/04/2025 | 🌐 250 | Letter filed by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood *(Letter to Judge Requesting Permission to Exceed Page Limit)*. (Freely, Cheyenne) (Entered: 02/04/2025) |
| 02/05/2025 | 🌐 251 | TEXT ORDER GRANTING re 250 Letter, filed by Byron C Lockwood, Daniel Derenda, Unknown Officers 1-20, Aaron Young, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Kevin Brinkworth, Philip Serafini, City of Buffalo, N.Y. Signed by Chief District Judge Christina Clair Reiss on 2/5/2025. (DDS) (Entered: 02/05/2025) |
| 02/07/2025 | 🌐 252 | MOTION for Summary Judgment by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood. (Attachments: # 1 Declaration of Peter A. Sahasrabudhe, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40, # 42 Exhibit 41, # 43 Exhibit 42, # 44 Exhibit 43, # 45 Statement of Undisputed Facts, # 46 Memorandum in Support of Defendants' Motion for Summary Judgment)(Sahasrabudhe, Peter) (Entered: 02/07/2025) |
| 02/07/2025 | 🌐 253 | MOTION for Partial Summary Judgment *against the City of Buffalo* by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Memorandum in Support of Plaintiffs' Motion for Partial Summary Judgment against the City of Buffalo, # 2 Statement of Undisputed |

| | | Facts in Support of Motion for Partial Summary Judgment, # 3 Appendix to Local Rule 56 Statement of Material Facts, # 4 Declaration of Edward P. Krugman, # 5 Declaration of Charles Palmer, # 6 Declaration of De'Jon Hall, # 7 Declaration of Dorethea Franklin, # 8 Declaration of Ebony Yeldon, # 9 Declaration of Jasmine Evans, # 10 Declaration of Joseph Bonds, # 11 Declaration of Shaketa Redden, # 12 Declaration Shirley Sarmiento, # 13 Declaration Taniqua Simmons)(Irwin, Philip) (Entered: 02/07/2025) |
|---|---|---|
| 02/07/2025 | 254 | DECLARATION signed by Philip Irwin re 253 MOTION for Partial Summary Judgment *against the City of Buffalo* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32)(Irwin, Philip) (Entered: 02/07/2025) |
| 03/13/2025 | 255 | Consent MOTION for Extension of Time to Complete Discovery by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood.(Sahasrabudhe, Peter) (Entered: 03/13/2025) |
| 03/14/2025 | 256 | TEXT ORDER granting 255 Motion for Extension of Time to Complete Discovery. Signed by Hon. Christina Reiss on 3/14/25. (RE) (Entered: 03/14/2025) |
| 04/01/2025 | 257 | Joint MOTION to Adjourn Deadlines in Case Management Order *(Stipulated)* by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe.(Joachim, Jordan) (Entered: 04/01/2025) |
| 04/01/2025 | 258 | MOTION for Leave to File Excess Pages *for Opposition to Defendants' Motion for Summary Judgment* by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe.(Joachim, Jordan) (Entered: 04/01/2025) |
| 04/02/2025 | 259 | TEXT ORDER granting 257 Motion to Adjourn. Signed by District Judge Christina Reiss on 4/2/25. (RE) (Entered: 04/02/2025) |
| 04/02/2025 | 260 | TEXT ORDER granting 258 Motion for Leave to File Excess Pages. Signed by District Judge Christina Reiss on 4/2/25. (RE) (Entered: 04/02/2025) |
| 04/22/2025 | 261 | OPINION AND ORDER granting in part and denying in part 202 Motion to Certify Class. Signed by Chief District Judge Christina Clair Reiss on 4/22/25. (JHF) (Entered: 04/22/2025) |
| 04/22/2025 | 262 | OPINION AND ORDER granting in part and denying in part Plaintiffs' 202 Motion to Certify Class. Signed by District Judge Christina Clair Reiss on 4/22/2025. (DDS) (Entered: 04/22/2025) |
| 04/23/2025 | | E-filing Notification: Please disregard 262 Opinion and Order: Duplicate order inadvertently entered on the docket. (DDS) (Entered: 04/23/2025) |
| 04/25/2025 | 263 | Joint MOTION to Adjourn Deadlines in Case Management Order (Stipulated) by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe.(Joachim, Jordan) (Entered: 04/25/2025) |
| 05/06/2025 | 264 | TEXT ORDER granting 263 Motion to Adjourn Deadlines in Case Management Order. Signed by Hon. District Judge Christina Reiss on 5/6/25. (RE) (Entered: 05/06/2025) |
| 05/06/2025 | 265 | NOTICE by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood re 261 Order on Motion to Certify Class *[Notice of Petition for Leave to Appeal to the Second Circuit]* (Sahasrabudhe, Peter) (Entered: 05/06/2025) |
| 05/14/2025 | | USCA Case Number 25-1191 opened on 5/8/25 re 265 Notice of Petition for Leave to Appeal to the Second Circuit. (RE) (Entered: 05/14/2025) |
| 05/30/2025 | 266 | RESPONSE in Opposition re 253 MOTION for Partial Summary Judgment *against the City of Buffalo [City of Buffalo Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment]* filed by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood. (Freely, Cheyenne) (Entered: 05/30/2025) |
| 05/30/2025 | 267 | STATEMENT OF FACTS *[City Defendants' Responses to Plaintiff's Rule 56(A) Statements]* by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood Related document: 253 Motion for Partial Summary Judgment,,,. (Freely, Cheyenne) (Entered: 05/30/2025) |
| 05/30/2025 | 268 | DECLARATION signed by Andrew J. Timmick re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 269 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 21-40 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 22, # 2 Exhibit 23, # 3 Exhibit 24, # 4 Exhibit 25, # 5 Exhibit 26, # 6 Exhibit 27, # 7 Exhibit 28, # 8 Exhibit 29, # 9 Exhibit 30, # 10 Exhibit 31, # 11 Exhibit 32, # 12 Exhibit 33, # 13 Exhibit 34, # 14 Exhibit 35, # 15 Exhibit 36, # 16 Exhibit 37, # 17 Exhibit 38, # 18 Exhibit 39, # 19 Exhibit 40)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 270 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 41-60* filed by |

| | | |
|---|---|---|
| | | Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 42, # 2 Exhibit 43, # 3 Exhibit 44, # 4 Exhibit 45, # 5 Exhibit 46, # 6 Exhibit 47, # 7 Exhibit 48, # 8 Exhibit 49, # 9 Exhibit 50, # 10 Exhibit 51, # 11 Exhibit 52, # 12 Exhibit 53, # 13 Exhibit 54, # 14 Exhibit 55, # 15 Exhibit 56, # 16 Exhibit 57, # 17 Exhibit 58, # 18 Exhibit 59, # 19 Exhibit 60)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 271 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, Jane Doe. to 268 Declaration,,, *Exhibits 61 - 80 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, Jane Doe. (Attachments: # 1 Exhibit 62, # 2 Exhibit 63, # 3 Exhibit 64, # 4 Exhibit 65, # 5 Exhibit 66, # 6 Exhibit 67, # 7 Exhibit 68, # 8 Exhibit 69, # 9 Exhibit 70, # 10 Exhibit 71, # 11 Exhibit 72, # 12 Exhibit 73, # 13 Exhibit 74, # 14 Exhibit 75, # 15 Exhibit 76, # 16 Exhibit 77, # 17 Exhibit 78, # 18 Exhibit 79, # 19 Exhibit 80)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 272 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, Jane Doe. to 268 Declaration,,, *Exhibits 81-100 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, Jane Doe. (Attachments: # 1 Exhibit 82, # 2 Exhibit 83, # 3 Exhibit 84, # 4 Exhibit 85, # 5 Exhibit 86, # 6 Exhibit 87, # 7 Exhibit 88, # 8 Exhibit 89, # 9 Exhibit 90, # 10 Exhibit 91, # 11 Exhibit 92, # 12 Exhibit 93, # 13 Exhibit 94, # 14 Exhibit 95, # 15 Exhibit 96, # 16 Exhibit 97, # 17 Exhibit 98, # 18 Exhibit 99, # 19 Exhibit 100)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 273 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 101 - 120 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 102, # 2 Exhibit 103, # 3 Exhibit 104, # 4 Exhibit 105, # 5 Exhibit 106, # 6 Exhibit 107, # 7 Exhibit 108, # 8 Exhibit 109, # 9 Exhibit 110, # 10 Exhibit 111, # 11 Exhibit 112, # 12 Exhibit 113, # 13 Exhibit 114, # 14 Exhibit 115, # 15 Exhibit 116, # 16 Exhibit 117, # 17 Exhibit 118, # 18 Exhibit 119, # 19 Exhibit 120)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 274 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 121-140 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 122, # 2 Exhibit 123, # 3 Exhibit 124, # 4 Exhibit 125, # 5 Exhibit 126, # 6 Exhibit 127, # 7 Exhibit 128, # 8 Exhibit 129, # 9 Exhibit 130, # 10 Exhibit 131, # 11 Exhibit 132, # 12 Exhibit 133, # 13 Exhibit 134, # 14 Exhibit 135, # 15 Exhibit 136, # 16 Exhibit 137, # 17 Exhibit 138, # 18 Exhibit 139, # 19 Exhibit 140)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 275 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 141 - 160 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 142, # 2 Exhibit 143, # 3 Exhibit 144, # 4 Exhibit 145, # 5 Exhibit 146, # 6 Exhibit 147, # 7 Exhibit 148, # 8 Exhibit 149, # 9 Exhibit 150, # 10 Exhibit 151, # 11 Exhibit 152, # 12 Exhibit 153, # 13 Exhibit 154, # 14 Exhibit 155, # 15 Exhibit 156, # 16 Exhibit 157, # 17 Exhibit 158, # 18 Exhibit 159, # 19 Exhibit 160)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 276 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 161-180 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 162, # 2 Exhibit 163, # 3 Exhibit 164, # 4 Exhibit 165, # 5 Exhibit 166, # 6 Exhibit 167, # 7 Exhibit 168, # 8 Exhibit 169, # 9 Exhibit 170, # 10 Exhibit 171, # 11 Exhibit 172, # 12 Exhibit 173, # 13 Exhibit 174, # 14 Exhibit 175, # 15 Exhibit 176, # 16 Exhibit 177, # 17 Exhibit 178, # 18 Exhibit 179, # 19 Exhibit 180)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 277 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 181 - 200 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 182, # 2 Exhibit 183, # 3 Exhibit 184, # 4 Exhibit 185, # 5 Exhibit 186, # 6 Exhibit 187, # 7 Exhibit 188, # 8 Exhibit 189, # 9 Exhibit 190, # 10 Exhibit 191, # 11 Exhibit 192, # 12 Exhibit 193, # 13 Exhibit 194, # 14 Exhibit 195, # 15 Exhibit 196, # 16 Exhibit 197, # 17 Exhibit 198, # 18 Exhibit 199, # 19 Exhibit 200)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 278 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 201-220 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 202, # 2 Exhibit 203, # 3 Exhibit 204, # 4 Exhibit 205, # 5 Exhibit 206, # 6 Exhibit 207, # 7 Exhibit 208, # 8 Exhibit 209, # 9 Exhibit 210, # 10 Exhibit 211, # 11 Exhibit 212, # 12 Exhibit 213, # 13 Exhibit 214, # 14 Exhibit 215, # 15 Exhibit 216, # 16 Exhibit 217, # 17 Exhibit 218, # 18 Exhibit 219, # 19 Exhibit 220)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 279 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 221 - 240 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 222, # 2 223, # 3 224, # 4 225, # 5 226, # 6 227, # 7 228, # 8 229, # 9 230, # 10 231, # 11 232, # 12 233, # 13 234, # 14 235, # 15 236, # 16 237, # 17 238, # 18 239, # 19 240)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 280 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 241-260 of the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 242, # 2 Exhibit 243, # 3 |

| | | |
|---|---|---|
| | | Exhibit 244, # 4 Exhibit 245, # 5 Exhibit 246, # 6 Exhibit 247, # 7 Exhibit 248, # 8 Exhibit 249, # 9 Exhibit 250, # 10 Exhibit 251, # 11 Exhibit 252, # 12 Exhibit 253, # 13 Exhibit 254, # 14 Exhibit 255, # 15 Exhibit 256, # 16 Exhibit 257, # 17 Exhibit 258, # 18 Exhibit 259, # 19 Exhibit 260)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 281 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibit 261 - 280 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 262, # 2 Exhibit 263, # 3 Exhibit 264, # 4 Exhibit 265, # 5 Exhibit 266, # 6 Exhibit 267, # 7 Exhibit 268, # 8 Exhibit 269, # 9 Exhibit 270, # 10 Exhibit 271, # 11 Exhibit 272, # 12 Exhibit 273, # 13 Exhibit 274, # 14 Exhibit 275, # 15 Exhibit 276, # 16 Exhibit 277, # 17 Exhibit 278, # 18 Exhibit 279, # 19 Exhibit 280)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 282 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 281-300 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 282, # 2 Exhibit 283, # 3 Exhibit 284, # 4 Exhibit 285, # 5 Exhibit 286, # 6 Exhibit 287, # 7 Exhibit 288, # 8 Exhibit 289, # 9 Exhibit 290, # 10 Exhibit 291, # 11 Exhibit 292, # 12 Exhibit 293, # 13 Exhibit 294, # 14 Exhibit 295, # 15 Exhibit 296, # 16 Exhibit 297, # 17 Exhibit 298, # 18 Exhibit 299, # 19 Exhibit 300)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 283 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 301 - 320 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 302, # 2 Exhibit 303, # 3 Exhibit 304, # 4 Exhibit 305, # 5 Exhibit 306, # 6 Exhibit 307, # 7 Exhibit 308, # 8 Exhibit 309, # 9 Exhibit 310, # 10 Exhibit 311, # 11 Exhibit 312, # 12 Exhibit 313, # 13 Exhibit 314, # 14 Exhibit 315, # 15 Exhibit 316, # 16 Exhibit 317, # 17 Exhibit 318, # 18 Exhibit 319, # 19 Exhibit 320)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 284 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 321-329 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 322, # 2 Exhibit 323, # 3 Exhibit 324, # 4 Exhibit 325, # 5 Exhibit 326, # 6 Exhibit 327, # 7 Exhibit 328, # 8 Exhibit 329)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 285 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibits 330-340 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 331, # 2 Exhibit 332, # 3 Exhibit 333, # 4 Exhibit 334, # 5 Exhibit 335, # 6 Exhibit 336, # 7 Exhibit 337, # 8 Exhibit 338, # 9 Exhibit 339, # 10 Exhibit 340) (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 286 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 268 Declaration,,, *Exhibit 341 - 350 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 342, # 2 Exhibit 343, # 3 Exhibit 344, # 4 Exhibit 345, # 5 Exhibit 346, # 6 Exhibit 347, # 7 Exhibit 348, # 8 Exhibit 349, # 9 Exhibit 350)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 287 | DECLARATION re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Declaration of Edward D. Krugman in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Exhibit T, # 21 Exhibit U, # 22 Exhibit V, # 23 Exhibit W)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 288 | DECLARATION signed by Bianca Bassett re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 289 | DECLARATION signed by Bruce Myree re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 290 | DECLARATION signed by Charles Palmer re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 291 | DECLARATION signed by Dorethea Franklin re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |

| | | |
|---|---|---|
| 05/30/2025 | 292 | DECLARATION signed by Quentin Suttles re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 293 | DECLARATION signed by Ebony Yeldon re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 294 | DECLARATION signed by De'Jon Hall re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 295 | DECLARATION signed by Scott Griffin re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 296 | DECLARATION signed by IAD Witness re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 297 | DECLARATION signed by Shaketa Redden re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 298 | DECLARATION signed by Jasmine Evans re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 299 | DECLARATION signed by Joseph Bonds re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 300 | DECLARATION signed by Edward Krugman re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 301 | DECLARATION signed by Shirley Sarmiento re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 302 | DECLARATION signed by Delwanda Garland re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 303 | DECLARATION signed by Stanley Clyburn re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 304 | DECLARATION signed by Talisha Davis re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 305 | DECLARATION signed by Tanika Lucas re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |

| 05/30/2025 | 🌐306 | DECLARATION signed by Taniqua Simmons re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Timmick, Andrew) (Entered: 05/30/2025) |
|---|---|---|
| 05/30/2025 | 🌐307 | DECLARATION signed by Michael Taylor re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe, Shaketa Redden *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe, Shaketa Redden. (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐308 | DECLARATION signed by Andrew J. Timmick re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Second Declaration in Opposition to Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 351, # 2 Exhibit 352, # 3 Exhibit 353, # 4 Exhibit 354, # 5 Exhibit 355, # 6 Exhibit 356, # 7 Exhibit 357, # 8 Exhibit 358, # 9 Exhibit 359, # 10 Exhibit 360, # 11 Exhibit 361, # 12 Exhibit 362, # 13 Exhibit 363, # 14 Exhibit 364, # 15 Exhibit 365, # 16 Exhibit 366, # 17 Exhibit 367, # 18 Exhibit 368, # 19 Exhibit 369, # 20 Exhibit 370)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐309 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *in Opposition to Defendants' Motion for Summary Judgment* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 372, # 2 Exhibit 373, # 3 Exhibit 374, # 4 Exhibit 375, # 5 Exhibit 376, # 6 Exhibit 377, # 7 Exhibit 378, # 8 Exhibit 379, # 9 Exhibit 380, # 10 Exhibit 381, # 11 Exhibit 382, # 12 Exhibit 383, # 13 Exhibit 384, # 14 Exhibit 385, # 15 Exhibit 386, # 16 Exhibit 387, # 17 Exhibit 388, # 18 Exhibit 389, # 19 Exhibit 390)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐310 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 391-407 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 392, # 2 Exhibit 393, # 3 Exhibit 394, # 4 Exhibit 395, # 5 Exhibit 396, # 6 Exhibit 397, # 7 Exhibit 398, # 8 Exhibit 399, # 9 Exhibit 400, # 10 Exhibit 401, # 11 Exhibit 402, # 12 Exhibit 403, # 13 Exhibit 404, # 14 Exhibit 405, # 15 Exhibit 406, # 16 Exhibit 407)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐311 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 408-410 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 409, # 2 Exhibit 410)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐312 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 411 - 430 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 412, # 2 Exhibit 413, # 3 Exhibit 414, # 4 Exhibit 415, # 5 Exhibit 416, # 6 Exhibit 417, # 7 Exhibit 418, # 8 Exhibit 419, # 9 Exhibit 420, # 10 Exhibit 421, # 11 Exhibit 422, # 12 Exhibit 423, # 13 Exhibit 424, # 14 Exhibit 425, # 15 Exhibit 426, # 16 Exhibit 427, # 17 Exhibit 428, # 18 Exhibit 429, # 19 Exhibit 430)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐313 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 431-450 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 432, # 2 Exhibit 433, # 3 Exhibit 434, # 4 Exhibit 435, # 5 Exhibit 436, # 6 Exhibit 437, # 7 Exhibit 438, # 8 Exhibit 439, # 9 Exhibit 440, # 10 Exhibit 441, # 11 Exhibit 442, # 12 Exhibit 443, # 13 Exhibit 444, # 14 Exhibit 445, # 15 Exhibit 446, # 16 Exhibit 447, # 17 Exhibit 448, # 18 Exhibit 449, # 19 Exhibit 450)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐314 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 451 - 470 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 452, # 2 Exhibit 453, # 3 Exhibit 454, # 4 Exhibit 455, # 5 Exhibit 456, # 6 Exhibit 457, # 7 Exhibit 458, # 8 Exhibit 459, # 9 Exhibit 460, # 10 Exhibit 461, # 11 Exhibit 462, # 12 Exhibit 463, # 13 Exhibit 464, # 14 Exhibit 465, # 15 Exhibit 466, # 16 Exhibit 467, # 17 Exhibit 468, # 18 Exhibit 469, # 19 Exhibit 470)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐315 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 471-490 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 472, # 2 Exhibit 473, # 3 Exhibit 474, # 4 Exhibit 475, # 5 Exhibit 476, # 6 Exhibit 477, # 7 Exhibit 478, # 8 Exhibit 479, # 9 Exhibit 480, # 10 Exhibit 481, # 11 Exhibit 482, # 12 Exhibit 483, # 13 Exhibit 484, # 14 Exhibit 485, # 15 Exhibit 486, # 16 Exhibit 487, # 17 Exhibit 488, # 18 Exhibit 489, # 19 Exhibit 490)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 🌐316 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 491 - 510 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 492, # 2 Exhibit 493, # 3 Exhibit 494, # 4 Exhibit 495, # 5 Exhibit 496, # 6 Exhibit 497, # 7 Exhibit 498, # 8 Exhibit 499, # 9 Exhibit 500, # 10 Exhibit 501, # 11 |

| | | |
|---|---|---|
| | | Exhibit 502, # 12 Exhibit 503, # 13 Exhibit 504, # 14 Exhibit 505, # 15 Exhibit 506, # 16 Exhibit 507, # 17 Exhibit 508, # 18 Exhibit 509, # 19 Exhibit 510)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 317 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 511-530 to the Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 512, # 2 Exhibit 513, # 3 Exhibit 514, # 4 Exhibit 515, # 5 Exhibit 516, # 6 Exhibit 517, # 7 Exhibit 518, # 8 Exhibit 519, # 9 Exhibit 520, # 10 Exhibit 521, # 11 Exhibit 522, # 12 Exhibit 523, # 13 Exhibit 524, # 14 Exhibit 525, # 15 Exhibit 526, # 16 Exhibit 527, # 17 Exhibit 528, # 18 Exhibit 529, # 19 Exhibit 530)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 318 | CONTINUATION OF EXHIBITS by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. to 308 Declaration,,, *Exhibits 531 - 539 to Timmick Declaration* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Exhibit 532, # 2 Exhibit 533, # 3 Exhibit 534, # 4 Exhibit 535, # 5 Exhibit 536, # 6 Exhibit 537, # 7 Exhibit 538, # 8 Exhibit 539)(Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | | NOTICE of MANUAL FILING by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe re 268 Declaration,,, 308 Declaration,,, 287 Declaration,,, (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 319 | STATEMENT OF FACTS *Counterstatement in Response to Defendants' Statement of Undisputed Facts pursuant to Local Rule 56(a)(2) and Additional Material Facts* by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe Related document: 252 Motion for Summary Judgment,,,,. (Attachments: # 1 Appendix of Documents)(Wilner, Claudia) (Entered: 05/30/2025) |
| 05/30/2025 | 320 | NOTICE by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe re 268 Declaration,,, 308 Declaration,,, 287 Declaration,,, *Notice of Manual Filing of Certain Exhibits Filed in Opposition to Defendants' Motion for Summary Judgment* (Timmick, Andrew) (Entered: 05/30/2025) |
| 05/30/2025 | 321 | MEMORANDUM in Opposition re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Wilner, Claudia) (Entered: 05/30/2025) |
| 05/30/2025 | 322 | DECLARATION re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe *Declaration of Amandi Perera* filed by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Appendix A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Wilner, Claudia) (Entered: 05/30/2025) |
| 06/17/2025 | 323 | Consent MOTION for Extension of Time to File Response/Reply *[to Extend Summary Judgment Deadlines]* by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood.(Sahasrabudhe, Peter) (Entered: 06/17/2025) |
| 06/20/2025 | 324 | TEXT ORDER granting 323 Motion for Extension of Time to File Response/Reply, replies due by 8/1/2025. Signed by Chief District Judge Christina Clair Reiss on 6/20/2025. (LB) (Entered: 06/20/2025) |
| 06/23/2025 | 325 | NOTICE of Withdrawal of Attorney: Edward P. Krugman no longer appearing for Plaintiffs Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. **CLERK TO FOLLOW UP.** (Wilner, Claudia) (Entered: 06/23/2025) |
| 06/30/2025 | | NOTICE OF HEARING: Oral Argument on the parties' motions 252 and 253 set for 10/17/2025 10:00 AM in US Courthouse, 2 Niagara Square, Buffalo, NY 14202-3350 before Chief District Judge Christina Clair Reiss. (EKM) (Entered: 06/30/2025) |
| 07/11/2025 | 326 | MOTION to Intervene by Markel Nance, Thomas Christopher Williams Jr., Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Andrew Timmick, # 3 Exhibit 1 - Complaint in Intervention, # 4 Exhibit 2 - Appendix C, Gennaco Report, # 5 Declaration of Thomas Christopher Williams Jr., # 6 Declaration of Markel Nance)(Timmick, Andrew) (Entered: 07/11/2025) |
| 07/11/2025 | 327 | MOTION for Reconsideration *of (1) the Denial of the Motion to Certify the Traffic Enforcement Class Pursuant to Rule 54(b) or, in the Alternative, (2) to Renew the Motion to Certify Pursuant to Rule 23(c)(1)(C)* by Markel Nance, Thomas Christopher Williams Jr., Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe. (Attachments: # 1 Memorandum in Support, # 2 Declaration of Andrew Timmick, # 3 Exhibit 1 - Complaint in Intervention, # 4 Exhibit 2 - Appendix C, Gennaco Report, # 5 Declaration of Thomas Christopher Williams Jr., # 6 Declaration of Markel Nance)(Timmick, Andrew) (Entered: 07/11/2025) |
| 07/17/2025 | 328 | NOTICE of Hearing on Motion 252 MOTION for Summary Judgment , 253 MOTION for Partial Summary Judgment *against the City of Buffalo* : Oral Argument set for 10/17/2025 10:00 AM via video conference before Chief District Judge Christina Clair Reiss. (EKM) (Entered: 07/17/2025) |
| 07/21/2025 | 329 | Consent MOTION for Extension of Time to File Response/Reply by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood.(Sahasrabudhe, Peter) (Entered: 07/21/2025) |
| 07/21/2025 | 330 | TEXT ORDER granting 329 Motion for Extension of Time to File Response/Reply Replies due by 8/1/2025.Signed by Chief District Judge Christina Clair Reiss on 7/21/2025. (TMK) (Entered: 07/21/2025) |

| | | |
|---|---|---|
| 08/01/2025 | 331 | DECLARATION re 252 MOTION for Summary Judgment filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda filed by Aaron Young, City of Buffalo, N.Y., Philip Serafini, Unknown Officers 1-20, Byron C Lockwood, Kevin Brinkworth, Robbin Thomas, Unknown Supervisory Personnel 1-10, Byron B Brown, Daniel Derenda. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Defendants' Reply to Plaintiff's Response to Counterstatement of Facts, # 13 Memorandum in Support [Reply MOL in Further Support Motion for Summary Judgment])(Sahasrabudhe, Peter) (Entered: 08/01/2025) |
| 08/01/2025 | 332 | REPLY/RESPONSE to re 253 MOTION for Partial Summary Judgment *against the City of Buffalo Reply Brief in Support* filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Markel Nance, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Thomas Christopher Williams Jr., Ebony Yeldon. (Joachim, Jordan) (Entered: 08/01/2025) |
| 08/05/2025 | 333 | NOTICE of Withdrawal of Attorney: Anjana Malhotra no longer appearing for Plaintiffs Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.<br><br>**CLERK TO FOLLOW UP.**<br><br>(Wilner, Claudia) (Entered: 08/05/2025) |
| 08/21/2025 | 334 | Consent MOTION to Unseal Document 321 Memorandum in Opposition to Motion, filed by Taniqua Simmons, Dorethea Franklin, Charles Palmer, Ebony Yeldon, Joseph Bonds, Shaketa Redden, Jane Doe, Shirley Sarmiento, De'Jon Hall, Black Love Resists in the Rust, 319 Statement of Facts, filed by Taniqua Simmons, Dorethea Franklin, Charles Palmer, Ebony Yeldon, Joseph Bonds, Shaketa Redden, Jane Doe, Shirley Sarmiento, De'Jon Hall, Black Love Resists in the Rust by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Wilner, Claudia) (Entered: 08/21/2025) |
| 08/25/2025 | 335 | TEXT ORDER granting 334 Motion to Unseal Document. Signed by Chief District Judge Christina Clair Reiss on 8/25/2025. (DDS) (Entered: 08/25/2025) |
| 09/17/2025 | 336 | NOTICE OF APPEAL by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. Filing fee $ 605, receipt number ANYWDC-5579200. Appeal Record due by 9/29/2025. (Russ, Hugh) (Entered: 09/17/2025) |
| 09/18/2025 | | Remark: Pursuant to Local Rule 12.1 of the US Court of Appeals for the Second Circuit, Forms C and D must be completed within 14 days after the filing of a notice of appeal. Forms C and D can be obtained at www.ca2.uscourts.gov. (DDS) (Entered: 09/18/2025) |
| 09/26/2025 | 337 | DESIGNATION of Record on Appeal by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young re 336 Notice of Appeal, CLERK TO FOLLOW UP (Freely, Cheyenne) (Entered: 09/26/2025) |
| 09/26/2025 | 338 | MEMORANDUM IN OPPOSITION re 327 MOTION for Reconsideration *of (1) the Denial of the Motion to Certify the Traffic Enforcement Class Pursuant to Rule 54(b) or, in the Alternative, (2) to Renew the Motion to Certify Pursuant to Rule 23(c)(1)(C)*, 326 MOTION to Intervene by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Russ, Hugh) (Entered: 09/26/2025) |
| 09/26/2025 | 339 | CLERKS CERTIFICATE filed and electronically sent to Court of Appeals. (DDS) Modified to replace main document with correct file on 9/26/2025 (Entered: 09/26/2025) |
| 09/26/2025 | | E-Filing Notification: 339 CLERKS CERTIFICATE filed and electronically sent to Court of Appeals. (DDS) Modified to replace main document with correct file on 9/26/2025 (DDS) (Entered: 09/26/2025) |
| 09/26/2025 | 340 | Consent MOTION to Unseal Document 296 Declaration, filed by Taniqua Simmons, Dorethea Franklin, Charles Palmer, Ebony Yeldon, Joseph Bonds, Shaketa Redden, Jane Doe, Shirley Sarmiento, De'Jon Hall, Black Love Resists in the Rust by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 09/26/2025) |
| 09/29/2025 | 341 | MANDATE of USCA regarding 265 Notice of Petition for Leave to Appeal to the Second Circuit. (JLH) (Entered: 09/29/2025) |
| 09/29/2025 | 342 | TEXT ORDER granting 340 Motion to Unseal Document re 296 Declaration. Signed by Chief District Judge Christina Clair Reiss on 9/29/2025. (DDS) (Entered: 09/30/2025) |
| 10/03/2025 | 343 | Consent MOTION for Leave to File Excess Pages by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Markel Nance, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Thomas Christopher Williams Jr., Ebony Yeldon.(Ezie, Andrea) (Entered: 10/03/2025) |
| 10/03/2025 | 344 | MEMORANDUM in Opposition re 252 MOTION for Summary Judgment filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Wilner, Claudia) (Entered: 10/03/2025) |
| 10/03/2025 | 345 | STATEMENT OF FACTS *Counterstatement in Response to Defendants' Statement of Undisputed Facts pursuant to Local Rule 56(a)(2) and Additional Material Facts* by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon Related document: 319 Statement of Facts,. (Wilner, Claudia) (Entered: 10/03/2025) |
| 10/03/2025 | 346 | DECLARATION re 296 Declaration, filed by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon *Redacted Declaration of IAD Witness*. (Wilner, Claudia) (Entered: 10/03/2025) |
| 10/03/2025 | 347 | Consent MOTION Drop Parties by Black Love Resists in the Rust, Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.(Wilner, Claudia) (Entered: 10/03/2025) |

| 10/03/2025 | 348 | TEXT ORDER granting 343 Motion for Leave to File Excess Pages. Signed by Chief District Judge Christina Clair Reiss on 10/3/2025. (DDS) (Entered: 10/03/2025) |
|---|---|---|
| 10/03/2025 | 349 | TEXT ORDER granting 347 Motion to drop parties. Signed by District Judge Christina Clair Reiss on 10/3/2025. (DDS) (Entered: 10/03/2025) |
| 10/10/2025 | 350 | NOTICE of Change of Address by Andrew J. Timmick (Timmick, Andrew) (Entered: 10/10/2025) |
| 10/10/2025 | 351 | REPLY to Response to Motion re 327 MOTION for Reconsideration *of (1) the Denial of the Motion to Certify the Traffic Enforcement Class Pursuant to Rule 54(b) or, in the Alternative, (2) to Renew the Motion to Certify Pursuant to Rule 23(c)(1)(C)*, 326 MOTION to Intervene filed by Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Markel Nance, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Thomas Christopher Williams Jr., Ebony Yeldon. (Timmick, Andrew) (Entered: 10/10/2025) |
| 10/13/2025 | 352 | NOTICE of Change of Address by Jordan Scott Joachim (Joachim, Jordan) (Entered: 10/13/2025) |
| 10/13/2025 | 353 | NOTICE of Change of Address by Philip A. Irwin (Irwin, Philip) (Entered: 10/13/2025) |
| 10/15/2025 | 354 | NOTICE of Change of Address by Christine Adrienne Nelson (Nelson, Christine) (Entered: 10/15/2025) |
| 10/17/2025 | 355 | Minute Entry for proceedings held before Hon. Christina Reiss: Motion Hearing held on 10/17/2025 re 252 MOTION for Summary Judgment by Daniel Derenda, Aaron Young, Kevin Brinkworth, Philip Serafini, Robbin Thomas, Unknown Supervisory Personnel 1-10, Unknown Officers 1-20, City of Buffalo, N.Y., Byron B Brown, Byron C Lockwood and 253 MOTION for Partial Summary Judgment against the City of Buffalo by Black Love Resists in the Rust, Shirley Sarmiento, Ebony Yeldon, Charles Palmer, Shaketa Redden, Joseph Bonds, Dorethea Franklin, Taniqua Simmons, De'Jon Hall, Jane Doe.<br><br>The court makes inquires.<br><br>Statements by counsel.<br><br>Court to take motions under advisement.<br><br>APPEARANCES: Andrea Chinyere Ezie, Esq., Christina Nelson, Esq., Andrew Timmick, Esq., Jordan Joachim, Esq., Claudia Wilner, Esq., Philip Irwin (Plaintiffs). Peter Sahasrabudhe, Esq., Cheyenne Freely, Esq., Hugh Russ, Esq. (Defendants). All Appearances by Zoom for Government.<br><br>(Court Reporter Kimberly Weber - Forbes Court Reporting.) (EKM) (Entered: 10/20/2025) |
| 03/16/2026 | 356 | NOTICE of Withdrawal of Attorney: Andrew Timmick no longer appearing for Plaintiffs Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon.<br><br>**CLERK TO FOLLOW UP.**<br><br>(Joachim, Jordan) (Entered: 03/16/2026) |
| 03/27/2026 | 357 | OPINION AND ORDER denying 326 Plaintiff's Motion to Intervene Markel Nance and Thomas Christopher Williams Jr. as Plaintiffs and Representatives of the Traffic Enforcement Class ; denying Plaintiff's 327 Motion to Reconsider or Renew the Motion to Certify the Traffic Enforcement Class. Signed by Chief District Judge Christina Clair Reiss on 3/27/2026. (JLH) (Entered: 03/31/2026) |
| 04/21/2026 | 358 | MOTION to Withdraw as Attorney by Kevin Brinkworth, Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood, Philip Serafini, Robbin Thomas, Unknown Officers 1-20, Unknown Supervisory Personnel 1-10, Aaron Young. (Attachments: # 1 Declaration of Peter A. Sahasrabudhe)(Sahasrabudhe, Peter) (Entered: 04/21/2026) |
| 04/21/2026 | 359 | TEXT ORDER granting 358 Motion to Withdraw as Attorney. Attorney Peter A. Sahasrabudhe terminated. Signed by Chief District Judge Christina Clair Reiss on 4/21/2026. (DDS) (Entered: 04/21/2026) |
| 04/27/2026 | 360 | NOTICE OF APPEAL as to 357 Order on Motion for Miscellaneous Relief,, Order on Motion for Reconsideration, by Markel Nance, Thomas Christopher Williams Jr.. Filing fee $ 605, receipt number ANYWDC-5806555. Appeal Record due by 5/11/2026. (Wilner, Claudia) (Entered: 04/27/2026) |
| 04/28/2026 |  | Pursuant to Local Rule 12.1 of the US Court of Appeals for the Second Circuit, Forms C and D must be completed within 14 days after the filing of a notice of appeal. Forms C and D can be obtained at www.ca2.uscourts.gov. (CGJ) (Entered: 04/28/2026) |
| 04/28/2026 |  | Within 14 days of filing the Notice of Appeal, the appellant is required to electronically file with the District Court an index of filed documents it wishes the Court of Appeals to consider, called Designation of Record on Appeal. After receipt, the Clerks Office will certify and transmit the index to the Circuit. (CGJ) (Entered: 04/28/2026) |
| 05/05/2026 | 361 | NOTICE of Appearance by Ava J. Horgan on behalf of Byron B Brown, City of Buffalo, N.Y., Daniel Derenda, Byron C Lockwood (Horgan, Ava) (Entered: 05/05/2026) |
| 05/09/2026 | 362 | DESIGNATION of Record on Appeal by Markel Nance, Thomas Christopher Williams Jr. re 360 Notice of Appeal, CLERK TO FOLLOW UP (Wilner, Claudia) (Entered: 05/09/2026) |
| 05/11/2026 | 363 | CLERKS CERTIFICATE filed and electronically sent to Court of Appeals re 362 DESIGNATION of Record on Appeal (CGJ) (Entered: 05/11/2026) |
| 05/29/2026 | 364 | OPINION AND ORDER granting in part and denying in part 252 Defendants' Motion for Summary Judgment and denying 253 Plaintiffs' Motion for Partial Summary Judgment. Signed by Chief District Judge Christina Clair Reiss on 5/29/2026. (LB) (Entered: 05/29/2026) |
| 06/29/2026 | 365 | MOTION for Entry of Judgment under Rule 54(b) by Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. (Attachments: # 1 Memorandum in Support)(Ezie, Andrea) (Entered: 06/29/2026) |

| 06/29/2026 | 366 | NOTICE OF APPEAL as to 364 Order on Motion for Summary Judgment,, Order on Motion for Partial Summary Judgment, by Joseph Bonds, Jane Doe, Dorethea Franklin, De'Jon Hall, Charles Palmer, Shaketa Redden, Shirley Sarmiento, Taniqua Simmons, Ebony Yeldon. Filing fee $ 605, receipt number ANYWDC-5882877. Appeal Record due by 7/13/2026. (Ezie, Andrea) (Entered: 06/29/2026) |
|---|---|---|
| 06/30/2026 | | Within 14 days of filing the Notice of Appeal, the appellant is required to electronically file with the District Court an index of filed documents it wishes the Court of Appeals to consider, called Designation of Record on Appeal. After receipt, the Clerks Office will certify and transmit the index to the Circuit.<br><br>Pursuant to Local Rule 12.1 of the US Court of Appeals for the Second Circuit, Forms C and D must be completed within 14 days after the filing of a notice of appeal. Forms C and D can be obtained at www.ca2.uscourts.gov. (CGJ) (Entered: 06/30/2026) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 06/30/2026 14:25:02 | | | |
| PACER Login: | moglidabear | Client Code: | BLRR |
| Description: | Docket Report | Search Criteria: | 1:18-cv-00719-CCR |
| Billable Pages: | 30 | Cost: | 3.00 |